**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| DUAINE GALBRAITH, Derivatively On Behalf of Nominal Defendant FORCE PROTECTION, INC., ) ) ) | Civil Action No.: 2:08-1907-CWH |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| FRANK KAVANAUGH, GORDON R. McGILTON, MICHAEL MOODY, MICHAEL S. DURSKI, RAYMOND W. POLLARD, JACK DAVIS, ROGER G. THOMPSON, JR., JOHN S. DAY, JOHN W. PAXTON SR., GALE AGUILAR, and R. SCOTT ERVIN, ) ) ) ) ) ) | **COMPLAINT** |
| ) | |
| Defendants, ) | |
| ) | |
| -and- ) | |
| ) | **JURY TRIAL DEMANDED** |
| FORCE PROTECTION, INC., ) | |
| ) | |
| Nominal Defendant. ) | |

**VERIFIED DERIVATIVE COMPLAINT**

Plaintiff, Duaine Galbraith ("Plaintiffs"), by his attorneys, submits this Verified Derivative Complaint (the "Complaint") against the Defendants named herein. The allegations of the Complaint are based on the personal knowledge of Plaintiff as to himself and on information and belief including the investigation of Plaintiff's counsel, which included a review of filings with the United States Securities and Exchange Commission ("SEC"), as well as press releases and other public statements issued by Force Protection, Inc., ("Force Protection" or the "Company"), and securities analysts' reports, and other media reports about the Company.

## **NATURE OF THE ACTION**

1.      This is a shareholders' derivative action brought for the benefit of Nominal Defendant Force Protection against certain current and former members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy Defendants' breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment and other violations of the law, which have caused substantial losses to Force Protection and other damages, such as to its reputation and goodwill.  On behalf of Force Protection, this action seeks, among other things, damages, corporate governance reforms, and restitution.

2.      Force Protection designs, develops and manufactures survivability equipment, predominantly ballistic- and blast-protected wheeled vehicles currently deployed by the U.S. military and its allies to support armed forces and security personnel in conflict zones.  The Company's specialty vehicles are designed specifically for reconnaissance, forward command and control, and urban operations and to protect their occupants from landmines, hostile fire, and improvised explosive devices ("IEDs," commonly referred to as roadside bombs). The Company is one of the original developers and primary providers of vehicles for the U.S. military's Mine Resistant Ambush Protected, or MRAP, vehicle program.

3.      Force Protection's primary customer is the U.S. Department of Defense, which purchases MRAP vehicles for both the U.S. Army and the U.S. Marines.  The Department of Defense negotiates it contracts through either a "sole source" or "open competition" bid process. A sole source process is one in which the Company is the sole bidder for the contract.   An open competition bid process involves various bidders.

4.      For years, Force Protection monopolized the MRAP market with its Cougar series of vehicles as most of the Company's contracts with the Marines were "sole-source" due to the Marines contracting agent's determination that there were no other viable contenders that could immediately produce the vehicles they needed.

5.      Prior to and during the relevant period, Defendants continually boasted Force Protection's dominance in the MRAP market was due to its superior product design and rapid delivery rates.

6.      However, in a report dated June 27, 2007, the Inspector General of the Department of Defense questioned both of these claims and criticized the awarding of contracts to Force Protection on a sole source basis and without competitive bidding.

7.      The report further criticized Force Protection for repeatedly missing delivery deadlines, despite an expansion project funded by the government.   According to the report, by early 2006, Force Protection had missed 98% of its order deadlines and faced up to $6.7 million in liquidated damages.  However, those damages were not enforced because of threats to the Company's cash flow and overall financial condition.   The Company continued to miss delivery deadlines throughout 2006 and into 2007.

8.      During 2007, as the U.S. Marines began to implement a competitive bidding process for many of its contracts and moved away from sole sourcing a majority of the MRAP awards to Force Protection, the Company began to lose crucial contract awards to its competitors.

9.      Then, on February 29, 2008, the Company announced that it would delay filing of its 2007 Annual Report on Form 10-K and that it would have to restate its financial statements for the three and nine month periods ended September 30, 2007 because those financial

3

statements contained material misrepresentations of net income. Additionally, the Company admitted to a multitude of internal problems, including:

·   Ineffective control over the financial statements closing process;

·   Ineffective controls in accounting for inventory and the associated accounts payable expenses related to the receipt of inventory;

·   Insufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company, and training in the application of generally accepted accounting principles ("GAAP") in the United States; and

·   Ineffective controls over the completeness and accuracy of deferred tax balances.

10.     On March 3, 2008, the Company announced that Chief Financial Officer Michael Durski and Chief Operating Officer Raymond Pollard resigned. Upon the release of the February 29, 2008 and March 3, 2008 news, the Company's shares declined $0.53 per share, or 12.9%, to close on March 3, 2008 at $3.58 per share, on unusually heavy trading volume.

11.     On March 17, 2008, the Company delayed filing its 2007 Annual Report on Form 10-K a second time because of the "scope of work" necessary to identify accounting errors. Upon release of the March 17, 2008 news, the Company's shares declined an additional $0.42 per share, or 23.5%, to close on March 17, 2008 at $1.37 per share on unusually heavy trading volume.

12.     During the relevant time period, shares of the Company's stock traded as high as $30.27 per share and had begun to decline as the Company and the press began to slowly release information about the Company's internal deficiencies. While Force Protection's stock price

4

traded at artificially high levels, certain of the Defendants recognized a windfall from their breaches of fiduciary duties by selling tens of millions of dollars of their personal holdings of Force Protection stock.

13.     The improper conduct and false and misleading statements described above represent a severe breakdown in Force Protections corporate governance and a breach of the fiduciary obligations of good faith, loyalty, and due care by the Company's senior officers and directors, who were required to use their utmost ability to control and manage the corporation in a fair, honest and equitable manner.

14.     Defendants breached their fiduciary duties by knowingly or recklessly permitting Force Protection to conduct its business without sufficient internal controls over its operations and financial reporting.  Defendants further breached their fiduciary duties by causing and/or allowing materially false and misleading statements to be issued regarding the nature of Force Protection's operations, internal controls and financial results, including allowing the Company's financial statements to be issued when they were not prepared in accordance with GAAP.

15.     Defendants should be held accountable for the significant damages and losses suffered by Force protection as a result of their breaches of their fiduciary duties and their failures to act under circumstances in which due attention would have prevented such damage and loss.  Defendants' conduct has impaired Force Protections' ability to compete for government contracts, which represent the core of the Company's business.  In addition, Defendants' conduct caused the value of Force Protection's stock to be artificially inflated during the relevant time period and subsequently suffer a severe decline, ultimately exposing the Company to several securities class actions.

16.     Certain Defendants also breached their fiduciary duties by selling $85.3 million of Force Protection stock during the relevant time period at prices that were artificially inflated as a result of their own improper conduct.   These Defendants should not be permitted to profit from the severe damage they inflicted on the Company.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity exists between the Plaintiff and each Defendant, and the amount in controversy exceeds $75,000.   Force Protection is a Nevada corporation with its principal executive offices located at 9801 Highway 78, Building No. 1, Ladson, South Carolina.   Plaintiff is a resident of Michigan.   Defendants are residents of states other than Michigan.

18.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

19.     Venue in proper in this District pursuant to 28 U.S.C. § 1391(a) because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

20.    Plaintiff Duaine Galbraith, is and at all times relevant to this action, was a shareholder of nominal Defendant Force Protection at the time of the transactions complained of herein.

21.    Nominal Defendant Force Protection is a Nevada corporation with its principal executive offices located at 9801 Highway 78, Building No. 1, Ladson, South Carolina.  The Company designs, develops and manufactures survivability equipment, predominantly ballistic- and blast-protected wheeled vehicles currently deployed by the U.S. military and its allies to support armed forces and security personnel in conflict zones.

22.    Defendant Frank Kavanaugh ("Kavanaugh") was, at relevant times, the Company's Chairman of the Board of Directors until he resigned on June 21, 2007.  At all relevant times, Kavanaugh was responsible for the Company's false financial statements and reaped proceeds of over $62 million by selling over 4.5 million shares of his Force Protection stock.  Defendant Kavanaugh signed the Form 10-K filed for 2006.  Plaintiff is informed and believes that Defendant Kavanaugh is a resident of California.

23.    Defendant Gordon R. McGilton ("McGilton") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and a member of the Company's Board of Directors until he resigned on January 31, 2008.   At all relevant times, McGilton was responsible for the Company's false financial statements and reaped proceeds of over $23 million by selling over 1.2 million shares of his Force Protection stock.  Plaintiff is informed and believes that Defendant McGilton is a resident of North Carolina.

7

24.     Defendant Michael Moody ("Moody") was appointed a Director of the Company on September 18, 2006, has served as the President of the Company since September 19, 2007, was appointed interim CEO and Chairman of the Board of Directors on January 8, 2008, and has served as CEO and Chairman of the Board of Directors since February 29, 2008.   During the relevant period, Defendant Moody served as a member of both the Audit and Compensation Committees of the Board of Directors.   Plaintiff is informed and believes that Defendant Moody is a resident of California.

25.     Defendant Michael S. Durski ("Durski") was, the Company's Chief Financial Officer ("CFO") from January 2007 until he resigned on February 29, 2008.   Plaintiff is informed and believes that Defendant Durski is a resident of South Carolina.

26.     Defendant Raymond W. Pollard ("Pollard") was, at relevant times, the Company's Chief Operating Officer ("COO") until he resigned on March 3, 2008.   Plaintiff is informed and believes that Defendant Pollard is a resident of South Carolina.

27.     Defendant Jack Davis ("Davis") was, at relevant times, a Director of the Company.   During the relevant period, Defendant Davis served as a member of both the Audit and Compensation Committees of the Board of Directors.   Plaintiff is informed and believes that Defendant Davis is a resident of North Carolina.

28.     Defendant Roger G. Thomson, Jr. ("Thompson") has been a Director of the Company since December 26, 2006.   During the relevant period, Defendant Thompson served as a member of both the Audit and Compensation Committees of the Board of Directors. Plaintiff is informed and believes that Defendant Thompson is a resident of South Carolina.

29.    Defendant John S. Day ("Day") has been a Director of the Company since September 18, 2007.   During the relevant period, Defendant Day served as a member of both the Audit and Compensation Committees of the Board of Directors.   Plaintiff is informed and believes that Defendant Day is a resident of Georgia.

30.    Defendant John W. Paxton, Sr. ("Paxton") has been a Director of the Company since February 20, 2008.   Plaintiff is informed and believes that Defendant Paxton is a resident of Ohio.

31.    Defendant Gale Aguilar ("Aguilar") was a Director of the Company from 2003 until September 18, 2006.   Plaintiff is informed and believes that Defendant Aguilar is a resident of California.

32.    Defendant R. Scott Ervin ("Ervin") the Company's Acting Chief Financial Officer until January 19, 2007 and a Director of the Company until October 3, 2006.   Plaintiff is informed and believes that Defendant Ervin is a resident of Texas.

33.    Defendants Kavanaugh, McGilton, Moody, Durski, Pollard, Davis, Thompson Day, Paxton, Aguilar and Ervin are collectively referred to hereinafter as the "Defendants." Defendants Moody, Davis, Day, Paxton and Thompson are collectively referred to hereinafter as the "Director Defendants."

34.    Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Force Protection's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

## DUTIES OF THE DEFENDANTS

35.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, candor, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.    Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.      exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

      b.      exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

      c.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

      d.      disseminate information truthfully and honestly whenever they communicate with shareholders or the market in general;

      e.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP;

      f.      establish and maintain an adequate system for gathering and processing information regarding the corporation's business and operations so that upper management and the Board remain informed regarding actual or potential problems;

      g.      when placed on notice of improper or imprudent conduct by the corporation and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and

      h.      refrain from unduly benefitting themselves and other Company insiders at the expense of the Company.

     39.    Defendants, particularly the Force Protection officers and Defendants Moody, Thompson, Davis and Day, as members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to

ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, Defendants were required to:

> (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that -
>
> > (a)    transactions are executed in accordance with management's general or specific authorization, and
> >
> > (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

40.    In addition, Defendants had a duty to comply with Force Protection's Corporate Code of Conduct and Ethics under which, among other things, each Defendant was "expected to be honest in all business dealings and obligations, and to try to ensure:

> a.    the ethical handling of conflicts of interest between personal and professional relationships;
>
> b.    accurate, timely and understandable disclosure in the reports required to be filed by the company with the SEC and in other public communications made by the company; and
>
> c.    compliance with applicable governmental laws, rules and regulations."

Each Defendant was not only expected to follow the Corporate Code of Conduct and Ethics, but was also expected to report any violation known to them.

## SUBSTANTIVE ALLEGATIONS

### Background

41.    Force Protection is a designer, developer and manufacturer of survivability equipment, predominantly ballistic- and blast-protected wheeled vehicles currently deployed by the U.S. military and its allies to support armed forces and security personnel in conflict zones. The Company's specialty vehicles are designed specifically for reconnaissance, forward command and control, and urban operations and to protect their occupants from landmines, hostile fire, and IEDs. The Company is one of the original developers and primary providers of vehicles for the U.S. military's MRAP vehicle program.

42.    Since the inception of Sarbanes-Oxley, Force Protection maintained that it had an adequate system of internal controls over its financial reporting. However, the Company has been repeatedly criticized for its lack of internal controls. For instance, beginning in May 2004, the Defense Contract Audit Agency ("DCAA") issued periodic reports that were critical of the Company's finances and financial accounting system.

43.    Even after these critical reports, the Company continued to state that its internal control processes were effective.

### Defendants Issue False and Misleading Statements Concerning Force Protection's Internal Controls, Operations, and Financial Results

44.    On August 14, 2006, the Company filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants McGilton, Kavanaugh, Davis, Aguilar and Ervin.    The Company's 10-Q filed on August 14, 2006 also contained Sarbanes-Oxley required certifications, signed by Defendants McGilton and Ervin, who stated:

I, [Gordon McGilton / R. Scott Ervin] certify that:

1. I have reviewed this quarterly report of Force Protection, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (c) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to

14

the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

45.    On August 15, 2006, the Company issued a press release entitled "Force Protection, Inc. Announces Second Quarter Profitability and Record Sales Growth." Therein, the Company, in relevant part, stated:

> **Force Protection, Inc. (OTCBB:FRPT) today announced record sales of $56,074,537 as part of its second quarter results for the three month period ended June 30, 2006.  The company also recorded its highest quarterly gross profit to date of $10,156,786, and a net profit of $1,234,015 for the same period.**

> "Our second quarter results reflect the increasing demand for our life-saving armored vehicles, and that we remain on track in FY06 in meeting that demand," said CEO Gordon McGilton. "The hard work performed by our employees to improve operations and increase production continues to pay benefits."

> Force Protection's net cash flow from operations for the six-month period ended June 30, 2006 was $4.0 million, compared with a loss from operations of $4.8 million during the same period in 2005. The company was also profitable for the first half of 2006, booking a year-to-date net profit of $568,382.

> "While we are extremely pleased to report these positive earnings, we have not lost sight of our long-term plan," said McGilton. ***"Force Protection's overarching objective is to become a high-volume supplier of the best-protected vehicles available in the world."***

15

Force Protection's dramatic growth from a small start-up firm to a mainstream manufacturer with a workforce of more than 550 has been driven by the demand of U.S. combat engineers and explosive ordnance disposal teams for the Buffalo and Cougar mine-protected vehicles, which they credit with saving lives since 2003. A recent contract from the British Ministry of Defense for protected vehicles to support infantry patrols marks an additional expansion of the company to the international defense industry. [Emphasis added.]

46.     On November 14, 2006, the Company issued a press release entitled "Force Protection, Inc. Announces Continued Profitability for Third Quarter." Therein, the Company, in relevant part, stated:

Force Protection, Inc. (OTCBB: FRPT) today announced sales of $42,160,858 as part of its third quarter results for the three-month period ended September 30, 2006. ***The company recorded a quarterly gross profit of $7,918,508, and a net profit of $602,698 for the same period. Force Protection has realized year-to-date net profits of $1,171,080, generating year-to-date earnings of $0.03 per share.***"

This is Force Protection's third consecutive month of operating profitability," said Vice President of Finance Richard Hamilton. "Sales for the quarter bring our 2006 cumulative year-to-date revenue total to $133,037,980, reflecting a dramatic increase from our 2005 full-year results."

Force Protection was recently named South Carolina's Fastest- Growing Company in 2006. The award, based on gross revenues and employment, recognizes the top 25 companies that have contributed to the state's economy. Since their initial deployment to Iraq and Afghanistan in 2003, no fatalities have occurred in a Force Protection vehicle.

"The third quarter was a period of internal growth for the company," said CEO Gordon McGilton. "We added two new vehicle production lines, improved efficiency within the facilities, and continued our workforce expansion program. ***The focus on these activities caused an anticipated short-swing dip in our third quarter revenue compared with our second quarter results, but it***

16

*has positioned us to secure new contracts and handle the increased workload flowing from them."*
[Emphasis added.]

47.    Also on November 14, 2006, Force Protection filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendants McGilton, Kavanaugh, Davis, Moody and Ervin.  The Form 10-Q also contained virtually identical Sarbanes-Oxley certifications by Defendants McGilton and Ervin as Force Protection's Form 10-Q for the second quarter of 2006.

48.    On December 15, 2006, the Company issued a press release entitled "Force Protection, Inc. Announces Review of Financial Statements; Restatement." Therein, the Company, in relevant part, stated:

> *Force Protection, Inc. (the "Company") (OTCBB: FRPT) announced today that management of the Company has completed a review of its prior financial filings. In that review, the Company has discovered items which require restatement. The Company will restate the financial statements for the fiscal years ended December 31, 2003 and 2004.  The Company did not give a timetable as to when the restatements would be completed.*

> *The items identified by the Company relate to the valuation method used to account for certain equity issuances which did not properly include a full analysis of the embedded conversion feature associated with such issuances as required under EITF 98-5, Accounting for Convertible Securities with Beneficial Conversion Features or Contingently adjustable Conversion Ratios, or which were otherwise incorrectly valued.  As a result, a number of shares of the Company's stock issued as compensation to certain executives and other third parties and recorded as general and administrative compensation expense appear to have been valued at less than fair value.*

> The Company believes this issue is limited to a small number of equity issuances made during 2003 and 2004, with a total combined value of not more than $3.75 million.  The Company is

17

undertaking a careful review of its equity transactions and related financial statements in light of all applicable accounting guidelines and currently expects that it will need to restate its financial results for the years 2003 and 2004 to include additional general and administrative compensation expenses for such periods. ***The Company expects that such restatement will result in a corresponding additional cumulative net loss of approximately $3.75 million for these periods. The Company believes that the restatement will not materially impact its 2006 financial results.*** [Emphasis added.]

49.     On December 20, 2006, Force Protection completed a private placement of 13 million shares of its common stock to institutional investors at $11.75 per share, resulting in net proceeds of $146.6 million.

50.     On March 6, 2007, the Company issued a press release entitled "Force Protection, Inc. Announces Review of Financial Statements," which stated, in relevant part:

Force Protection, Inc. (the "Company") announced today that management of the Company has completed a review of its prior financial filings. In that review, the Company has discovered items which require restatement. The Company will restate the financial statements for the fiscal year ended December 31, 2005. The Company did not give a timetable as to when the restatement would be completed.

The Company believes the areas requiring restatement relate to its accounting for preferred stock and warrants issued to investors. The Company has reviewed applicable Financial Accounting Standards Board Statements and Emerging Issue Task Force Statements (EITFs) including EITF 00-19, Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stocks. As a result, the Company believes that the accounting method it applied to the warrants of its Series D Preferred Stock equity issuance did not include a complete analysis of the mandatory redeemable feature as required.

The Company believes that it will need to restate its financial results for the year ended December 31, 2005 to reflect a realized gain on derivative instruments in the range of $2 to $4 million due

18

to changes in the "fair value" of the warrants, however, this adjustment is still an estimate and it may be higher or lower once the Company completes the final accounting and independent audit of its conclusions. The Company believes that the restatement will not materially impact its 2006 financial results. The Company's management and audit committee have discussed the subject matter giving rise to this conclusion with Jaspers + Hall, PC, its independent accounting firm for the fiscal year ended December 31, 2005.

51.    On March 16, 2007, the Company issued a press release entitled "Force Protection Reports Record Results in 2006." Therein, the Company, in relevant part, stated:

> Force Protection, Inc. (Nasdaq: FRPT) -- the leading protective vehicle manufacturer, today announced results for the fourth quarter and year ended December 31, 2006.
>
> For the year ended December 31, 2006, the Company's net sales totaled $196.0 million. Net income was $18.2 million or $0.39 per diluted share.
>
> In the fourth quarter of 2006, the Company's net sales totaled $62.9 million. Net income was $17.0 million or $0.32 per diluted share during the fourth quarter of 2006.
>
> Gordon McGilton, Chief Executive Officer of Force Protection, said, *'2006 has been a milestone year in the history of Force Protection. It is the first year of profitability and a year of tremendous growth. With the completion of a $152.75 million equity offering, the appointment of several independent Board members, and the NASDAQ Stock Market listing, the Company is able to handle the rapid expansion and accommodate the continuing demand of our vehicles. We continue to focus on expediting deliveries through the efficient use of our production facilities and the collaboration of other defense industry leaders with whom we have partnered. Our mission is to produce vehicles that protect and save lives and we are committed to ensuring that those vehicles are available to protect our troops in a timely manner.'* [Emphasis added.]

52.    Also on March 16, 2007, Force Protection filed its Annual Report with the SEC on Form 10-K for fiscal 2006. The Company's 10-K was signed by the Defendants McGilton,

Kavanaugh, Moody, Thompson Durski and Davis and reaffirmed the Company's financial results announced that same day. The Company's 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants McGilton and Durski, substantially similar to the certifications contained in the Company's second quarter 2006 10-Q.

53. On May 15, 2007, the Company issued a press release entitled "Force Protection Reports Record First Quarter 2007 Financial Results." Therein, the Company, in relevant part, stated:

> Force Protection, Inc. (Nasdaq: FRPT), the leading armored vehicle manufacturer, today announced results for the first quarter ended March 31, 2007.
>
> **Net sales for the first quarter ended March 31, 2007 totaled $100.2 million, an increase of 187.6% compared with $34.8 million reported during the same period in the prior year. This growth is primarily due to a significant increase in vehicle production and deliveries in several blast protected vehicle programs, reflecting contract awards received in the latter half of 2006.** These include contracts with the U.S. Marine Corps to supply Cougar Joint Explosive Ordnance Disposal Rapid Response Vehicles (JERRV), Buffalo Mine Protected Clearance Vehicles, and a contract with the British Ministry of Defense for Mastiff Protected Patrol Vehicles or Mastiff PPV.
>
> **Force Protection recorded a gross profit for the first quarter 2007 of $21.8 million, an operating profit of $2.5 million and negative cash flows from operations of $27.2 million. Net income for the first quarter of 2007 was $2.5 million or $0.04 per diluted share, compared with a net loss of $665,633 or $(0.03) per diluted share for the same period last year.**
>
> Gordon McGilton, Chief Executive Officer of Force Protection, said, 'We are very pleased with our results for the first quarter. **The Company is now starting to see the tangible benefits of the contract awards we received in 2006 and already, in the first quarter alone we have achieved net sales that equal nearly half of our total 2006-year net sales performance. We believe our outlook for the rest of 2007 is even brighter, given recent contract**

*awards and the delivery orders we have already received from the U.S. Marine Corps. We intend to continue to expand our operations and remain focused on expediting deliveries through increased efficiencies at our production facilities.'* [Emphasis added.]

54.    Also on May 15, 2007, Force Protection filed its Quarterly Report with the SEC on Form 10-Q for the first quarter of 2007. The Company's 10-Q was signed by Defendants McGilton and Durski.    The Company's 10-Q reaffirmed the Company's financial results announced that same day. The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants McGilton and Durski, substantially similar to the certifications contained in the Company's second quarter 2006 10-Q.

55.    On June 11, 2007, Force Protection filed with the SEC an amended Form 10-K for the fiscal year ended December 31, 2006.   The Company's amended Form 10-K was signed by Defendants McGilton, Kavanaugh, Davis, Durski, Moody and Thompson.   Despite providing restated financial results for 2006, the Form 10-K also contained virtually identical certifications by Defendants McGilton and Durski as contained in Force Protection's Form 10-Q for the second quarter of 2006.

56.    On June 15, 2007, the Company announced that Defendant Kavanaugh would be resigning from the Company effective June 21, 2007.

57.    On June 27, 2007, Force Protection filed with the SEC an amended Form 10-K for the fiscal year ended December 31, 2005.   The Company's amended Form 10-K was signed by Defendants McGilton, Davis, Durski, Moody and Thompson. Despite providing restated financial results for 2005, the Form 10-K also contained virtually identical certifications by

21

Defendants McGilton and Durski as contained in Force Protection's Form 10-Q for the second quarter of 2006.

58.    On June 27, 2007, the Department of Defense's Office of Inspector General issued a report entitled "Procurement Policy for Armored Vehicles." Therein, the report, in relevant part, stated:

> **Who Should Read This Report and Why?**   Army and the Marine Corps acquisition and contracting personnel should read this report because it concerns armored vehicle procurement decisions that affect Global War on Terrorism mission requirements.
>
> **Background.**   Congresswoman Louise M. Slaughter requested that the DoD Office of Inspector General review the DoD procurement history for body armor and armored vehicles and determine whether officials properly followed contracting policies.  Congresswoman Slaughter also requested specific information on why DoD issued contracts to Force Protection, Inc., and Armor Holdings, Inc., for armored vehicles.   This report addresses armored vehicles.   The DoD Office of Inspector General is conducting a separate audit on body armor.
>
> Armored vehicles provide various levels of protection and are built with integrated protection or are outfitted with armor kits.  This report addresses the following armored vehicles: the Buffalo Mine Protected Clearance Vehicle, the Cougar, the Joint Explosive Ordnance Disposal Rapid Response Vehicle, and the High Mobility Multipurpose Wheeled Vehicle.
>
> *Procurement History for Armored Vehicles. DoD awarded 15 contracts, valued at $2.2 billion, to Force Protection, Inc., and Armor Holdings, Inc., for armored vehicles and armor kits. Specifically, DoD awarded 11 sole-source contracts, valued at $416.7 million, to Force Protection, Inc., for armored vehicles and 4 sole-source contracts, valued at $1.8 billion, to Armor Holdings, Inc., for armored vehicles and armor kits.   In addition, DoD placed two orders, valued at $5.6 million, on a General Services Administration Federal supply schedule contract with Armor Holdings, Inc., for armor kits.   DoD contracting and program officials stated that Force Protection,*

*Inc., and Armor Holdings, Inc., were the only sources capable of producing the armored vehicles and meeting the urgent delivery schedules required to support the Global War on Terrorism.*

**Results.    *The Marine Corps Systems Command awarded sole-source contracts to Force Protection, Inc., for the Joint Explosive Ordnance Disposal Rapid Response Vehicle even though Marine Corps Systems Command officials knew other sources were available for competition.  In addition, TACOM Life Cycle Management Command and Marine Corps Systems Command officials did not adequately justify the commercial nature of three commercial contracts with Force Protection, Inc., for the Cougar and the Buffalo Mine Protected Clearance Vehicle.  As a result, the Marine Corps Systems Command continued to award contracts for armored vehicles to Force Protection, Inc., even though Force Protection, Inc., did not perform as a responsible contractor and repeatedly failed to meet contractual delivery schedules for getting vehicles to the theater.   In addition, TACOM Life Cycle Management Command and Marine Corps Systems Command decisions to award commercial contracts to Force Protection, Inc., may have limited the Government's ability to ensure it paid fair and reasonable prices for the contracts.  The Marine Corps Systems Command should continue to calculate and assess any additional liquidated damages for late delivery of vehicles on contract M67854-05-D-5091 and compete future contracts for the Joint Explosive Ordnance Disposal Rapid Response Vehicle. Additionally, TACOM Life Cycle Management Command contracting officials should procure future Buffalo Mine Protected Clearance Vehicles and Marine Corps Systems Command contracting officials should procure future Mine Resistant Ambush Protected vehicles under FAR Part 15 with negotiated prices based on certified cost and pricing data, and include and enforce a liquidated damages clause on future contracts with Force Protection, Inc. (finding A).***

\* \* \*

**Management Comments and Audit Response.**  The Acting Chief of Staff, TACOM Life Cycle Management Command, and the Commandant of the Marine Corps commented on finding A and concurred with the recommendations.  The comments were responsive and no additional comments are required.    A discussion of the management comments is in the Finding section

of the report, and the complete text of the comments is in the Management Comments section. [Emphasis added.]

59.    On July 12, 2007, the *TheStreet.com* issued an article entitled "Force Protection Shakes Off Questions." Therein, the article, in relevant part, stated:

Force Protection FRPT may have run into a bit of a landmine.

For years, the Ladson, S.C., defense contractor monopolized the market for blast-resistant vehicles by boasting superior products and rapid delivery rates. ***But a damaging government report, published late last month by the Office of the Inspector General, raises questions about both claims.***

***For starters, the OIG report suggests that another company offered a suitable vehicle - - with a faster delivery schedule - - even though the military singled out Force Protection as the only viable contender when awarding the company big contracts without seeking competitive bids. Moreover, the report claims that Force Protection repeatedly missed delivery deadlines - - despite an expansion project financed by the government - - and escaped mandated penalties because of threats to the company's cash flow and overall financial condition.***

***The government's financial assistance supposedly came with strings attached. With 98% of its orders missing deadlines by early 2006, the report estimates, Force Protection faced up to $6.6 million in liquidated damages. Force Protection would have struggled to cover those extra costs, since - - even without them - - its auditors raised concerns about the company's ability to survive just a few months later. Losing the military as its only customer might have killed the company altogether.***

***Instead, Force Protection not only dodged expensive fines but also went on to score additional vehicle contracts and emerge as the leader in a field now crowded with larger competitors. Force Protection, through a joint-venture with heavyweight defense contractor General Dynamics GD, currently ranks as the biggest winner under the military's multibillion-dollar Mine-Resistant Ambush-Protected vehicle program.***

Force Protection did not immediately respond to a telephone message left by TheStreet.com Thursday morning. However, the

24

company seemed almost apologetic when discussing the situation with Bloomberg News the previous afternoon.

"We have continually given the government our most aggressive, best delivery schedule," Michael Aldrich, Force Protection's vice president of government relations, told Bloomberg News on Wednesday.  "With increasing numbers and a more complex flow of materials, it is inevitable that our most aggressive schedule will be disrupted from time to time by lack of critical materials."

*However, Aldrich conceded, "because we've been late, we need to provide compensation to the government, and we are negotiating on that."*

*Meanwhile, Force Protection has failed to monopolize MRAP - - as many analysts expected - - after the company missed its early deadlines and the military started welcoming other bidders. Moreover, the company faces mounting competition and calls for sturdier vehicles as it seeks to maintain its leadership position under a greatly expanded MRAP II program.*

Still, until now, the government has complained little about Force Production's delivery delays.  Indeed, in a February article published by the Marine Corps Times, Marine spokesman Bill Johnson-Miles singled out Force Protection as one of two companies that "have shown their reliability to produce vehicles, meaning they meet Marine Corps Systems Command survivability, production number and delivery timeline requirements."

*At the same time, Force Protection itself has been boasting about "record" production rates and the company's ability to meet - - and even exceed - - tight deadlines. But David Phillips, a financial expert known as the "10-Q Detective," has always felt skeptical about Force Protection's claims.*

*"The company was so concerned with living up to the hype that it kept booking contract after contract," says Phillips, who has no position in Force Protection's stock himself.  "But I never felt that management had the skill set - - or that the company had the manufacturing capacity - - to follow through on that volume."*

Force Protection insiders haven't exactly displayed total confidence in the company, either.  Notably, even as Force Protection touted its achievements, insiders were busy dumping loads of company

shares. Thanks to stock sales, in fact, Force Protection's longtime chairman recently retired from his post as a multimillionaire.

Bulls like to argue that Force Protection executives sold their stock under prearranged plans. However, bears counter that those executives are free to cancel future sales -- and might want to if they expected the stock to climb -- any time they wish.

To be fair, ordinary shareholders have gotten rich on Force Protection's meteoric rise as well. But Phillips, for one, worries that investors could pay a steep price for their trust in company management in the end.

*"The stock went from $3 to $30 on the expectation that the company was delivering the goods," he says. "But to be honest - - as the Pentagon pointed out - - the company did not deliver on its promises."*

After dropping sharply in early trading, Force Protection shares bounced back Thursday to rise a dime to $22.79. [Emphasis added.]

60.    On July 12, 2007, Force Protection filed with the SEC a second amended Form 10-K for the fiscal year ended December 31, 2006. The Company's second amended Form 10-K was signed by Defendants McGilton, Davis, Durski, Moody and Thompson. Despite providing restated financial results for 2006, the Form 10-K also contained virtually identical certifications by Defendants McGilton and Durski as contained in Force Protection's Form 10-Q for the second quarter of 2006.

61.    On July 13, 2007, the Company issued a press release entitled "Force Protection, Inc. Offers Comment On Report by Pentagon's Inspector General." Therein, the Company, in relevant part, stated:

Force Protection, Inc. (NASDAQ:FRPT) today offered comment on a June 27 report issued by the Pentagon's Inspector General that criticized the U.S. Marine Corps for awarding sole source armored

vehicle contracts to the company in 2005 despite delays in delivering the vehicles on schedule.

"Like all Americans, we are disappointed with some of the findings in the Inspector General's report," said Force Protection CEO Gordon McGilton.   "From its beginnings, Force Protection's objective has been to provide the finest lifesaving vehicles in the world.   We have consistently operated under urgent operational needs and have sought diligently to meet government requirements under extremely short timeframes.   *However, we believe that recent press coverage on the report has missed some key findings. As stated clearly on page 26, 'the Cougars and the JERRVs proved to have significant and operational value to our warfighters on the field.'   The report also states that 'We reviewed documentation from users and classified data on vehicle performance and learned that the vehicles performed well and saved lives.'*

*"When past delivery delays have occurred it has been representative that even a minor glitch in the supply chain can push things back under such tight parameters," McGilton said. "Enormous progress has been made in fielding this proven, battlefield solution years ahead of traditional defense schedules. Tens of thousands of our servicemen and women are alive and have reunited with their families and friends at home because of the protection provided by our vehicles. Force Protection will continue to work with the Department of Defense to produce and improve upon the best blast and ballistic protection technology in the world."*

Force Protection's vehicles have become the gold standard in troop protection against IEDs, roadside bombs, and land mines.   The vehicles have logged more than three million hours of heavy combat operations and withstood thousands of blast attacks in Iraq and Afghanistan since 2003.

Force Protection is a leading ballistics research and manufacturing enterprise, specializing in the development and production of highly reinforced armored personnel carriers that are designed to save soldiers' lives by shielding them from the deadly effects of roadside bombs, or IEDs, which have become a leading killer of U.S. troops in Iraq.   The trucks' unique, V-shaped hull is designed to deflect the force of IED blasts away from the vehicle, keeping soldiers inside safe and alive, and have become the proven

response to an emerging global threat to U.S. troops. Its leading models include the 23 ton "Buffalo", a uniquely-designed mine clearance vehicle with a reinforced mechanical arm, and the family of "Cougar" vehicles, both of whose mine and ballistic protection capabilities are among the most advanced in the world. [Emphasis added.]

62.    On July 19, 2007, Force Protection filed with the SEC an amended Form 10-Q for the first quarter of 2007. The Company's amended Form 10-Q was signed by Defendants McGilton and Durski. Despite providing restated financial results for the period, the Form 10-Q contained virtually identical certifications by Defendants McGilton and Durski as those contained in the Company's Form 10-Q for second quarter 2006.

63.    As a result of these partial disclosures, shares of the Company's stock steadily declined from as high as over $30 a share on May 30, 2007, to a closing price of $15.41 per share on July 30, 2007.

64.    On August 9, 2007, the Company issued a press release entitled "Force Protection Reports Record Second Quarter and Six Month 2007 Financial Results." Therein, the Company, in relevant part, stated:

Force Protection (NASDAQ: FRPT), today announced results for its second quarter and six months ended June 30, 2007.

***Net sales for the second quarter of 2007 rose 140% to $134.7 million, compared to net sales of $56.1 million for the second quarter of 2006. Net sales for the six month period ended June 30, 2007 were $234.9 million, compared to $90.9 million for the first six months of 2006, a 158% increase. The primary reason for the increase in sales was due to the improving production capability leading to increased deliveries and sales of its Cougar and Buffalo vehicles.***

For the second quarter gross profit was $32.8 million, or 24.3% of net sales, compared to a gross profit of $10.2 million, or 18.1% of

28

net sales for the second quarter of 2006. As a percentage of net sales gross margin increased 6.2% over second quarter 2006. Gross profit for the first six months of 2007 was $55.3 million, or 23.5% of net sales, compared to a gross profit of $16.8 million, or 18.5% of net sales for the first six months of 2006. As a percentage of net sales gross margin increased 5.0% for the first six months of 2007, compared to the same period last year. The gross profit increase for the second quarter and six month period was primarily due to improved material and labor costs and the Company's increased ability to leverage fixed costs as it continues to expand its production capability.

Research and development (R&D) expenses increased 416% to $3.3 million, compared to $641,215 for second quarter 2006. For the first six months of 2007, R&D rose 524% to $8.1 million, compared to $1.3 million for the first six months of 2006 primarily due to continued development of the Cheetah vehicle. The company previously announced the acquisition of an additional facility for the manufacture of current and future products including the Cheetah and expects the production capacity to be approximately 2,000 Cheetah vehicles in 2008 as previously stated.

Expansion efforts continue and are on track to provide increased capacity at our facilities in Ladson, SC, Roxboro, NC and the various facilities within our enterprise which will enable us to meet previously stated production capacity within our operations.

The Company recorded an operating profit of $13.9 million for the quarter, compared to an operating profit of $1.8 million for the second quarter of 2006. Operating profit was $16.5 million for the first half of 2007, compared to an operating profit of $1.8 million for the first half of 2006.

Income after taxes for the second quarter was $9.6 million, compared to income after taxes of $973,024 for the same quarter last year, a 889% increase. For the six month period ended June 30, 2007, the Company reported income after taxes of $12.1 million, compared to income after taxes of $205,575 for the first six months of 2006.

Net income for the quarter rose 2,170% to $9.6 million, or $0.14 per diluted share, compared to net income of $424,047 or $0.01 per diluted share for the same period last year. Net income for the six month period was $12.1 million, or $0.18 per diluted share,

compared to net loss of $(989,267) or $(0.03) per diluted share for the same period last year. The Company incurred a $1.7 million charge for the late registration of the private placement during the second quarter 2007, or $0.025 per diluted share. Excluding this charge, EPS would have been $0.17 per share. As earlier announced, the S-3 filing was declared effective on July 26, 2007.

Gordon McGilton, Chief Executive Officer of Force Protection commented, *"We are most pleased with our results for the second quarter having realized significant increases in net sales, net income and gross profit. At the same time, we produced 229 vehicles in the second quarter compared to 285 vehicles in all of 2006."*

*"We were also pleased to have signed several additional contracts during the quarter in connection with our joint venture with General Dynamics. During the quarter, we announced that we had been awarded contracts totaling $711 million to produce 1,455 vehicles for the U.S Marine Corps' Mine Resistant Ambush Protected (MRAP) vehicle program.*

As previously announced, we received our first Canadian contract for approximately $8.9 million to produce five Buffalo and five Cougar mine-protected vehicles for the Canadian Expeditionary Force Command (CEFCOM). We recently delivered the first of these vehicles to the Canadian forces."

**Subsequent Events**

On July 20, 2007, we entered into an Agreement with Wachovia Bank for a revolving credit facility of $50,000,000. We entered into this agreement to assure continued flow of cash while administrative contractual payment issues are worked out with government payment offices on recently established MRAP programs.

On August 1st, 2007, the Company announced a contract for approximately $5.3 million for continued work under the Iraqi Light Armored Vehicle (ILAV) program for new ILAV vehicles and equipment to include 22 new vehicles and more than 40 articulating interrogating arms.

Mr. McGilton concluded, *"The progress that we have made to date in 2007 positions us for a successful year. As noted, we are continuing to see strong demand for our vehicles. We are also*

> *realizing the benefits of improved materials and labor costs and a reduction in our fixed costs. Most importantly we remain committed to our mission to make vehicles that protect and save lives by making sure that those vehicles are available to our troops in a timely manner."* [Emphasis added.]

65.      On August 9, 2007, Force Protection filed its Quarterly Report with the SEC on Form 10-Q for the second quarter of 2007 and reaffirmed the Company's financial results previously announced the same day.   The Company's Form 10-Q was signed by Defendants McGilton and Durski.   The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants McGilton and Durski, virtually identical to the certifications contained in the Company's second quarter 2006 10-Q.

66.      On October 15, 2007, Force Protection filed amended Annual Reports for fiscal years ended December 31, 2005 and December 31, 2006 with the SEC on Form 10-K.   The Company's amended Forms 10-K were signed by Defendants McGilton and Durski.   The Company's amended Forms 10-K also contained virtually identical certifications by Defendants McGilton and Durski as contained in Force Protection's Form 10-Q for the second quarter of 2006.   Defendants represented that the restatements were due to management's reevaluation of the effectiveness of the Company's internal controls.   Due to the reevaluation, management concluded that Force Protection's internal controls for 2005 and 2006 were deficient and suffered from material weaknesses.   Force Protection's restated 2006 10-K, in relevant part, stated:

> Based on this assessment, our management identified the following material weaknesses in the Company's internal control over financial reporting as of December 31, 2006:
>
> *Our financial and accounting organization was not adequate to support our financial accounting and reporting needs.*

31

*Specifically, we did not maintain a sufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company and training in the application of GAAP commensurate with our financial reporting requirements. The lack of a sufficient complement of personnel with an appropriate level of accounting knowledge, experience with our Company and training contributed to the control deficiencies noted below.*

(1)    We did not maintain effective policies and procedures related to the accounting for specific equity issuances, including accounting for stock-based compensation in accordance with Statement of Financial Accounting Standard ("SFAS") No. 123, Share-Based Payment , and accounting for convertible and redeemable preferred stock and warrants.  This deficiency resulted in errors in the Company's accounting and disclosures for these equity issuances and related earnings per share calculations.

(2)    We did not maintain effective controls to ensure the accuracy of disclosures in our financial statements and classification of certain financial transactions in the financial statements.  Specifically, we failed to classify the allowance for contractual adjustments as a reduction in receivables and had incorrect or inadequate disclosures in financial statement disclosures related to the non-recurring warranty, statement of shareholders' equity, deferred tax assets, liabilities and related income tax expense, contingency losses, discontinued operations, receivables and factoring accounts, debt and the statement of cash flows in our financial statements.

The control deficiency described above in (1) resulted in the restatement of our annual consolidated financial statements for 2005, 2004, and 2003.  The control deficiency described in (2) required amendment of our annual financial statements for the years 2005, 2004 and 2003 which are included in our amended 2005 Form 10-K filing.  The control deficiency related to earnings per share in (1) resulted in restatement of the 2006 earnings per share calculations in the annual financial statements in the amended 2006 Form 10-K. Additionally, these control deficiencies could result in a misstatement in our annual or interim consolidated financial statements that would not be prevented or detected. Management has determined that each of the control deficiencies described above constitutes a material weakness.

> *These deficiencies result in more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected. Management has taken or plans to take steps to improve our internal control over financial reporting* (see below).

> *As a result of the material weaknesses, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2006.*  [Emphasis added.]

67.     On November 13, 2007, Force Protection filed its Quarterly Report with the SEC on Form 10-Q for the third quarter 2007.  The Company's 10-Q was signed by Defendants McGilton and Durski.    The Company's 10-Q also contained Sarbanes-Oxley required certifications signed by Defendants McGilton and Durski, substantially similar to the certifications contained in the Company's second quarter 2006 10-Q. The Company admitted to continuing internal control problems and that those internal controls were deficient for the third quarter of 2007.   The Company, in relevant part, stated:

> Our management evaluated, with the participation of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures as of the end of the period covered by this quarterly report on Form 10-Q. Based on this evaluation, and in light of the material weaknesses in our internal control over financial reporting that are discussed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006, as amended, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures, including internal control over financial reporting, were not effective to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934, as amended (i) is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (ii) is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.  Our disclosure controls and procedures are intended to

be designed to provide reasonable assurance that such information is accumulated and communicated to our management. ***Our management concluded so, in part, because (1) we did not maintain effective policies and procedures related to the accounting for specific equity issuances, including accounting for stock-based compensation in accordance with statement of Financial Accounting Standard ("SFAS") No. 123, Share-Based Payment , and accounting for convertible and redeemable preferred stock and warrants. This deficiency resulted in errors in the Company's accounting and disclosures for these equity issuances and related earnings per share calculations. (2) We did not maintain effective controls to ensure the accuracy of disclosures in our financial statements and classification of certain financial transactions in the financial statements. Specifically, we failed to classify the allowance for contractual adjustments as a reduction in receivables and had incorrect or inadequate disclosures in financial statement disclosures related to the non-recurring warranty, statement of shareholder's equity, deferred tax assets, liabilities and related income tax expense, deferred tax assets, liabilities and related income tax expense, contingency losses, discontinued operations, receivables and factoring accounts, debt and the statement of cash flows in our financial statements. (3) As discussed below in changes in internal controls, during the third quarter, we have also encountered turnover in financial reporting personnel and implementation issues of our new Enterprise Resource Planning ("ERP") computer system.***

*          *          *

***We believe the following changes in internal control over financial reporting (as defined in Rule 13a-15(f) of the Securities Exchange Act of 1934) occurred during the third quarter of 2007 that materially affected or were, reasonably likely to materially affect our internal control over financial reporting.***

Throughout 2007 and including the third quarter of 2007, we have dedicated a significant amount of time and resources to revise our internal controls to remediate the material weaknesses noted in our Annual Report on Form 10-K/A filed on October 15, 2007 and to enhance existing internal controls because of our significant growth. We have added new in house legal counsel and key management in financial operations. Financial operations role is to focus on implementation of our new ERP system and its

34

communication with all other significant business systems in the Company to ensure accurate financial reporting. We have also engaged a third party with expertise in internal controls to review documents and revise (as necessary) internal controls in an analysis of our key business operating systems.

In the third quarter of 2007, we implemented the inventory component of our ERP system and encountered issues in reconciliation of the physical inventory to the ERP system balances, requiring us to add additional manual controls to the process to correct these issues. This has delayed our implementation to the new ERP system. Also, we have encountered financial reporting personnel turnover in our financial reporting department which has delayed our quarterly reporting.

68.     The Company's third quarter 2007 10-Q also reveals previously undisclosed additional risk factors, including the following:

***We are now a large business and may be precluded from entering into new contracts with the U.S. government unless our financial and accounting systems are improved sufficiently to meet government standards.***

In order to enter into contracts with the U.S. military, a contractor's financial and accounting systems must generally meet the standards established by the Federal Acquisition Regulation ("FAR") and the Cost Accounting Standards ("CAS"). Compliance is usually reviewed by the Defense Contract Audit Agency ("DCAA"), an arm of the Department of Defense. Contractors who do not meet these standards generally are not eligible to win new contracts from the U.S. government.

Because we previously were a small business, we were not required to comply with all of the financial and accounting requirements in order to enter into contracts with the U.S. military. However, as a result of the growth of our business, we are no longer a small business, and we therefore will be required to meet these additional financial and accounting standards. We have

been advised by the DCAA that our financial and accounting systems do not meet these requirements and, although we have been seeking to improve these systems, we have extensive work remaining in order to meet these standards. There can be no assurance as to when we will be able to meet these standards and, until we are able to do so, we may not be eligible for new contract awards by the U.S. military. Accordingly, any failure to meet these standards will likely have a material adverse effect on our business.

***The DCAA has issued audit reports that have been highly critical of our finances and financial accounting system, that have questioned our ability to perform our government contracts, and that have questioned or disallowed significant proposed charges under some of our government contracts.***

U.S. government agencies, generally through the DCAA, routinely audit and investigate government contracts and government contractors' administrative processes and systems. The audits may review the costs we incur on our U.S. government contracts, including allocated indirect costs. The auditor may also review our compliance with applicable laws, government regulations, policies and standards and the adequacy of our internal control systems and policies, including our purchasing, property, estimating, compensation and management information systems. An adverse finding under a DCAA audit could result in the disallowance of our costs under a U.S. government contract, termination of U.S. government contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government. Any costs found to be improperly allocated or otherwise improperly accounted for may not be paid or reimbursed, and any such costs previously paid or reimbursed may have to be refunded. We have recorded contract revenues based upon costs we expect to realize upon the final audit. However, we do not know the outcome of any future audits and adjustments and we may be required to reduce our revenues or profits upon completion and final negotiation of audits. If any audit uncovers improper or illegal activities, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government. In addition, responding to governmental audits may involve significant expense and divert management attention.

36

Moreover, if any of our administrative processes and systems are found not to comply with the applicable requirements, we may be subjected to increased government scrutiny or required to obtain additional governmental approvals that could delay or otherwise adversely affect our ability to compete for or perform contracts. Therefore, an unfavorable outcome to an audit by the DCAA or another government agency, could materially adversely affect our competitive position and result in a substantial reduction of our revenues.

The DCAA has issued a number of audit reports concerning some of our contracts with the U.S. military. These reports have generally been highly critical of our finances and financial accounting systems. The DCAA has issued at least eight audit reports on our operations and contracts from May of 2004 through October of 2007. Some of these audit reports focused on proposals that we submitted or on our accounting systems. With respect to our proposal submissions, DCAA has repeatedly found that we did not submit our proposals in the correct format, that required data were missing, and that our proposal often lacked a proper basis for the costs submitted. In several of these audits, DCAA found that our accounting systems were inadequate, that our books failed to reconcile our general ledger with our cost summaries, that our systems did not track and properly account for direct and indirect costs, and that our systems are unable to segregate pre-production and production costs. In addition, DCAA audit reports in September 2006 and March 2007 considered us to have an unfavorable financial condition.

On January 25, 2006, the U.S. Army Tank-automotive and Armaments Command ("TACOM") audited the company to evaluate the adequacy of our ISO-9001:2000 Quality System. The audit report identified critical areas of non-compliances and weaknesses in our quality system of control and provided various recommendations to address the deficiencies.

The Company is taking steps to improve its financial systems and to address the issues raised by the DCAA, TACOM and the Department of Defense Inspector General. For example, we are implementing a new financial system. Although we indicated in our responses to certain audit responses that we planned to have the system operational by July 2007, it is still not fully operational. There can be no assurance as to whether we will be able to address these issues to the satisfaction of these agencies and, if we

are unable to do so, we may be subject to price reductions, contract terminations, civil and criminal penalties, and other sanctions, including forfeitures of profits, suspension of payments, fines and suspension or debarment from doing business with the federal government as a prime or subcontractor.   Accordingly, any failure to meet these standards could have a material adverse effect on our business.

***The Inspector General of the U.S. Department of Defense has issued a report questioning the award of sole source contracts to us and criticizing our performance.***

Because of the need to accelerate deliveries of blast resistant vehicles to U.S. forces in Iraq, certain of our contracts with the U.S. government were awarded to us on a "sole source" basis, meaning that our competitors were not permitted to bid for the contracts. In a report dated June 27, 2007, the Inspector General of the U.S. Department of Defense criticized the award of these contracts without competitive bidding, noting that there were other vehicles that could have competed with our Cougar vehicle, and recommended that future contracts for JERRV vehicles be awarded through a competitive bidding process.   The report further indicated that the U.S. Marine Corps agreed that future contracts should be awarded through competitive bidding.   To the extent that future U.S. military contracts for blast resistant vehicles are subjected to competitive bidding, it is likely that a number of other companies, most of which have substantially greater resources than we do, will bid for those contracts. Accordingly, the use of competitive bidding could have a material adverse effect on our ability to obtain future awards and contracts and on our operating results, cash flow, liquidity and prospects.

The report further indicates that we "did not perform as a responsible contractor and repeatedly failed to meet contractual delivery schedules."   The criticism that we did not perform as a "responsible contractor" indicates that, in the view of the Inspector General of the Department of Defense, our performance under the contracts reviewed in the report did not meet the requirements of the federal regulations establishing "responsibility" as a prerequisite to qualifying for the award of U.S. government contracts.   To the extent that Department of Defense officials in charge of the awarding of procurement contracts for our types of

vehicles conclude that we are not "responsible," we would not be able to receive any such contracts.

In addition, in its description of the late delivery of vehicles by us, the report states that, of 233 Cougar, JERRV and Buffalo vehicles ordered by the Marine Corps under our contracts, 60% of the

vehicles were delivered more than 30 days late under their original delivery schedules and that a substantial percentage were also more than 30 days late under revised delivery schedules. Moreover, in a contract relating to 122 JERRV vehicles, we agreed to pay liquidated damages of approximately $55,000 per vehicle (or a maximum of up to $6.7 million) in the event of late deliveries. The contract schedules were bilaterally modified and any liquidated damages that were due for late deliveries were paid by us. The report recommends that the U.S. military include in future contracts and enforce a provision requiring us to pay liquidated damages for late deliveries, which also could require us to make substantial payments and adversely affect our liquidity and results of operations. None of our current active contracts provide for liquidated damages. [Emphasis added.]

69.    On November 14, 2007, the Company issued a press release entitled "Force Protection Reports Record Third Quarter and Nine Month 2007 Financial Results." Therein, the Company, in relevant part, stated:

Force Protection, Inc. (NASDAQ: FRPT) today announced results for its third quarter and nine months ended September 30, 2007.

***The Company reported net sales for the third quarter of $206.3 million, a 389% increase, compared with net sales of $42.2 million for the third quarter of 2006. Net sales for the first nine months of 2007 rose 232% to $441.2 million, compared with net sales of $133.0 million for the first nine months of 2006. The sales increase for both periods was a result of increased deliveries of Force Protection's Cougar and Buffalo vehicles. This includes increased production of vehicles by our joint venture partner General Dynamics Land Systems (GDLS), whose sales of Cougar vehicles under the mine resistant ambush protected (MRAP) program are included in our net sales.***

39

The Company's third quarter 2007 results included approximately $33.3 million of net sales attributed to vehicles produced by GDLS under the December 15, 2006 joint venture requiring the company to award fifty percent (50%) of the MRAP Cougar vehicle production work to GDLS. Pursuant to the joint venture and a subcontract issued in support thereof, GDLS charges the Company an amount per vehicle that is equal to the revenue the Company receives from the Government, which increased the Company's cost of sales for the third quarter of 2007 by a corresponding $33.3 million. Including the revenues as cost of vehicles manufactured by GDLS results in a decreased gross margin percentage, but has no impact on our absolute dollars of gross margin. Until such time as the MRAP contract is novated to the joint venture, vehicles produced by GDLS will be reported by the Company in sales and cost of sales.

Net earnings available to common shareholders for the third quarter of 2007 increased to $11.4 million, or $0.16 per diluted share, compared with net income of $239,943, or $0.0 per diluted share for the third quarter of last year. Net earnings available to common shareholders for the nine month period of 2007 was $23.5 million, or $0.34 per diluted share, compared with a net loss of $(749,324), or $(0.02) per diluted share for the same period last year.

Gross profit for the third quarter of 2007 was $40.6 million, or 19.7% of net sales, compared with a gross profit of $7.9 million, or 18.8% of net sales for the third quarter of 2006. For the first nine months of 2007, the Company reported gross profit of $95.9 million, or 21.7% of net sales, compared with a gross profit of $24.7 million, or 18.6% for the prior year period. The gross profit increase for the third quarter and nine months was primarily due to improved material and labor costs and the Company's increased ability to leverage fixed costs as it continues to expand production.

The Company recorded an operating profit of $18.1 million for the third quarter 2007, compared with an operating profit of $657,372 for last year's third quarter. Operating profit was $34.6 million for the nine month period ended September 30, 2007, compared with $2.4 million for the first nine months of 2006.

Cash flow for the first nine months of 2007 decreased by $84.0 million, compared with an increase of $25.5 million for the same nine month period in 2006. The 2007 decrease is primarily due to

increased working capital and approximately $44 million in capital expenditures to support higher production volumes.

Gordon McGilton, Chief Executive Officer commented, *"We are most pleased with the results for our third quarter and nine month periods, where we once again posted strong improvement in net sales, net income and gross profit.   During the quarter we, together with our partners, produced 374 vehicles, compared with 58 vehicles for the same quarter last year."*

"During the quarter we received a follow-on order totaling approximately $69 million from the U.S. Marine Corps for an additional 125 Cougar Category I and II vehicles for the MRAP program.   The vehicles due under this order, twenty-five Category I, plus 100 Category II MRAPs are planned to be delivered by the end of 2007.   Approximately 50% of the work under this order will be performed by GDLS."

Further, Mr. McGilton noted, *"The Company continues to focus time and resources on managing the complexities of exponential growth which the Company has experienced.    We are continuing to balance this successful growth with the maturation of our Business Operating System."* [Emphasis added.]

70.    On December 19, 2007, the Company issued a press release entitled "Force Protection Awarded $379 Million MRAP Contract, Additional Sales Orders to Follow." Therein, the Company, in relevant part, stated:

> *Force Protection, Inc. (NASDAQ:FRPT - News) today announced it has received a delivery order for an additional 358 Mine Resistant Ambush Protected (MRAP) Category I and Category II vehicles from the U.S. Marine Corps Systems Command (MARCORSYSCOM), which is acting as the lead contracting agency for the Department of Defense.   The total approximate value of the order is $379 million.*
>
> MARCORSYSCOM also advised Force Protection that its Cheetah vehicle proposal is in the competitive range for continued development and testing and will be further evaluated with modifications as part of the ongoing MRAP II competition.

41

*"In addition to this order from the Marine Corps Systems Command, we intend to continue working with the Army to field the Cougar vehicle in a way that will meet the Army's objective of reducing sustainment and life cycle expense," said Gordon McGilton, CEO of Force Protection, Inc. "The MRAP vehicle program requirements are based on the very design characteristics of our Cougar and Buffalo – the most proven and effective vehicles of this kind in service, and the Army continues to be a valued customer under the MRAP Category III Buffalo program. We are in the process of finalizing a contract for the Buffalo route clearance vehicles to be part of the Ground Standoff Mine Detection System (GSTAMIDS) program of record.*

"We are pleased that the Marine Corps, Navy, and Air Force continue to select our proven Cougar MRAP for their Category I and II vehicle requirements," said McGilton. "The Cougar JERRV variant is already meeting joint service requirements for explosive ordnance disposal teams and continues to be the gold standard in performance where it matters most—on the battlefield."

In related activities, foreign military sales have also been approved to the United Kingdom and Italy for approximately 300 Cougar and Buffalo vehicles. These contracts have a combined estimated value of $150 million, and include spare parts and sustainment items.

"As U.S. requirements for MRAP vehicles rise and fall, we are pleased to see the release of orders to foreign militaries," said McGilton. "We are aware of several other countries who have expressed additional need for these life saving vehicles, and we expect to receive approval to service them as well."

Deliveries for Cougar Category I and II vehicles in the MRAP program are executed through the company's joint venture, Force Dynamics, LLC, with General Dynamics Land Systems (NYSE:GD - News). As reported at the end of November, Force Dynamics is 68 vehicles ahead of the contracted MRAP delivery schedule. Buffalo Category III vehicles are sole-sourced to Force Protection and produced independently in Ladson, SC. [Emphasis added.]

71.    On December 19, 2007,    *MarketWatch* published an article entitled "Force Protection loses ground to rivals," which, in relevant part, stated:

> **Shares of Force Protection Inc. fell as much as 34% Wednesday after the Defense Department's latest order for its heavily armored trucks came in much lower than expected, worrying investors that the Pentagon is increasingly turning to contractors that can build on well-established supply and maintenance programs.**
>
> The military said late Tuesday that it would buy an additional 3,126 armored trucks for $2.66 billion, bringing its total order to 11,941 vehicles for delivery by mid-summer.   The largest contract in the new order went to Navistar International Corp.
>
> *            *            *
>
> **Shares of Force Protection closed Wednesday at $4.93, down more than 16%. Earlier the stock traded at a new 52-week low of $3.89.**
>
> The Pentagon's decision to award the bulk of new MRAP orders to Navistar highlights a broader theme in modern militaries: a desire for different types of field equipment to share parts to bolster parts availability, cut down service costs and improve performance.
>
> International Military and Government and its parent Navistar already supply heavy trucks to the military for transport and freight, and its MaxxPro MRAP uses a similar engine and chassis.
>
> "We are able to bring forward a scale of commercial-truck and engine manufacturing they don't currently have," a spokesman for the company said.   "Generally speaking, the trucks and the MRAP are the same."
>
> Additionally, International Military has more than 1,000 parts and service providers across the world, including dealerships in Iraq and Afghanistan.
>
> **"MRAP orders were historically based on who could produce the number the DoD wanted, but greater concern was later based upon commonality with other existing vehicles in the fleet,"** said Patrick McCarthy, an analyst for Friedman, Billings, Ramsey.

> *On Monday, McCarthy lowered his rating for Force Protection to underperform from market perform on concerns that the company wouldn't win as many MRAP orders as expected, because its vehicles don't share as many parts with vehicles already in the military's fleet.*
>
> *Before this week, McCarthy had expected the company to win as much as 40% of the new contracts.*
>
> *"Commonality is becoming more important, because it enables the military to leverage spare and maintenance capabilities across more types of vehicles, lowering longer-term logistics costs,"* he said. [Emphasis added.]

72.     Following these reports, shares of the Company's stock fell $0.98, or 16.6 percent, to close on December 19, 2007, at $4.93 per share.

73.     On February 29, 2008, after the market closed, the Company issued a press release entitled "Force Protection Announces Delay in 2007 Form 10-K and Required Restatement of Form 10-Q for the Period Ended September 30, 2007." Therein, the Company, in relevant part, stated:

> *Force Protection, Inc. (NASDAQ:FRPT) today announced that it will delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2007.  The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007.*
>
> *Force Protection today also announced that the Company's Audit Committee concluded that the Company will restate its previously reported interim financial statements for the three and nine month periods ended September 30, 2007.  The Company will file a Form 8-K with the Securities and Exchange Commission with regard to this restatement decision.*
>
> The Company reached the conclusion to restate based upon the recommendation of management and the concurrence of the Audit Committee of the Company's Board of Directors.  The Company also discussed the matters related to the restatement with Elliott

44

Davis, LLC, the Company's current independent registered public accounting firm. **_Therefore, the previously issued financial statements of the Company for the third quarter of 2007 filed on a Form 10-Q on November 13, 2007 should no longer be relied upon. Management discovered significant accounting errors during its year end review, including errors specifically related to the recording of accounts payable related to inventory purchased from a sub-contractor as a result of a contract termination._**

The Company continues to evaluate the impact of the matters described above on its internal control over financial reporting and the Company's disclosure controls and procedures. Management noted it had previously identified and described material weaknesses in its internal control over financial reporting in its Quarterly Report on Form 10-Q filing dated November 13, 2007. As a result of these previously identified material weaknesses and other deficiencies identified during the review of financial statements for the year ended December 31, 2007, management has concluded internal controls over financial report were not effective as of December 31, 2007. Additionally, management does not believe that the material weaknesses identified as of December 31, 2007 will be remediated by March 31, 2008 and anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008. Therefore, management expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008.

[Emphasis added.]

74.     On March 3, 2008, Force Protection filed a Form 12b-25 Notification of Late

Filing with the SEC. Therein, the Company, in relevant part, stated:

> **_Force Protection, Inc. (the "Company") has determined that it is unable to file its Annual Report on Form 10-K for the year-ended December 31, 2007 by the prescribed due date. As described in further detail below, the Company requires additional time to complete its evaluation of its internal control over financial reporting and preparation of the consolidated financial statements. The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended 2007 although it is possible that it will not be filed on or before March_**

*17, 2008.   In turn, Elliott Davis, LLC, the Company's independent registered public accounting firm, requires additional time to complete its audit procedures in order to provide the Company with its audit report on the audit of the financial statements and of the Company's internal control over financial reporting.*

Although management has not yet completed its evaluation of the Company's internal control over financial reporting, management had, as of December 31, 2007, identified the following material weaknesses in internal control over financial reporting:

·   *Ineffective control over the financial statements closing process;*

·   *Ineffective controls in accounting for inventory and the associated accounts payable expenses related to the receipt of inventory;*

·   *Insufficient complement of personnel with an appropriate level of accounting knowledge, experience with the Company, and training in the application of general accepted accounting principles (GAAP) in the United States; and*

·   *Ineffective controls over the completeness and accuracy of deferred tax balances.*

In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company has been assessing the effectiveness of its internal control over financial reporting that existed as of December 31, 2007. As management's required assessment of internal controls over financial reporting is not complete, it is possible that the Company will identify one or more additional material weaknesses which, individually or in the aggregate, would constitute a material weakness in internal controls over financial reporting in accordance with Section 404 of the Sarbanes -Oxley Act of 2002. Management has concluded that as a result of above-described the material weaknesses, internal controls over financial reporting are not effective as of December 31, 2007.   Management also does not believe that the material weaknesses, or other deficiencies which may be identified, will be remediated by March 31, 2008. Therefore, the Company expects that internal control over financial reporting is likely to be ineffective as of March 31, 2008 and

anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first quarter of 2008.

In addition, the Company has also determined that its previously filed interim financial statements for the three and nine month periods ended September 30, 2007 and all public communications of such financial statements should no longer be relied upon because those financial statements contain material misstatements of net income. Accordingly, the Company plans to restate its historical financial statements for the quarter ended September 30, 2007 and the Company is also reviewing its historical financial statements for the quarter ended June 30, 2007. The Company is working to complete the restatement of its financial statements for the quarter ended September 30, 2007 and to prepare its financial statements for the year ended December 31, 2007. The Company is also reviewing its accounting procedures and controls, and the financial reporting processes.

As a result of the scope of the work to be performed to complete its analysis and to identify the material weaknesses in the Company's internal control over financial reporting, including the need to restate its financial statements, it is not practicable for the Company to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2007 by the prescribed due date. The Company is working as expeditiously as possible to finalize the financial statements for the fiscal year ended December 31, 2007 and to file amendments to its previously filed Quarterly Report on Form 10-Q for the quarter ended September 30, 2007. [Emphasis added.]

75.    On this news, the Company's shares fell $0.53 per share, or 12.9 percent, to close

on March 3, 2008 at $3.58 per share, on unusually heavy trading volume.

76.    On March 17, 2007, the Company filed with the SEC a Regulation FD disclosure

on Form 8-K stating that it would not be filing its 2007 Annual Report on Form 10-K by the

previously extended deadline of March 17, 2008 due to the "scope of the work" involved in

evaluating its internal controls and restating its prior financial statements. The Form 8-K, in

relevant part, stated:

**Item 7.01. Regulation FD Disclosure.**

Force Protection, Inc. (the "Company") previously announced that it was unable to file its Annual Report on Form 10-K for the year-ended December31, 2007 by the prescribed due date, and filed an extension on Form 12b-25 with the SEC on February 29, 2008. The Company has also announced that its previously filed interim financial statements for the three and nine month periods ended September 30, 2007 and all public communications of such financial statements should no longer be relied and that the Company plans to restate its historical financial statements for the quarter ended September 30, 2007.

The Company intends to file its Annual Report on Form 10-K for the year ended December 31, 2007 with the SEC promptly upon the completion of the audit of the consolidated financial statements for the year ended December 31, 2007. **However, the Company will be unable to file the Annual Report on Form 10-K on or prior to March 17, 2008, the prescribed due date as allowed by the extension on Form 12b-25. As a result of the scope of the work to be performed to complete its analysis and to identify the material weaknesses in the Company's internal control over financial reporting, including the need to restate its financial statements, it is not practicable for the Company to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2007 by the prescribed due date.** The Company is working as expeditiously as possible to finalize the financial statements for the fiscal year ended December 31, 2007 and to file amendments to its previously filed Quarterly Report on Form 10-Q for the quarter ended September 30, 2007. (emphasis added)

77.     On this news, the Company's shares fell $0.42 per share, or 32.5%, to close at $1.37 per share, on unusually heavy trading volume.

78.     On March 24, 2008, Force Protection announced that on March 19, 2008 it received a notice from the staff of The Nasdaq Stock Market stating that Force Protection is not in compliance with Marketplace Rule 4310(c)(14) as a result of not filing with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2007 and that Force Protection is subject to having its stock delisted from the Nasdaq Capital Market. Force Protection reported that it had requested and been granted an oral hearing before the Nasdaq

Listing Qualifications Panel to review the Nasdaq Staff determination on its continued listing, and that the hearing request automatically stays the delisting of Force Protection's common stock pending the Panel's decision.

79.     On March 24, 2008, Force Protection also announced that on March 18, 2008, Force Protection was informed by Elliott Davis, LLC, the Company's independent registered public accounting firm, that, effective immediately, it was resigning as the Company's independent registered public accounting firm and that the Company's Audit Committee accepted this resignation.

80.     The true facts, which were known or should have been known, by Defendants, but were not properly addressed by Defendants and were concealed from shareholders during the relevant time period, were as follows:

        a.      As a result of the Company's ongoing problems in meeting contractual delivery deadlines, the Company would have trouble competing in the MRAP market;

        b.      In audit reports, the DCAA had been critical of the Company's finances and financial accounting system, which threatened the Company's eligibility to compete for government contracts;

        c.      The Company's accounting department suffered from material weaknesses and deficiencies and lacked the necessary staff and resources to perform its required functions;

        d.      Contrary to the representations in the Company's SEC filings, the Company's internal controls were inadequate and easily manipulated, and,

49

as a result, multiple areas of the Company's internal controls suffered serious deficiencies, including: (i) the financial closing process; (ii) accounting for inventory and the associated accounts payable expenses; (iii) stock-based compensation; and (iv) deferred tax balances;

e.    The Company lacked effective internal controls in its financial reporting process required to enable it to properly analyze and/or estimate Force Protection's future financial and operational performance; and

f.    Defendants caused the Company to falsely report financial results.

81.    As a result of the Company's false statements, Force Protection's stock traded at artificially inflated levels during the relevant period and Defendants were able to sell $87.4 million in Force Protection stock.   However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 88% from the high during the relevant period.

## VIOLATIONS OF SEC REGULATIONS DUE TO INADEQUATE INTERNAL CONTROLS

82.    Throughout the relevant period, Defendants were able to cause the Company to issue materially false and misleading financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls over financial reporting. Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

\*          \*          \*

(ii)    transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A)-(B).

83.    These provisions require an issuer of publicly traded securities to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

84.    Defendants caused Force Protection to violate §13(b)(2)(A) of the 1934 Act by failing to maintain accurate records.  Force Protection's inaccurate and false records were not isolated or unique instances they were improperly maintained for multiple reporting periods.  Accordingly, Force Protection violated §13(b)(2)(A) of the 1934 Act.

85.    In addition, Defendants caused Force Protection to violate §13(b)(2)(B) of the 1934 Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  Force Protection failed to ensure that proper review and checks were in place.  In fact, despite knowing the true dismal state of the Company's internal controls, Defendants regularly issued quarterly financial statements throughout the relevant period without ever disclosing the deficiencies in Force Protection's internal accounting controls and falsely asserted that its financial statements complied with GAAP.

86.    Both prior to and during the relevant period, Defendants caused the Company to make representations that Force Protection's internal disclosure and accounting controls were

51

designed to be effective and detect and prevent fraud and had been tested and found to be effective.

87.     These representations were false as Force Protection's disclosure controls and procedures were not effective and the Company's financial statements were not fairly presented in according with GAAP.   During the relevant period, Force Protection violated §13(b)(2)(A) of the 1934 Act by failing to maintain adequate internal controls in order to ensure that its financial statements were prepared in conformity with GAAP and that its public filings were accurate.

88.     Moreover the lack of internal controls was caused by and/or perpetuated by software purchased from a party related to Defendant McGilton.   Defendant McGilton is a principal in APT Leadership ("APT"), a technology consulting firm.   Beginning in 2005, Force Protection hired APT to provide the Company with various business consulting services, training seminars and certain business software.   In 2005 and 2006, the Company paid APT $225,400 and $606,817, respectively, for such services, training and software.

89.     Additionally, in 2006, Force Protection entered into an agreement with APT for the non-exclusive right and license to use diagrams, methods, concepts and business operation systems functionality contained in APT's "APT Tool" software.   The Company paid APT a one-time license fee of $60,000 and agreed to pay APT an annual license fee thereafter of $50,000.   The APT tools software was still in the early stages of being developed and was still being tested for bugs.   Upon information and belief, the APT system had not been properly designed and did not work as well as Force Protection's Excel system which was currently being used at the time.

90.     Thomas Thebes, the Company's CFO at the time, noted his concerns that Force Protection's deal with APT violated Force Protection's Code of Ethics.  He resigned soon thereafter along with Garth Barrett, Force Protection's original founder.

91.     Force Protection's lack of adequate internal controls rendered Force Protection's financial reporting during the relevant period inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.  Nonetheless, throughout the relevant period, the Company regularly issued quarterly and annual financial statements without disclosing the existence of all of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

### FORCE PROTECTION'S VIOLATION OF GAAP RULES IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC

92.     In order to inflate the price of Force Protection's stock, Defendants caused, or by failure to ensure adequate accounting methods allowed, the Company to falsely report its results for the three and nine months ended September 30, 2007 through improper accounting entries, which inflated the Company's reported financial results, including net income.  The Company subsequently has admitted that it will be required to restate its prior financial results due to these accounting violations.

93.     The results for the three and nine months ended September 30, 2007 were included in a Form 10-Q filed with the SEC.  The results were also included in press releases disseminated to the public.

94.     Force Protection has now admitted that its previous financial statements were not a fair presentation of Force Protection's results and were presented in violation of GAAP and SEC rules.

95.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

96.     The fact that Force Protection will restate its financial statements for the three and nine months ended September 30, 2007, and disclosed that these financial statements should not be relied upon is an admission that they were false and misleading when originally issued and that the overstatement of financial results was material (APB No.20, ¶¶7-13; SFAS No. 154, ¶25).

97.     Given these accounting irregularities, the Company presented financial results and statements that violated GAAP and the following fundamental accounting principles:

a.      The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

b.      The principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

c.      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

d.      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated (FASB Statement of Concepts No. 1, ¶42);

e.  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated (FASB Statement of Concepts No. 1, ¶50);

f.  The principle that financial reporting should be reliable in that it represents what it purports to represent was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

g.  The principle that completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

h.  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated (FASB Statement of Concepts No. 2, ¶95).

98.  The adverse information concealed by Defendants during the relevant period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

99.  Further, the undisclosed adverse information concealed by Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the nation stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' INSIDER STOCK SALES

100.     During the relevant period, Defendants, in violation of their fiduciary duties, sold millions of their personally held shares of Force Protection stock while in possession of material adverse non-public information regarding, among other things, the Company's inadequate internal controls, violations of GAAP and failures to meet product delivery deadlines

101.     The price of Force Protection stock dramatically increased during the time period in which Defendants sold their stock.   From August 14, 2006 (the date when the Company filed its Form 10-Q for the quarterly period ending June 30, 2006) through May 31, 2007 (the date of the last insider stock sale during the relevant period), the Company's stock price increased from a closing price of $5.96 per share to a closing price of $28.47 per share as a result of Defendants' misconduct and breaches of fiduciary duties.

102.     During the relevant period, Defendant Kavanaugh profited from his improper use of material non-public information by selling his personally held shares of Force Protection stock as set forth in the following table:

**Frank Kavanaugh, Chairman of the Board of Directors until June 21, 2007**

| Tran ~ | Transaction Date | | Shares | Transaction Price | | Market Value |
|---|---|---|---|---|---|---|
| | Start | End | | Low | High | |
| S | 09/05/06 | 09/12/06 | 691,000 | $6.56 | $7.36 | $4,734,197 |
| S | 09/13/06 | 09/18/06 | 1,000,000 | $7.09 | $7.98 | $7,409,362 |
| S | 10/03/06 | 10/05/06 | 580,000 | $8.11 | $8.55 | $4,825,575 |
| S | 11/20/06 | 11/21/06 | 440,000 | $10.70 | $11.38 | $4,958,896 |
| S | 12/21/06 | 12/28/06 | 780,000 | $15.20 | $17.87 | $12,892,325 |
| S | 04/24/07 | 04/26/07 | 750,000 | $23.13 | $24.04 | $17,855,874 |
| S | 05/14/07 | 05/21/07 | 50,000 | $26.44 | $28.23 | $1,390,751 |
| S | 05/22/07 | 05/23/07 | 160,000 | $28.05 | $29.69 | $4,708,662 |
| S | 05/30/07 | 05/31/07 | 111,343 | $30.28 | $30.78 | $3,386,605 |
| | | | **4,562,343** | | | **$62,162,246** |

103.    During the relevant period, Defendant McGilton profited from his improper use of material non-public information by selling his personally held shares of Force Protection stock as set forth in the following table:

**Gordon R. McGilton, CEO and Director until January 31, 2008**

| Tran ~ | Transaction Date | | Shares | Transaction Price | | Market Value |
|---|---|---|---|---|---|---|
| | Start | End | | Low | High | |
| S | 09/26/06 | 09/26/06 | 83,333 | $8.77 | $8.77 | $731,222 |
| S | 10/09/06 | 10/11/06 | 300,000 | $8.11 | $8.38 | $2,465,696 |
| S | 01/24/07 | 01/26/07 | 1,000,001 | $19.68 | $20.32 | $19,900,526 |
| | | | **1,383,334** | | | **$23,097,444** |

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

104.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Defendants' breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment and other violations of the law.

105.    Plaintiff is currently an owner of Force Protection common stock and was an owner of Force Protection common stock continuously during the relevant period.Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

106.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Force Protection Board to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

107.    In order to bring this suit, Director Defendants Moody, Davis, Thompson, Day and Paxton would be forced to sue themselves and persons with whom they have extensive business and personal relationships, which they will not do, thereby making demand on the Board a futile and excusing the same.

108.    At the time this action was commenced, the Board consisted of five (5) directors, which includes Defendants Moody, Davis, Thompson, Day and Paxton.   The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

> a.    Defendant Moody because his principal professional occupation is Chief Executive Officer, President and Chairman of the Company, pursuant to

which he receives $560,000 per year in salary and up to 75% of his salary in cash bonuses. As the CEO, President and Chairman of the Company, Defendant Moody is responsible for directing the Company's day-to-day operations and for overseeing its corporate development and strategic planning. Because he is an executive of the Company, Defendant Moody is not an independent Director under either New York Stock Exchange or NASDAQ listing standards. Accordingly, Moody is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the other Defendants, particularly Defendants Thompson, Davis and Day who currently serve on Force Protection's Compensation Committee.

b.    Defendants Moody, Davis, Thompson, Day and Paxton because the majority of the Board is dominated by Defendants who were personally and directly involved in the misconduct alleged and/or who each approved the actions complained herein. This domination of the Board has impaired the Board's ability to validly exercise its business judgment and render it incapable of reaching an independent decision as to whether to accept a demand. Furthermore, the acts complained herein constitute violations of fiduciary duties owed by the Board and these acts are incapable of ratification.

c.    Defendants Moody, Davis, Day and Thomson as members and former members of Force Protection's Audit Committee, they directly participated

60

in and approved the filing of false financial statements and other false SEC filings and directly participated in and approved the Company's violations of GAAP, as alleged herein. These Defendants were also charged with assisting the Board in fulfilling its oversight responsibility relating to, *inter alia,* the Company's compliance with legal and ethical requirements as well as its internal audit function and internal controls. These Defendants, therefore, are substantially likely to be held liable for breaching their fiduciary duties and they would be unable to comply with their fiduciary duties to disinterestedly consider pre-suit demand of the allegations contained herein.

d.    Defendants Davis and Thompson have received substantial compensation from Force Protection for serving as directors on the Board, including cash payments and stock awards, as detailed in the Company's annual proxy statements in which Defendants Davis and Thompson were reported to have received $94,262 and $36,999 during 2006, respectively, in cash and stock (Defendant Thompson was appointed to the Board on December 26, 2006). Defendants Day and Paxton were appointed to the Board after the Company's most recent proxy statements, but, on information and belief, have received similar compensation in 2007. As such, and Defendants Davis, Thompson, Day and Paxton each have a strong financial interest in preserving his Board position in order to ensure their continued receipt of such remuneration. Accordingly, Defendants Davis, Thompson, Day and

61

Paxton are each incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the other Defendants.

109.    Additionally, in order to bring this action, each of the Director Defendants would have to sue the Company's former CEO, Defendant McGilton, with whom, upon information and belief, the Company maintains an ongoing business relationship.   As described above in ¶¶88-90, Force Protection hired APT to provide the Company with various business consulting services, training seminars and certain business software.   Defendant McGilton is the principal of APT and is also named in this action.   The Company's ongoing business relationship would impair the majority of the Director Defendants' ability to vigorously prosecute any action against McGilton and exercise independent business judgment to determine whether to bring this action against McGilton.

110.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.   As detailed above, Director Defendants caused, or through a lack of reasonably prudent oversight allowed, the Company to implement inadequate internal controls that continuously and systematically caused Force Protection's relevant period financial reporting to be inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. While adequate internal controls are important for every organization, it is even more crucial for a company, such as Force Protection, who contracts with the government to have adequate financial controls. Causing or allowing the Company to continuously and systematically lack adequate internal controls is devoid of any legitimate business purpose and is not a product of a

valid exercise of business judgment. Accordingly, Defendants' misconduct is egregious enough to reasonably conclude that it falls outside the protection of the business judgment rule, thereby excusing Plaintiff from bringing a pre-suit demand on futility grounds.

111.    Moreover, Force Protection's continuous and systematic failure to file accurate financial statements year after year, which required the Company to restate its SEC filings on multiple occasions, constitutes "red flags," of which the Director Defendants must have known of and recklessly ignored. As detailed above, due to material weaknesses in its internal controls, Force Protection was forced to announce that the Company would have to restate its annual consolidated financial statements for 2005, 2004, and 2003. After knowing of these internal control deficiencies, the Company was again forced to announce that it would be restating its 2006 earnings per share calculations in the Company's annual financial statements. Despite the knowledge of its internal control deficiencies, recently, Force Protection was once again forced to announce that it would have to restate its financial statements because of material weaknesses in the Company's internal control over financial reporting. This time the Company has to restate its reported three and nine month periods ending September 30, 2007. The Company was also forced to delay the filing of its 2007 annual financial report on Form 10-K. Furthermore, the DCAA issued audit reports that were highly critical of Force Protection's finances and financial accounting system, which were apparently ignored as evidenced by the Company's numerous SEC violations. Evidently, neither DCAA censures nor several restatements motivated the Director Defendants to take the appropriate action concerning the Company's severe internal control problems for over at least a three-year period. The magnitude and duration of these "red flags" demonstrate that the failure of the Director Defendants to act accordingly constitutes a lack

of good faith and that their actions, or lack thereof, are not protected by the business judgment rule.

### FIRST CLAIM
### For Breaches Of The Fiduciary Duties Of Loyalty, Due Care And Good Faith
### (Against All Defendants)

**112.**     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.     As alleged herein, Defendants owed and owe Force Protection fiduciary duties. By reason of their fiduciary relationships, Defendants owed and owe Force Protection the fiduciary obligations of good faith, loyalty, candor and due care and are required to use their utmost ability to ensure that the Company operates in a fair, just, honest and equitable manner and complies with all laws, rules and regulations.   Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the company.

114.     Each of the Defendants knew, or was reckless in not knowing, that each of them violated and breached their fiduciary duties.

115.     Each of the Defendants was aware, or should have been aware, of the pervasive problems with Force Protection's internal controls. These serious problems enabled the Company to (i) issue false and misleading statements that artificially inflated Force Protection's stock price during the relevant period; (ii) establish an accounting department that suffered from material weaknesses and deficiencies and lacked the necessary staff and resources to perform its required functions; and (iii) improperly analyze and/or estimate Force Protection's future financial and

operational performance causing its financial results to be materially misstated in violation of GAAP.

116.     As a direct and proximate result of Defendants' failure to perform their fiduciary duties, the Company has suffered significant damages.

117.     Defendants are not protected from personal liability by any waiver or exemption from liability clauses because their actions - which were of a continuous and systematic nature - were done either intentionally, recklessly, in bad faith, or as a knowing violation of law.

118.     Plaintiff, as a shareholder and representative of Force Protection, seeks damages and other relief for the Company as set forth below.

**SECOND CLAIM**
**For Gross Mismanagement**
**(Against All Defendants)**

119.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120.     By their actions alleged herein, Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Force Protection in a manner consistent with the operations of a publicly held corporation.

121.     By their actions, Defendants breached their duties to oversee, direct and control Force Protection in a manner consistent with the legal duties of directors and officers of a publicly held company and under the applicable state laws.

122.     As a direct and proximate result of Defendants' gross mismanagement and breach of duties alleged herein, Force Protection has sustained significant damages.

### THIRD CLAIM
### Waste Of Corporate Assets
### (Against All Defendants)

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    As a direct result of wrongdoing alleged herein, Defendants have unreasonably and unnecessarily caused Force Protection to expend millions of dollars of corporate assets to the extreme detriment of the Company.

**125.**    As a direct and proximate result of Defendants' waste of corporate assets as alleged herein, Force Protection has sustained damages.

### FOURTH CLAIM
### Unjust Enrichment
### (Against All Defendants)

126.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

127.    As a direct result of wrongdoing alleged herein, Defendants received money or other property which, in equity and good conscience and under the law, belongs to Force Protection. Defendants have unjustly enriched themselves by breaches of the duty not to engage in self-dealing and interested transactions as pled herein. All such monies and property in the hands of Defendants are due to be repaid to and for the benefit of Force Protection.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of Force Protection as follows:

A.    Against each Defendant for damages in favor of Plaintiff, on behalf of Force Protection, and awarding punitive and exemplary damages as appropriate, plus

66

pre-judgment interest, modeled in a fashion to ensure Defendants do not participate therein or benefit thereby;

B.    Equitable and/or injunctive relief, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of Force Protection, has an effective remedy;

C.    Directing Force Protection to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, as well as all other legal requirements to protect the Company and its shareholders from the damaging effects described herein;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs and expenses;

E.    Granting a trial by jury on all issues so triable; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

_____

Theodore H. Huge (D.S.C. Bar No. 9508)
**THEODORE HUGE LAW FIRM LLC**
171 Church Street, Suite 160
Charleston, SC   29401
Tel:   (843) 793-4702
Fax:   (843) 577-0460
Email: thh@thehugelawfirm.com

Sherrie R. Savett, Esq.
Russell D. Paul, Esq.
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

*Attorneys for Plaintiff*

Charleston, South Carolina
May 14, 2008