UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

_____

IN RE FORCE PROTECTION, INC.     )
DERIVATIVE LITIGATION       )
           )
           )    Master File No. 2:08-1907-CWH
           )
           )    Consolidated with Case Nos.
           )    2:08-1904-CWH; 2:08-1998-CWH
           )    2:08-2019-CWH
           )
_____)

**NOMINAL DEFENDANT FORCE PROTECTION, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
THE CONSOLIDATED AMENDED VERIFIED DERIVATIVE COMPLAINT**

Eleni M. Roumel               M. Robert Thornton
Federal Bar No. 9959          Michael R. Smith
NELSON MULLINS RILEY &     Benjamin Lee
SCARBOROUGH LLP         KING & SPALDING LLP
151 Meeting Street           1180 Peachtree Street N.E.
Charleston, SC  29401       Atlanta, Georgia  30309
843.534.4112 (Telephone)     404.572.4600 (Telephone)
843.534.4223 (Facsimile)      404.572.5100 (Facsimile)
eleni.roumel@nelsonmullins.com  bthornton@kslaw.com
                      mrsmith@kslaw.com
                      blee@kslaw.com

*Attorneys for Defendants Frank
Kavanaugh, Gordon R. McGilton,
Michael Moody, Jack Davis, Roger G.
Thompson, Jr., John S. Day, Raymond
W. Pollard, R. Scott Ervin, John W.
Paxton, Sr., Gale Aguilar, and
Michael S. Durski
and Nominal Defendant Force
Protection, Inc.*

# INTRODUCTION

Force Protection, Inc. ("Force Protection" or the "Company") designs, manufactures, and sells blast and ballistics-protected armored vehicles which are deployed by the U.S. Military and its allies to protect the armed forces from improvised explosive devices.  CC ¶ 23.  The Company began in 1997 as a small manufacturer of speed boats.  Facing waning demand for its products, the Company transitioned in 2002 to manufacturing heavily armored trucks that deflected underbody blasts away from the passenger compartment.  This new product -- formally dubbed mine-resistant, ambush protected vehicles ("MRAPs") -- proved highly effective at saving the lives of U.S. troops.  As a first-mover in the manufacture of MRAP vehicles, early on, the Company won many contracts for which the Department of Defense ("DoD") solicited no other bids.  *Id*. ¶ 4.  The DoD's need for Force Protection's vehicles was so urgent that the Army and Marines awarded sole-source contracts to the Company due to the fact that "there were no other viable contenders that could immediately produce the vehicles they needed" in order to adequately support the Global War on Terrorism.  *Id*.  By 2007, the Company had grown its annual sales to an impressive $890 million.

As demand for MRAPs skyrocketed, the Company poured its resources into increasing its production capacity to get vehicles in the field protecting troops as quickly as possible.  While the Company was able to increase its production from 14 vehicles in 2004 to over 1600 vehicles in 2007, such a rapid operational expansion was certainly not seamless.  The Company's back office struggled to keep up with the staggering demands of the Company's rapid growth.  Force Protection began outgrowing its computer systems and software.  Even though the Company's outside auditors issued clean audit opinions in connection with the Company's financial statements from 2003 through 2006 (Exs. A through D), the Company eventually discovered

certain discrete accounting errors -- such as incorrect valuations of certain equity issuances and warrants -- that required the restatement of its earnings for 2003 through 2005.  Ex. E, p. 13.  In late 2007, the Company found and timely disclosed additional accounting errors.  At that time, the Company also stated that it had determined that its internal financial controls had not operated with sufficient efficacy in light of the rapidly growing size and complexity of the Company's operations.  Ex. F, p. 39.  Since late 2007, the Company has devoted a huge portion of its resources toward remedying the weaknesses in its internal controls.

Despite these publicly-disclosed remedial efforts, shareholders rushed to file derivative lawsuits in Nevada and South Carolina alleging that the Company's earnings restatements resulted not from a failure to adequately cope with the evolving and increasing demands placed on the Company's systems and controls by the Company's meteoric growth, but from intentional dereliction of duty by the board of directors.  The Plaintiff in this action, a Michigan resident and alleged holder of an unspecified number of Force Protection shares, filed suit in this Court, after a federal securities class action had been filed against the Company in this Court, and after several shareholders had filed similar actions in South Carolina and Nevada state courts.  Much of Plaintiff's Consolidated Amended Verified Derivative Complaint ("Complaint" or "CC") is a carbon copy of the operative complaint in the securities class action -- even portions that are completely inapt in the context of the fiduciary duty claims Plaintiff purports to allege.[1]

Derivative lawsuits are in derogation of the fundamental principle of corporate governance that a company's board of directors, rather than its minority shareholders, should manage the company's affairs, including deciding whether to pursue legal claims for the company's benefit.  Generally speaking, shareholders are not entitled to sue on a company's

---

[1] For example, ¶ 48 appears to be directly pasted from the federal securities complaint and alleges violations of Section 13(b)(2) of the "the 1934 Act," which has no applicability to Plaintiff's claims in this case.

behalf. They are instead required to "demand" that the board of directors evaluate the potential claim and decide whether the company should take action. There is but one very narrow exception to that demand requirement. Demand is legally excused only where the shareholder can show, through particularized allegations of fact, that a demand would have been "futile." Pleading demand futility is notoriously difficult. The plaintiff must show that a majority of the company's directors could not have impartially considered whether to authorize the company to pursue the claims at issue. *See* Fed. R. Civ. P. 23.1 (requiring a derivative plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority…and the reasons for the plaintiff's failure to obtain the action or for not making the effort").[2] It is not nearly enough for a plaintiff to speculate that the directors would have decided not to pursue the claims; all that matters is that a majority of the directors could have considered the matter free of improper influences.

Plaintiff alleges that demand was excused primarily because a majority of the Company's Board of Directors face personal liability for damages in this lawsuit, and thus cannot be trusted to evaluate impartially whether the Company should pursue the claims. CC ¶¶ 16, 17, 62, 134, 138, 144. But the primary claim at issue here -- that the directors breached their fiduciary duties not by an affirmative decision or action, but rather by failing to establish and maintain effective internal controls -- is "***possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment***." *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Stating such a claim requires specific factual allegations establishing that "the directors *knew* that they were not discharging their fiduciary obligations." *Stone v.*

---

[2] The procedural law of this Court supplies the pleading standards that Plaintiff's allegations must satisfy, while the substantive law of Nevada, the state of Force Protection's incorporation, establishes the substantive requirements of pre-suit demand. *See Hazelton v. Kuttner,* C/A No. 08:06-cv-02063-GRA, 2007 WL 1120405, at *3 (D.S.C. Apr. 13, 2007).

*Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis added). Plaintiff's allegations fall short of that stringent standard.[3]

# PLAINTIFF'S ALLEGATIONS

## I.    THE PARTIES

Force Protection is a Nevada corporation with its principal place of business in Ladson, South Carolina. *See* CC ¶ 23. Individual Defendants Michael Moody, Jack Davis, Roger G. Thompson, John S. Day, and John S. Paxton, Sr. comprised the Company's board of directors at the time this lawsuit was originally filed. *Id.* ¶ 131.

> **Major General Jack Davis (Ret.)**: Mr. Davis has been a director of Force Protection, Inc. since March 2006. Mr. Davis served in the U.S. Marine Corps from 1968 to 2005 where he held the rank of Major General. In addition to his service with Force Protection, Mr. Davis currently serves on the Board of Advisors of two publicly held and one privately held companies. Mr. Davis last stood for election to Force Protection's board in 2006, when 94% of voting shares voted in favor of his election.

> **Michael Moody**: Mr. Moody has been a director of Force Protection since September 18, 2006. Mr. Moody was appointed President of Force Protection, Inc. in September 2007, the Interim Chief Executive Officer on January 30, 2008 and appointed as the Chief Executive Officer on February 29, 2008. Mr. Moody was the Chief Operating Officer at the London American General Agency and Senior Vice President of Corporate Development for Magna Carta Companies, a mutual insurance company, where he also served on the Board of Directors. Mr. Moody is also a Certified Public Accountant (Australia). On June 21, 2007, Mr. Moody was reelected to Force Protection's board, with 93% of voting shares in favor of his election.

> **Roger G. Thompson, Jr.**: Mr. Thompson has been a director since December 26, 2006. Mr. Thompson is a veteran with thirty-four years of experience on active duty in the United State Army. Mr. Thompson completed his military career as the Deputy Commander in Chief, United States Transportation Command. Mr. Thompson holds a Bachelor of Science degree from the United States Military

---

[3] This Court is not bound by prior decisions in related derivative litigation involving some or all of these Defendants in which state courts in South Carolina and Nevada have denied motions to dismiss the complaints in those cases on similar legal grounds to those asserted here. *See* Exs. G and H. The orders denying motions to dismiss in the two state court actions are not final and hence, for that and other reasons, cannot provide a basis for claim or issue preclusion. Additionally, the issue before this Court is whether *Plaintiff's* Complaint -- not other complaints filed by different nominal plaintiffs in separate actions -- satisfies the demanding pleading requirements for maintaining a derivative lawsuit.

Academy, a Master's degree in Business Administration from Syracuse University, and a Master's degree in National Security and Strategic Studies from the Naval War College. On June 21, 2007, Mr. Thompson was reelected to Force Protection's board, with 95% of voting shares in favor of his election.

**John S. Day**: Mr. Day has been a director of Force Protection, Inc. since September 2007. Mr. Day retired from Deloitte & Touche LLP in December 2005. Mr. Day holds a Bachelor of Arts in Economics from the University of North Carolina and a Master of Business Administration from Harvard Graduate School of Business.

**John W. Paxton, Sr.**: Mr. Paxton has been a director of Force Protection, Inc. since February 2008. From 2007 until the present, Mr. Paxton has been the Vice Chairman of IntelliCheck Mobilisa, Inc. From 1998 until 2002, Mr. Paxton was the Chairman and Chief Executive Officer of Telxon Corporation. Mr. Paxton holds a Bachelor of Science and Master of Science in business administration from LaSalle University, and is a registered professional engineer.

In addition, Plaintiff has named as Defendants five former Force Protection directors and officers (Frank Kavanaugh, Gordon R. McGilton, Raymond W. Pollard, Gale Aguilar, and Michael S. Durski) who were not members of the board when Plaintiff filed his Complaint.

Plaintiff Duane Galbraith, a Michigan resident, purportedly owns an unspecified number of Force Protection shares. *Id*. ¶ 22. The Complaint does not reveal when Mr. Galbraith purchased his shares, whether he has sold any, or how many he might still own. It says only that Mr. Galbraith owned shares at all time relevant to the matters alleged in the Complaint. *Id*. Although the Complaint makes occasional reference to a "relevant period," Plaintiff never defines that term, even though the Complaint refers to events that date as far back as 2004. *Id*. ¶¶ 66, 79, 97, 99, 134. Whether Mr. Galbraith owned shares at that time is a question the Complaint does not bother to answer.

## II.    PLAINTIFF'S CLAIMS

Plaintiff's claims fall into three categories.

*First*, Plaintiff alleges that the Individual Defendants breached their fiduciary duties to the Company "by knowingly or recklessly permitting Force Protection to conduct its business

5

without sufficient internal controls over its operations and financial reporting." *Id.* ¶ 16. Plaintiff surmises that, because the Company eventually admitted that it had discovered (and subsequently disclosed) certain weaknesses in its internal controls, those weaknesses must have existed all along, been known to the Individual Defendants, and the Individual Defendants "knowingly" or "recklessly" chose to do nothing about them. *Id.* ¶¶ 134, 138.

*Second*, Plaintiff alleges that the Individual Defendants made various misrepresentations to the Company's shareholders through Force Protection's public filings with the Securities and Exchange Commission. *Id.* ¶¶ 16, 48, 50-52. Plaintiff claims that several of the Company's financial statements were misleading because they contained statements that the Company's "internal disclosure and accounting controls" were effective when, in fact, internal controls were actually not effective when the statements were made. *Id.* ¶¶ 48, 63-64.

*Last*, Plaintiff claims that as a result of the alleged breaches of fiduciary duties, all the Individual Defendants "wasted" Company assets by "expend[ing] millions of dollars of corporate assets to the extreme detriment of the Company." *Id.* ¶ 147. Plaintiff also claims that all of the Individual Defendants have "unjustly enriched themselves" by breaching their duties not to engage in unidentified "self-dealing" and "interested transactions." *Id.* ¶ 150.

## III.    ALLEGATIONS CONCERNING PLAINTIFF'S FAILURE TO MAKE DEMAND

Plaintiff alleges that he was excused from making a demand on Force Protection's board before filing this lawsuit because all five members of the Force Protection board at the time the original action was filed "would be forced to sue themselves and persons with whom they have extensive personal and business relationships." *Id.* ¶ 130. Plaintiff also alleges that demand is excused because: (1) Defendant Moody is an employee of the Company, *Id.* ¶ 131(a); (2) the majority of the board is "dominated" by Defendants who, by virtue of their participation in the alleged wrongs, face liability, *Id.* ¶ 131(b); (3) four board members served on the Company's

Audit Committee, *Id*. ¶ 131(c); (4) the alleged wrongs complained of fall outside the protection of the business judgment rule, *Id*. ¶ 133; (5) the current directors would not sue Defendant McGilton, with whom Plaintiff alleges "upon information and belief, the Company maintains an ongoing business relationship," *Id*. ¶ 132; and (6) two directors receive certain unspecified payments and other benefits by virtue of their membership on the board, *Id*. ¶ 131(d). As set forth herein, Plaintiff's allegations fail to satisfy the heightened standards of federal procedural law and Nevada substantive law applicable to efforts to plead excuse from demand.

## ARGUMENT

I. **HAVING FAILED TO MAKE A PRE-SUIT DEMAND, PLAINTIFF MUST SATISFY HEIGHTENED PLEADING REQUIREMENTS**

As a matter of Nevada law, the "board of directors has full control over the affairs of the corporation." N.R.S. § 78.120(1). The board's decision-making authority extends to decisions regarding whether to pursue litigation: "Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors." *United Copper Sec. Co. v. Amalgamated Copper Co*., 244 U.S. 261, 263 (1917). Rule 23.1's demand requirement promotes this bedrock principle of corporate governance in at least two important ways. First, the demand requirement preserves the board's inherent authority by giving it an opportunity to evaluate the shareholder's concerns and to consider taking appropriate action, including, but not limited to, initiating litigation. *Shoen v. SAC Holdings Corp*., 137 P.3d 1171, 1179 (Nev. 2006). Second, by subjecting such potential claims to the board's consideration, the demand requirement discourages unnecessary, unfounded, or improper shareholder actions. *Id*.

Plaintiff, of course, did not bother to ask the Board what it thought about the claims asserted in this Complaint before subjecting the Defendants to this lawsuit. Plaintiff must

therefore "allege with particularity" that demand was excused because a majority of the board at the time that the lawsuit was filed was legally incapable of fairly and impartially evaluating a demand.  Fed. R. Civ. P. 23.1; *see also Shoen*, 137 P.3d at 1183 ("[T]he demand futility analysis considers only whether a majority of the directors had a disqualifying interest in the [demand] matter or were otherwise unable to act independently [in evaluating the demand].") (internal quotation marks omitted).    Rule 23.1's heightened pleading standard is significantly more demanding than the liberal Rule 8 notice pleadings standard applicable to most civil complaints.  *Shoen*, 137 P.3d at 1179–80; *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 1984) ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.") (applying Delaware's substantively similar Rule 23.1).  Conclusory assertions and vague generalities will not suffice; a would-be derivative plaintiff must "set forth . . . particularized factual statements that are essential to the claim that a demand has been made and refused, or that making a demand would be futile."  *Shoen*, 137 P.3d at 1179–80 (modification in original, internal quotation marks omitted) (citing *Brehm*, 746 A.2d at 254).  "A prolix Complaint larded with conclusory language . . . does not comply with these fundamental pleading mandates."  *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (modification in original).

Whether a board would have *agreed* with and instituted litigation in response to a shareholder demand is irrelevant to the analysis.  In other words, a prospective plaintiff's demand is not "futile" merely because he alleges that the board would have decided not to pursue the claim in court.  All that matters is whether the board could have *considered* a demand free of improper influences.  As one commentator has observed:

> ***Confusion no doubt flows from the unfortunate use of the terms "futile" and "futility" in describing the circumstances in which demand is excused***.  The test, as articulated by the Delaware courts, is not whether it appears unlikely on the evidence that the

> board will respond affirmatively to the demand.  Rather, the
> question is whether a plaintiff has adequately alleged facts which,
> if true, compel a conclusion that the board is legally disabled from
> dealing with a demand to bring suit **on the claim in question**.

DAVID A. DREXLER ET AL., 2 DELAWARE CORPORATE LAW AND PRACTICE § 42.03[2], at 42-12 to

42-13 (2004) (emphasis added).  Where, as here, a plaintiff does not challenge any specific

business decision by the board, but instead seeks to assert claims based on alleged failures to act,

the test for demand excuse is whether the allegations in the complaint establish that a majority of

the current board "had a disqualifying interest in the [demand] matter or were otherwise unable

to act independently at the time the complaint was filed."  *Shoen*, 137 P.3d at 1183 (quotation

marks omitted); *see Rales v. Blasband*, 634 A.2d 927, 936–37 (Del. 1993).

Failure to satisfy the heightened requirements for pleading demand futility deprives the

shareholder of standing and mandates dismissal of the complaint.  *Shoen*, 137 P.3d at 1180; *see*

*also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) ("[A]s a precondition for the

[shareholder derivative] suit . . . the shareholder [must] demonstrate that the corporation itself

had refused to proceed after suitable demand, unless excused by extraordinary conditions."

(internal quotation marks omitted)).  The Complaint fails to adequately allege demand futility

and must be dismissed.

## II.    THE INSTANT MOTION TO DISMISS SEEKS A DETERMINATION THAT THE COMPLAINT IN *THIS* ACTION FAILS TO SATISFY RULE 23.1

This consolidated action is one of what were seven separate and substantially identical

derivative actions.[4]  Defendants acknowledge that Plaintiff's claims are similar to those which

have previously withstood motions to dismiss in South Carolina and Nevada state courts (the

Nevada case has since been consolidated into the derivative actions pending before Judge

---

[4] There were four such actions filed in this Court; two in state court in Charleston, South Carolina; and one in state court in Las Vegas, Nevada.

Young).   Copies of those interlocutory orders, which are not final orders susceptible to immediate appeal at this time, are attached as Exhibits G and H.   This Court is not bound by either of these orders.   The issue for decision on the instant motion is whether the allegations in Plaintiff's complaint -- not complaints filed in other actions -- satisfy the heightened pleading requirements of Rule 23.1.   Neither Judge Young nor the Nevada court was asked to decide the legal sufficiency of Plaintiff's allegations; nor were the orders denying Defendants' motions final judgments as required to preclude this Court's determination of the issue.   *See Town of Sullivan's Island v. Felger,* 457 S.E.2d 626, 628 (S.C. App. 1996) ("In order to successfully assert collateral estoppel, the party seeking issue preclusion must show that the issue was actually litigated and directly determined in the prior action, and that the matter or fact directly in issue was necessary to support the first judgment.")*; see also Huntley v. Young,* 462 S.E.2d 860, 861 (S.C. 1995) (denial of motion to dismiss is not a final judgment).[5]

Furthermore, Defendants respectfully submit that both orders were wrongly decided (except as noted below) and do not contain the detailed examination of the complaints required by Rule 23.1 or *Caremark* and its progeny.   Judge Young's order, for example, states only that members of the board served on the audit committee -- which, as described below, is legally insufficient to excuse demand -- and that the complaints before him contained "entire sections" devoted to demand futility allegations.   Ex. G, p. 8.   The Nevada order is even less detailed. After devoting several pages to a recitation of *Caremark*'s procedural history, the court summarily concluded that it was "not able to conclude" that the complaint failed to state a claim.

---

[5] Federal courts give preclusive effect to state court judgments where the law of the state in which the judgment was rendered would do so.  *See San Remo Hotel, L.P. v. City and County of Franciso,* 545 U.S. 323, 335 (2005). Nevada preclusion law is functionally equivalent to South Carolina's.  *See Executive Mgmt., Ltd. v. Ticor title Ins. Co.,* 963 P.2d 465, 473 (Nev. 1998) ("The general rule of issue preclusion is that if an issue of fact or law was actually litigated and determined by a valid and final judgment, the determination is conclusive in a subsequent action between the parties.") (quotation omitted); *see also Botzet v. State,* 2009 WL 1458226, at *1 (Nev. Apr. 13, 2009) (order denying motion to dismiss is not a final judgment).

Ex. H, p. 4.  This Court should conduct its own analysis of Plaintiff's Complaint, decline to follow the superficial analyses evidenced by those orders, and thus decline to reach the same erroneous conclusions.  As explained below, a proper and rigorous application of Rule 23.1 and *Caremark* mandates dismissal of the Complaint.

## III.    PLAINTIFF HAS NOT ALLEGED FACTS ESTABLISHING THAT A MAJORITY OF THE BOARD HAS A DISABLING INTEREST PREVENTING PROPER CONSIDERATION OF A DEMAND

Plaintiff's primary demand futility allegations are a common, but long-rejected, pleading tactic: alleging that Force Protection's current directors cannot possibly decide whether Force Protection should pursue litigation in which they are the named defendants.  CC ¶ 130.  Of course, if Plaintiff could circumvent Rule 23.1's heightened pleading standard through the simple expedient of naming the directors as defendants, the demand requirement would be a requirement in name only.  The mere fact that a director has been sued is therefore meaningless for purposes of evaluating whether demand is excused.  "Allegations of mere threats of liability through approval of the wrongdoing or other participation . . . do not show sufficient interestedness to excuse the demand requirement."  *Shoen*, 137 P.3d at 1183.  Instead, "interestedness because of potential liability can be shown ***only in those rare cases where defendants' actions were so egregious that a substantial likelihood of director liability exists***."  *Id*. at 1184  (emphasis added; internal quotation marks omitted).  The Complaint fails to establish that any of the current directors -- much less a majority of them -- faces a "substantial likelihood" of personal liability.

### A.    The Complaint Does Not Allege A Substantial Likelihood Of Liability For Failure To Ensure The Adequacy Of Force Protection's Internal Controls.

The crux of the Complaint is Plaintiff's allegation that "Defendants breached their fiduciary duties by knowingly or recklessly permitting Force Protection to conduct its business

without sufficient internal controls over its operations and financial reporting." CC ¶ 16. These allegations not only fail to show that the Individual Defendants face a "substantial likelihood of liability," they fail to state a viable claim at all.

Failure of oversight claims are held to what may well be the most demanding standards in all of corporate law. *Caremark*, 698 A.2d at 967 (describing such failure of oversight claims as "***possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment***."). Stating such a claim requires specific factual allegations establishing that "the directors *knew* that they were not discharging their fiduciary obligations." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis added). This stringent standard precludes the imposition of liability -- even in the face of catastrophic failures of internal controls -- if a plaintiff offers nothing more than a hindsight complaint that "seeks to equate a bad outcome with bad faith." *Id*. at 373. In other words, Delaware law requires corporate directors to ensure that systems of oversight and internal controls exist, but does not make them *de facto* insurers against failures of those systems. *Caremark*, 698 A.2d at 971 (holding that "only a sustained or systematic failure of the board to exercise oversight -- such as an utter failure to attempt to assure a reasonable information and reporting system exists -- will establish the lack of good faith that is a necessary condition to liability."). Where directors establish a system of internal controls they believe in good faith to be adequate, and make efforts to ensure that system is functioning, they have satisfied their duty of oversight. *Id*.

Here, Plaintiff makes *no allegation* that the Individual Defendants utterly failed to attempt to assure that systems of internal controls existed within Force Protection. Instead, Plaintiff's allegations are of the same deficient species as those dismissed in *Stone*; they seek to equate a bad outcome (the Company's need to restate earnings) with bad faith on the part of the

Individual Defendants.  CC ¶ 16.  The inadequacy of such allegations was firmly established by *Stone*, where the Delaware Supreme Court affirmed the dismissal of a derivative claim even where "[w]ith the benefit of hindsight, it is beyond question that AmSouth's internal controls . . . were inadequate" and "the lack of internal controls resulted in a huge fine -- $50 million, alleged to be the largest ever of its kind."  911 A.2d  at 371.

The inadequacy of Plaintiff's allegations is further underscored by the Complaint's acknowledgment that the Board *did not* stand by and do nothing in the face of problems, but undertook efforts "[t]hroughout 2007" to revise the Company's internal controls.  CC ¶ 98.  As detailed in the Complaint, such efforts entailed "a significant amount of time and resources" and included:

- addition of "new in house legal counsel and key management in financial operations" *Id*.;
- "focus on implementation of [a] new [Enterprise Resource Planning computer] system and its communication with all other significant business systems in the Company to ensure accurate financial reporting" *Id*.; and
- engagement of "a third party with expertise in internal controls to review documents and revise (as necessary) internal controls in an analysis of our key business operating systems." *Id*. [6]

*Id*.  These actions by the board to add new employees and revise the Company's internal controls directly contradict Plaintiff's conclusory allegation that the Board "caus[ed] or allow[ed] the Company to continuously and systematically lack adequate internal controls."  *Id*. ¶ 133.  The very fact that the Board made efforts to remedy perceived weaknesses in Force Protection's internal controls makes it impossible to infer that the Individual Defendants are guilty of the "utter failure to attempt to assure that reasonable information and reporting exists" that is a necessary condition for liability under *Caremark*.  698 A.2d at 971.

---

[6] The Complaint actually goes so far as to say that after "recognizing…severe deficiencies in Force Protection's operational controls" the Company hired a consultant to implement "Process Flow Diagrams" to help remedy the problems.  CC ¶ 73.  Such allegations are legally inconsistent with a *Caremark* claim.

In addition, even before 2007, the Company's outside auditors examined the Company's internal financial controls and opined that those controls were adequate. See Exs. A through D. The directors were entitled to rely on those opinions. Having all but conceded that the Defendants discharged their *Caremark* duties to implement a system of internal controls, Plaintiff turns to allegations that the Defendants ignored "red flags" that allegedly showed the controls were not working. CC ¶ 134. These "red flags" consist of government reports that allegedly criticized the Company's accounting and operations, and the Company's earnings restatements issued from 2006 through 2008. *Id.* None establishes demand futility.

### 1.    The DCAA Reports

Plaintiff alleges that Defendants "knew or should have known" of weaknesses in the Company's internal financial controls because the Defense Contract Audit Agency ("DCAA") allegedly issued eight audit reports between 2004 and 2008 that were "highly critical of Force Protection's finances and financial accounting systems." *Id.* ¶ 66. Plaintiff asks the Court to assume that the vague reference to "accounting systems" means the DCAA opined that the Company's internal controls were inadequate, but provides no factual support for such an assumption. *Id.* ¶ 46 (alleging that DCAA audits assessed "the adequacy of the contractor's internal control systems and policies" and that negative reports placed the Individual Defendants on notice of flaws in financial reporting). In fact, assessing the adequacy of internal controls over financial reporting is not the DCAA's function. According to its website, the DCAA's responsibilities are limited to "*contract* audits" including "providing accounting and financial advisory services regarding *contracts and subcontracts* to all DoD components responsible for procurement and contract administration." *See* www.dcaa.mil (emphasis added). Plaintiff alleges no reason to believe that accounting and financial advisory services "regarding contracts

and subcontracts" with the DoD would thrust the DCAA into an examination of the adequacy of the Company's internal financial controls.

The Company's auditors, on the other hand, were tasked with the specific responsibility of assessing the adequacy of the Company's internal controls. As noted above, from 2003 through mid-2007, the Company's auditors issued favorable opinions to the Company in each case. Exs. A through E. Eventually, in the third quarter of 2007, the Company discovered weaknesses in its internal controls and, as of that time, disclosed the weaknesses and stopped certifying that its internal controls were adequate. Ex. F, p. 39. While these certifications were appended to the Company's public disclosures, Plaintiff makes no specific allegation that any contrary information -- including the DCAA reports -- ever came to the Board's attention.

### 2. The OIG Report

Plaintiff contends that a June 2007 report of the Department of Defense's Office of the Inspector General (the "OIG Report") details a series of missed production deadlines and supports an inference that the Directors abdicated their duties to monitor Force Protection's operational controls. CC ¶ 133. Missing from the Complaint, however, are allegations suggesting that the missed deadlines resulted from inadequate internal controls, as opposed to the myriad other factors that could cause the Company's vehicles to be delivered late, such as difficulties securing vehicle parts from suppliers. Indeed, the Complaint is silent as to the cause of the delays. Rule 23.1 does not permit the Court to speculate that the delays stemmed from inadequate controls, and that those inadequacies were a function of the Board's systemic inattention to such matters.

Moreover, as is the case with the federal securities complaint from which Plaintiff has copied many of his allegations, the Complaint distorts the contents of the OIG Report. The OIG Report does not say, as Plaintiffs alleged, that the Company "delivered nearly every promised

vehicle late" as of the date the OIG Report was issued.  *Id.* ¶ 70.  The OIG found only that, when measured against applicable revised delivery schedules, a mere 15% of Force Protection's deliveries to the Army, and 30% of its deliveries to the Marines, were 30 or more days late.  Ex. I, p. 22, Table 4.[7]  Moreover, the OIG concluded only that the Company's "performance on the *Cougar and first JERRV contracts* failed to meet" the standards for a "responsible contractor," not that the Company was "irresponsible" as of the date the OIG Report was released.  *Id.* at 18. The Cougar contract was awarded in April 2004, and the "first JERRV contracts" were awarded in May 2005.  *Id.* at 6-7.  If anything, the OIG Report reflects that Force Protection's late deliveries were heavily concentrated in its earliest years of operations and that on-time delivery rates vastly improved over time.[8]  This suggests prompt and effective corrective action, not the sustained or systematic directorial inattention Plaintiff asks the Court to presume.

Plaintiff compounds his errors by alleging that the severely exaggerated "late deliveries" alleged in the Complaint caused the DoD to open MRAP procurement to competitive bidding, which in turn led to the Company's loss of MRAP orders to competitors.  CC ¶¶ 70-72.  The OIG Report says no such thing.  The OIG report recognized that sole source awards to Force Protection were initially appropriate "given the unusual and compelling requirement" for MRAPs, but that as other MRAP manufacturers emerged, full and open competition became the preferred acquisition strategy.  Ex. I, p. 26.  Indeed, as the OIG Report notes, the Marines had

---

[7] As explained by the Commandant of the Marine Corps in a letter attached to the OIG Report, modifying delivery schedules "is a legal and acceptable practice" that was "not unexpected given the urgent nature of the action and the fact that the MCSC was trying to procure and field a complex, new vehicle system without the benefit of a lengthy and costly development phase."  *Id.* at 48.

[8] For example, the OIG Report reflects that Force Protection delivered all 79 JERRVs on time in its most recent contract with the Marines.  Similarly, of the four Buffalo contracts examined in the OIG Report (awarded in September 2002, May 2004, November 2004, and February 2006, respectively) virtually all of the late deliveries were concentrated in the first three contracts, all awarded during the Company's infancy as an MRAP manufacturer. Despite those initial late deliveries, the Army placed a large order for 41 Buffalos in February 2006.  Only 22% of those vehicles were delivered 30 or more days late.

begun competitive bidding for MRAPs even before the OIG Report was issued.  *Id*.  Plaintiff's

allegations that the OIG Report itself caused the DoD to stop awarding sole source contracts to

Force Protection defies this undisputed chronology.

Moreover, the OIG Report did *not* recommend that the DoD stop ordering the Company's

MRAPs.  To the contrary, the OIG Report recognized that Force Protection's vehicles "proved to

have significant and operational value to our warfighters on the field" and "the vehicles

performed well and saved lives."  *Id*.  The OIG therefore recommended that the DoD include

liquidated damages provisions and late delivery fees in future contracts with the Company.  In

other words, the *OIG Report presumes that the DoD will continue to order MRAPs from Force

Protection*.

That is precisely what occurred.  The Company received a steady stream of new MRAP

orders throughout 2007, both before and after the OIG Report and most of the DCAA Reports

had been issued:

- In November 2006 the United States Marine Corps ordered up to 200 JERRVs and 80 Buffalos, for a total estimated price of $214,124,450.  Ex. J, p. 2.[9]

- In February 2007 the Company received an order from the U.S. Marine Corps for 125 MRAPs worth $67 million. Ex. K, p. 2.  On March 9, 2007, the U.S. Marine Corps placed another order for 19 Buffalos.  Ex. L, p. 2.

- In April 2007 the Company had received the largest order in its history: an order for 1,000 MRAPs worth approximately $490,000,000.  Ex. M, p. 1.

- On May 3, 2007, the Company won yet another contract from the U.S. Marine Corps worth $8,860,000.  Ex. N, p. 2.  On May 30, 2007, it received yet another order worth $11,991,406.  Ex. O, p. 2.

- In October 2007, the Company received from the DoD a contract to build 800 MRAPs worth $376 million. Ex. P, p. 2.

---

[9] The Court may take judicial notice of Force Protection's SEC filings, many of which are cited at length in Plaintiff's Complaint.  *See Sec'y of State for Defense v. Trimble Navigation, Ltd*., 484 F.3d 700, 705 (4th Cir. 2007).

- In December 2007, the Company received yet another blockbuster order for 358 MRAPs worth $378 million. Ex. Q, p. 2.

Plaintiff then attempts to allege that, despite its success in increasing its orders in an absolute sense, the Company nonetheless lost share in a rapidly expanding MRAP market due solely to supposed late deliveries and internal controls deficiencies. CC ¶ 72. This is rank speculation; the Complaint contains no facts suggesting that the DoD awarded contracts to the Company's competitors for such reasons, as opposed to the myriad other competitive factors that go into awarding a large defense contract. In fact, the Complaint suggests that the Company's supposed loss of market share had nothing at all to do with late deliveries or internal controls, and everything to do with the DoD's "pure fleeting" decision, *i.e.,* a decision to buy MRAPs manufactured by contractors who already supplied other types of vehicles to the DoD. *Id.* ¶ 102 (quoting an article reporting that "the Pentagon's decision to award the bulk of new MRAP orders to Navistar highlights a broader theme in modern militaries: a desire for different types of field equipment to share parts to bolster availability, cut down service costs and improve performance" and that "Navistar already suppl[ies] heavy trucks to the military . . . and its MaxxPro MRAP uses a similar engine and chasis.").

### 3.    The Restatements

Plaintiff argues that the Company's discovery of errors in prior financial results, and its corresponding restatement of those results, show that the directors knowingly disregarded the internal controls problems. *See id.* ¶ 134 (claiming that the restatements constitute "red flags" that the board "must have known of and recklessly disregarded"). That makes no sense. The restatements represent the *discovery* and *voluntary public correction* of accounting errors. Correcting past accounting errors does not equate to ignoring problems; to the contrary, it is consistent with honest efforts to get things right. *Stone*, 911 A.2d at 370. By definition,

accounting errors and internal controls weaknesses that were in fact *discovered* and *reported* could not have been *ignored*. It is inexplicable that the Plaintiff can on one hand claim that the Company did nothing in the face of red flags showing the inadequacy of its internal controls, while on the other cite to the Company's Annual Report wherein it identified the mistakes, disclosed them to the public, and explained ongoing remediation efforts to correct them. *Compare* CC ¶ 134 *with id.* ¶ 98.

On this point, the decision in *Kenney v. Koenig*, 426 F. Supp. 2d 1175, 1183 (D. Colo. 2006) is particularly instructive. There, the plaintiff alleged that the defendants faced a substantial likelihood of liability for failure of oversight because the nominal defendant company had discovered "significant" accounting errors requiring the restatement of financial results for 2004 and parts of 2003, and also "recognized in multiple press releases that its internal financial controls during the relevant period were ineffective." *Id*. at 1181, 1183. The court dismissed the complaint, holding that "the fact that [the company] eventually recognized its controls were ineffective does not necessarily show a sustained or systematic failure of the board to exercise oversight" and that, "if anything," the company's recognition and disclosure of accounting errors and internal controls "would create quite the opposite inference." *Id*. at 1183 (internal quotation marks omitted). Indeed, if "mere recognition by the board that internal controls were previously ineffective or inadequate were sufficient to establish a substantial likelihood of liability, demand would be excused in practically every case involving a restatement of financials." *Id*. (quotation marks omitted).

Here, Force Protection not only had a system of oversight in place, but the Company received clean opinions from its independent auditor for each Annual Report from 2003 through 2006, and for the first quarter of 2007. *See* Exs. A, pp. 40-41; B, p. 17; C, p. 25; D, pp. 21-22; E,

pp. 21-22; R, pp. 25-26; S, pp. 25-26; T, p. 2; U, p. 1; V, p.3; W, p. 3.  When the Company ultimately discovered problems, it disclosed them to the public and, according to Plaintiff's recitation of the Company's own disclosures, took a number of actions to remedy the weaknesses.  CC ¶ 98.  This does not suggest a board that was inattentive to the Company's problems, but rather one that took affirmative steps to correct the problems that it found.  In this way, Plaintiff's allegations contradict conclusory allegations that the directors were conscious that they were "not doing their jobs."  *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003).

Plaintiff attempts to counter these facts with the allegations of a "confidential witness" who claims to have informed a former Company employee named Richard Hamilton -- who was never a Company Director and is not a Defendant -- of tax errors and inventory discrepancies in October 2007.  CC ¶¶ 53-55.  These allegations are of no help to Plaintiff.  The alleged tax error was, according to the Complaint, never brought to the attention of the Board.  *Id.* ¶ 54.  Plaintiff alleges only that Hamilton "was confronted with the error" and that it was Hamilton, and not any of the Director defendants, who allegedly "demanded that the Confidential Witness stop documenting the Company's accounting errors."  *Id.*

Plaintiff also acknowledges that the supposed inventory discrepancy was made known to Hamilton -- but again, not the Board -- in October 2007.  *Id.* ¶ 53.  Plaintiff alleges that the inventory discrepancy "was one of many problems that ultimately led to the restatement," presumably referring to the September 2008 earnings restatement referred to in paragraph 14 of the Complaint.  But Plaintiff alleges no facts to suggest that the alleged "discrepancy" was directly related to the Company's disclosure in September 2008 that it "did not properly measure inventory for financial reporting purposes in accordance with GAAP."  *Id.* ¶ 14.  At most, Plaintiff's allegation shows that a lower-level employee brought a discrepancy to Hamilton's

attention and that Company employees worked to resolve the discrepancy by "find[ing] the missing $60 million in inventory." *Id*. ¶ 53. Thus, Plaintiff concedes that the alleged discrepancy was not ignored -- even at Hamilton's level, the Company took action to resolve the alleged problem.

Plaintiff's intentionally vague allegations that the confidential witness documented these issues in a memorandum provided to unnamed "Company representatives," (*Id*. ¶ 56) and Plaintiff's strategic use of passive voice in alleging that the confidential witness "was fired" for discussing the issues with Hamilton, also fail to excuse demand. *Id*. Absent detailed allegations showing the involvement of a majority of the Board, Rule 23.1 is not satisfied.

Plaintiff also complains -- again liberally copying text from the federal securities complaint -- that the Company's accounting software was not "fully integrated" such that monthly manual entries were needed to post certain expenses. *Id*. ¶ 56. But Plaintiff never explains why this was a problem, much less a problem glaring enough to constitute a "red flag." The fact that entries were made manually does not mean they were erroneous. (Indeed, by Plaintiff's logic, all accounting performed before the onset of computers was by definition unreliable.) Moreover, Plaintiff's vague allegation that APT software "did not work as well" as Excel is not evidence of flawed controls, but mere quibbling with the relative effectiveness of competing software systems. *Id*. ¶ 58. Plaintiff's subjective disagreement with management's choice of accounting software does not establish a substantial likelihood of liability.

Finally, Plaintiff suggests that certain of the Company's officers signed false certifications concerning the Company's internal controls after the Company had disclosed during the third quarter of 2007 that it had discovered material weaknesses in its internal controls. *Id*. ¶ 134. That is not so. Although the Company had restated earnings before the third

quarter of 2007, it had never concluded that its internal controls were inadequate.  It came to and

publicly disclosed that conclusion after a "re-evaluation" of its controls in October 2007.  *Id*. ¶

97.  From that time forward, neither the Company nor any of its officers certified that the

Company's internal controls were adequate.  To the contrary, the Company proceeded to make

detailed disclosures of the material weaknesses and its efforts to remedy them.  *Id*. ¶¶ 98, 104-05,

118-19.

> B.    **Nevada Law And Force Protection's Articles Of Incorporation Exculpate The Individual Defendants From Monetary Liability To The Company For Any Alleged Breach Of The Duty Of Care.**

The Amended Complaint asserts damages claims as to which the directors are exculpated

from liability as a matter of Nevada law and Force Protection's own Articles of Incorporation.

Nevada's exculpation statute, N.R.S. § 78.138(7), states that "unless the articles of incorporation

. . . provide for greater individual liability":

> [A] director or officer is not individually liable ***to the corporation or its stockholders or creditors*** for any damages as a result of any act or failure to act ***in his capacity as a director or officer <u>unless</u>*** it is proven that***:***
>
>> ***(a) His act or failure to act constituted a breach of his fiduciary duties as a director;*** and
>>
>> ***(b) His breach of those duties*** involved intentional misconduct, fraud or a knowing violation of law.

(emphasis added).[10]    As  permitted  by  N.R.S.  § 78.138(7),  Force  Protection's  Articles  of

Incorporation exculpate the Defendants from liability for alleged breaches of fiduciary duty,

---

[10]  State  law  provisions  like  Nevada's  director  and  officer  exculpation  statute,  N.R.S.  § 78.138(7),  and corresponding provisions of companies' articles of incorporation, recognize the difficulty that public companies face in attracting qualified board members in light of the exposure corporate directors and officers face in today's litigious world.  By limiting the potential litigation exposure associated with service as a director or officer, these provisions encourage capable individuals to such service.  These protections and incentives are particularly important to directors, who often do not receive remuneration for their services that is material in the context of their overall financial status.

unless the alleged breach implicates the duty of loyalty, bad faith, or international violations of

the law:

> ***(d) Limitation on Director's Liability.***   No director of this
> corporation shall have any personal liability for monetary damages
> to the corporation or its shareholders for breach of his fiduciary
> duty as a director, except that this provision shall not eliminate or
> limit the personal liability of a director to the corporation or its
> shareholders for monetary damages for:  (i) any breach of the
> director's duty of loyalty to the corporation; or (ii) acts or
> omissions not in good faith or which involve intentional
> misconduct or a knowing violation of law; Nothing contained
> herein will be construed to deprive any director of his right to all
> defenses ordinarily available to a director, nor will anything herein
> be construed to deprive any director of any right he may have for
> contribution from any other director or other person.

Ex. X, Article Seventh (d); *see also* Ex. Y, Article Eighth (d) (same).[11]  This provision contains

no exception, however, for alleged breaches of the duty of care.  Thus, the Defendants are

exculpated from any liability as to such claims.

Here, Plaintiff admittedly seeks to recover in Count I for, among other things, alleged

breaches of the duty of care.  CC ¶ 136.  To the extent Count I is based on alleged breaches of

the duty of care, it poses no threat of liability to the Director Defendants because they are

exculpated by Nevada law and the Company's articles of incorporation.  Because the Defendants

cannot be liable under such a claim, there are no grounds on which to excuse demand as to that

claim.  *In re Baxter Int'l, Inc. S'holders Litig*., 654 A.2d 1268, 1270 (Del. Ch. 1995) ("When the

certificate of incorporation exempts directors from liability, the risk of liability does not disable

them from considering a demand fairly unless particularized pleading permits the court to

conclude that there is a substantial likelihood that their conduct falls outside the exemption.");

*Citigroup*, 964 A.2d at 124-25 ("Because the director defendants are exculpated from liability for

---

[11] This Court may take judicial notice of Force Protection's articles of incorporation, which are filed with the
Nevada Secretary of State, in deciding this motion to dismiss.  *See Hazelton,* 2007 WL 1120405, at *4 (considering
exculpatory provision of certificate of incorporation in evaluating sufficiency of demand futility allegations).

certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors" -- i.e. intentional misconduct or bad faith breach of the duty of loyalty.)  (internal quotation marks omitted) (emphasis in original).  Indeed, Judge Young correctly reached that conclusion in the Stevenson derivative case, where he dismissed all claims premised on alleged breaches of the duty of care.  Ex. G, p. 10.

C.    **Plaintiff's Claims Based On Alleged False Statements Do Not State A Viable Claim.**

Count I of the Complaint is premised in part on the making of allegedly false statements. CC ¶¶ 75-112.  Those allegations also fall victim to N.R.S. § 78.138(7) and the Articles of Incorporation.  *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994) (holding that directors were exculpated from liability for alleged false statements under Delaware's substantially similar exculpation statute).  Although it is theoretically possible for alleged disclosure violations to fall outside the scope of the exculpation permitted by N.R.S. § 78.138(7), such claims for damages are viable only where accompanied by particularized factual allegations that "the board lacked good faith in approving the disclosure."  *In re Tyson Foods, Inc. S'holders Litig.*, 919 A.2d 563, 597 (Del. Ch. 2007).  Where, however, "the misstatement or omission was made as a result of a director's erroneous judgment with regard to the proper scope and content of disclosure, but was nevertheless made in good faith," liability is foreclosed by N.R.S. § 78.138(7) and the Articles of Incorporation.  *Id.*; *Arnold*, 650 A.2d at 1270.

Plaintiff's allegations fail precisely because they contain no facts -- as opposed to bald conclusions -- suggesting that the alleged false statements were products of bad faith.  Plaintiff alleges that the Individual Defendants "knowingly" breached their fiduciary duties because they "knew that the adverse facts . . . had not been disclosed" and that the Company's ability to compete for government contracts was impacted by product delivery delays and inadequate

accounting systems, and that the Company "lacked adequate internal controls." CC ¶¶ 71, 133-34. The totality of Plaintiff's support for these allegations is (a) the "OIG Report," which merely noted that the Company had some difficulties meeting certain delivery deadlines; (b) unspecified and undated DCAA reports that allegedly concluded that the Company's "financial system of accounting" had certain deficiencies; and (c) as mentioned above, the Company's disclosure on October 15, 2007 that it had identified certain weaknesses in its internal controls. *Id.* ¶¶ 50, 97. These allegations fail to overcome N.R.S. § 78.138(7) because they are unaccompanied by particularized allegations of fact showing that the Individual Defendants made or approved the allegedly false statements with a bad faith disregard for their accuracy.

Plaintiff first alleges that the Defendants made false statements by failing to disclose product delivery delays alluded to in the OIG Report which, according to Plaintiff, "caus[ed] the DOD to start welcoming competing bidders" and therefore impacted the Company's ability to compete in the MRAP market. *Id.* ¶ 71. As noted above, the alleged late deliveries occurred in 2005 or before, and Plaintiff alleges no facts to suggest that the DoD welcomed other bidders because of them. Indeed, Plaintiff's allegation that the OIG Report "caused" the Department of Defense to start welcoming competing bidders (*Id.* ¶ 71) or in any way suggested that the Company's competitive position was impacted by delivery delays is pure fantasy. As noted above, the OIG Report did assert that Force Protection had some difficulties meeting delivery deadlines in its early years of operations -- hardly a surprising revelation for a new company building a new product on tight deadlines -- but the Report does not suggest that competitive bidding be established for that reason. The reason for competitive bidding was the presence of alternative supply sources for MRAPs. Ex. I, p. 26. And, as noted above, the Complaint suggests that the Company lost share in the MRAP market not because of internal controls

problems or late deliveries, but because the DoD decided to award MRAP contracts to a company (Navistar) whose MRAPs share an engine and chassis with other vehicles in the Army's fleet. *Id.* ¶ 102.

Plaintiff's allegations about the DCAA reports are similarly deficient. Plaintiff alleges that those reports show that the Company's statements about its internal controls were false when made, but those allegations rest on several unsupported assumptions about the timing and content of these reports. According to the Complaint, the Company received "at least eight audit reports on [its] operations and contracts with the U.S. Military from May of 2004 through October of 2007." *Id.* ¶ 66. While Plaintiff apparently hopes to use such allegations to create the illusion that the Board knew of alleged flaws in the Company's internal controls dating back to the earliest DCAA report (May 2004), the Complaint lacks the details necessary to support that conclusion. The Complaint alleges only that the DCAA issued a series of reports over a three-year period, but does not say what any of those specific reports related to, or precisely when within that three year window any of the reports was released. Nor is there any specific allegation that the Board was aware of the reports when issued. Thus, the unstated assumption in the Complaint -- that reports critical of the Company's internal controls were issued *before* the alleged false statements were made beginning in August 16, 2006 -- is pure speculation.

Plaintiff's failure to allege specific facts establishing that a majority of current directors had contemporaneous knowledge of information making challenged statements false or misleading when made or establishing that internal controls were inadequate yet did nothing about it is fatal to the Complaint. *See Shoen*, 137 P.3d at 1179 (holding that demand futility must be pled with specificity, as opposed to mere assumptions). With respect to alleged GAAP violations and other alleged accounting deficiencies, doing so requires, at a minimum, specific

allegations regarding "whether the Company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the improper accounting practices." *Guttman*, 823 A.2d at 498. Plaintiff points out the obvious fact that the Company had an audit committee, but does not go further. There is no allegation as to how often it met, what it considered, or anything else, for that matter.

**D.     None Of The Board Members At The Time The Action Was Filed Faces A Substantial Likelihood Of Personal Liability Arising From Alleged Stock Sales**

Although not included as a specific count, Plaintiff expends an entire section of his Complaint detailing alleged "insider stock sales" allegedly made by Defendants McGilton and Kavanaugh. CC ¶¶ 122-25. Plaintiff fails adequately to allege that a majority of the Board faces a substantial likelihood of liability to the Company for alleged insider trading. Neither McGilton nor Kavanaugh was a member of the Board when this action was filed. *Id.* ¶¶ 24-25. And since none of the Board members is alleged to have sold *any* shares, no director faces any prospect of personal liability for insider trading. Nor does Plaintiff allege a single reason why the Board could not impartially evaluate potential insider trading claims against McGilton or Kavanaugh. Accordingly, there is no basis on which to excuse demand as to these claims.

**E.     None Of The Directors Faces A Substantial Likelihood Of Liability As To Plaintiff's Claims For Waste Or Unjust Enrichment.[12]**

**1.     Plaintiff's allegations do not state a viable claim for waste.**

To plead a viable claim for waste, Plaintiff must meet an "extreme," "rarely satisfied" test. *See Highland Legacy Ltd*. *v. Singer*, No. Civ.A. 1566-N, 2006 WL 741939, at *7 (Del. Ch.

---

[12] The derivative complaints filed in South Carolina state court also included claims for waste and unjust enrichment. In his order, Judge Young explicitly refused to address the defendants' motion to dismiss these claims. Judge Young appears to have erroneously concluded that the Defendants' motion attacked the merits of the unjust enrichment and waste claims, as opposed to the sufficiency of the plaintiff's pleading of those claims. Ex. G, p. 10. Similarly, the order denying the Defendants' motion to dismiss in Nevada failed to address the unjust enrichment claim asserted in that case (there was no claim for waste in the Nevada proceeding). *See* Ex. H. Thus, neither order provides even persuasive support for the viability of the claims pled in Plaintiff's Complaint.

Mar. 17, 2006); *see also In re The Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) ("A claim of waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets.") (citations omitted).   Plaintiff must allege facts showing that defendants "authorize[d] an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."   *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).   "As a practical matter, a stockholder plaintiff must generally show that the board irrationally squandered corporate assets -- for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all."   *White v. Panic*, 783 A.2d 543, 554 (Del. 2001) (citations omitted).

Here, Plaintiff's one-sentence waste claim summarily alleges that Defendants "expend[ed] millions of dollars of corporate assets to the extreme detriment of the Company." CC ¶ 147.   Plaintiff does not allege any supporting facts regarding what funds were allegedly wasted, when they were expended, or why such unidentified expenditures would amount to "irrationally squander[ing] corporate assets."   *White*, 783 A.2d at 554.   Nor does Plaintiff attempt to detail the role of any Director in approving a wasteful transaction, much less show that a majority of the Board did so.   Plaintiff merely states that Defendants have spent money to the detriment of the Company.[13]   By failing even to identify the particular transaction that Plaintiff

---

[13] Plaintiff complains elsewhere about alleged agreements pursuant to which APT Leadership ("APT"), a company alleged to be affiliated with Defendant McGilton, provided business software, consulting services, and training to the Company.   CC ¶¶ 58-60.   But Plaintiff has not asserted any claim based upon those allegations. Nor has Plaintiff alleged demand was excused by virtue of the approval of those transactions.  Nor could he.  Plaintiff does not allege any facts suggesting that any member, let alone a majority, of the current Force Protection Board had any involvement or material personal interest in the alleged conduct.   Indeed, Plaintiff alleges that Force Protection made payments to APT for reference software and services "in 2005 and 2006."   *Id.* ¶ 57.   Directors Thompson, Day, and Paxton, however, joined Protection's board on or after December 26, 2006, and Plaintiff alleges nothing to suggest that the alleged transactions with APT were approved during the last five days of 2006.   In any case, Plaintiff alleges that McGilton's interests in APT were disclosed -- *see Id.* ¶ 59 -- which, as a matter of Nevada law, insulates the approval of those transactions from Plaintiff's attacks.   N.R.S. § 78.140(2)(a) (transaction is not void or

attacks as wasteful, Plaintiff fails to come remotely close to satisfying the "extreme," "rarely satisfied" test required to adequately plead a claim for waste, much less that a majority of the board faces substantial risk of liability for that claim.  As such, Plaintiff's Third Cause of Action does not give rise to any threat of liability at all.

> **2.    The Complaint does not state an actionable claim for unjust enrichment.**

Without providing the basic factual background to determine who, what, or when the Complaints are even referring to, Plaintiff nevertheless includes in his Complaint a count for unjust enrichment against all Defendants.  CC ¶ 149-50.  Unjust enrichment occurs when a person receives and retains a benefit that should belong to another.  *Unionamerica Mortgage & Equity Trust v. McDonald*, 97 Nev. 210, 212 (1981).  The Complaint utterly fails to adequately allege even the prima facie elements of a claim for unjust enrichment -- that is, what the benefit was, who retained the benefit, or why it should belong to another.  This failure alone is enough to warrant dismissal.  Dismissal is particularly appropriate here because demand is excused as to a claim for unjust enrichment only if Plaintiff alleges particularized facts showing that a majority of the Board faces a substantial likelihood of liability.  *See* Rule 23.1.

As noted above, Plaintiff's unjust enrichment claim contains no specificity at all. Perhaps the "enrichment" to which Plaintiff refers is the board's receipt of compensation for their services as the benefit.  CC ¶ 150.  To the extent Plaintiff seeks to allege that the Individual Defendants were unjustly enriched by receiving a salary, fee, or other compensation (such as stock options), such claims also fail.  Nothing in the Complaint demonstrates that Defendants received any unjustified benefit to which they were not entitled.  Defendants were presumably awarded salaries, benefits, bonuses and/or stock options as part of their compensation for which

voidable when "the fact of common directorship, office or financial interest is known to the board of directors" and the board "approves or ratifies the contract or transaction in good faith").

they, in turn, provided their services to the Company. Pursuant to N.R.S. § 78.140(5), "such compensation is *presumed to be fair* to the corporation unless proven unfair by a preponderance of the evidence." *Id.* (emphasis added). Plaintiff does not plead any specific facts, establishing or even suggesting that the value of the Defendants' services to the Company was less than the value of the unspecified compensation they received. *See, e.g., Highland Legacy*, 2006 WL 741939, at *7 n.73 ("[A]s a matter of law, the court cannot reasonably conclude that the defendants were unjustly enriched when [they] received compensation for providing services to [the company] pursuant to a contractual agreement approved by the [company's] board."). Moreover, because the business judgment rule will presume that such compensation is fair, without further allegations that these compensation decisions were tainted, the mere receipt of compensation will not support a claim for unjust enrichment. *See* N.R.S. § 78.140(5); *see also Brehm*, 749 A.2d at 263. Accordingly, there is no substantial likelihood of liability for unjust enrichment.

### F.     Plaintiff's Remaining "Demand Futility Allegations" Fail

Paragraphs 131(a) through (d) of the Amended Complaint act as repositories of the kind of conclusory, kitchen sink "demand futility allegations" that courts routinely reject as meaningless boilerplate. Plaintiff alleges that making a pre-suit demand would have been futile because: (1) Defendant Moody is an employee of the Company, CC ¶ 131(a); (2) the majority of the board is "dominated" by Defendants who, by virtue of their participation in the alleged wrongs, face liability, *Id.* ¶ 131(b); (3) four board members served on the Company's Audit Committee, *Id.* ¶ 131(c); (4) the current directors would not sue Defendant McGilton, with whom Plaintiff alleges "upon information and belief, the Company maintains an ongoing business relationship," *Id.* ¶ 132; and (6) two directors receive certain unspecified payments and other benefits by virtue of their membership on the board, *Id.* ¶ 131(d).

Plaintiff alleges that because Defendant Moody is employed by Force Protection he is "incapable of independently and disinterestedly considering a demand." *Id.* ¶ 131(a). Mere service as a corporate officer, however, is not sufficient to render demand futile. *See Jannett v. Gilmartin,* No. HNT-L-341-05, 2006 WL 2195819, at *3-4 (N.J. Super. Law Div. July 21, 2006) (directors who also serve as corporate executives are not presumptively interested; plaintiff must plead facts showing disqualifying interest to excuse demand as to such directors). The allegation that Moody is not "independent" under New York Stock Exchange rules due to his employment with the Company fails for the same reason. CC ¶ 131(a). The issue is whether Moody can independently evaluate the claims asserted in the complaint, not whether he meets the NYSE definition of "independent." Accepting Plaintiff's allegation would categorically disable all inside directors from being considered disinterested for purposes of Rule 23.1 -- an unworkable rule that has no precedential support.

Even if Moody's employment as an officer of the Company somehow were sufficient to render demand futile as to him, Plaintiff's allegation would, at most, suffice to plead demand futility as to one of the five Force Protection directors who would have considered a demand. Accordingly, this argument would not excuse demand here even if meritorious. *See Shoen,* 137 P.3d at 1183 ("[T]he demand futility analysis considers only whether a majority of the directors had a disqualifying interest in the [demand] matter or were otherwise unable to act independently" in evaluating a demand.).

Plaintiff also alleges that Defendants Moody, Davis, Day, and Thompson are incapable of considering a demand solely because they were "members or former members of Force Protection's Audit Committee." CC ¶ 131(c). But mere membership on a particular board committee is insufficient to establish demand futility. *See Rattner v. Bidzos*, No. Civ. A. 19700,

2003 WL 22284323, at *11 (Del. Ch. Sept. 30, 2003) (disqualifying interest not sufficiently pled where complaint merely "alleges general knowledge in a conclusory fashion . . . explained solely by virtue of [defendants'] service in their various capacities"); *see also Desimone v. Barrows*, 924 A.2d 908, 938 (Del. Ch. 2007) (allegations of mere committee membership were insufficient to plead a substantial likelihood of liability relating to matters for which those committees had responsibility); *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 963 (N.D. Cal. 2007) ("Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that directors were conflicted."). Plaintiff's allegations regarding certain committee members' service on the audit committee are, at bottom, just a variation on Plaintiff's failed attempt to allege that Defendants face a substantial risk of liability on the claims sought to be asserted. As discussed above, however, the mere fact that Force Protection restated certain financial results during the period of time in which Moody, Thompson, Day, and Davis served on the Audit Committee does not give rise to a substantial likelihood of personal liability as to these directors and therefore does not excuse demand. *See Shoen,* 137 P.3d at 1183-84 ("Allegations of mere threats of liability through approval of the wrongdoing or other participation . . . do not show sufficient interestedness to excuse the demand requirement. Instead, as the Delaware courts have indicated, interestedness because of potential liability can be shown only in those rare cases where defendants' actions were so egregious that a substantial likelihood of liability exists.").

Plaintiff's allegation that no Director would sue McGilton due to unspecified "ongoing business relationships" also fails. CC ¶ 132. The only business relationship alleged in the Complaint is the Company's purchase of certain software and business consulting services from APT. *Id.* ¶¶ 57-60. But that was a transaction between APT and the Company, not between

APT and the Director Defendants. Plaintiff alleges no facts to suggest that any Director had a personal interest of any kind in the Company's transactions with APT. In fact, Plaintiff's own allegations show that a majority of the Directors joined the Board after the transactions with APT had occurred. *Compare id.* ¶ 57 (transactions with APT occurred in 2005 and 2006) *with id.* ¶ 30 (Defendant Thompson joined Board on December 26, 2006), *id.* ¶ 31 (Defendant Day joined Board September 18, 2007), *id.* ¶ 32 (Defendant Paxton joined Board February 20, 2008).

Finally, Plaintiff alleges that Defendants Davis and Thompson are not disinterested because they, like virtually every other director of a public company throughout the United States, have been compensated for their service to the Company. Accepting Plaintiff's allegations would render virtually every director incapable of considering a shareholder demand, and it is for that very reason that such allegations have been uniformly rejected. *In re Keithley Instruments, Inc., Derivative Litig.*, 599 F. Supp. 2d 875, 892 (N. D. Ohio 2008) (holding that ordinary director compensation alone is insufficient to show demand futility); *Loveman v. Lauder*, 484 F. Supp. 2d 259, 269 (S.D.N.Y. 2007) (same); *In re Coca-Cola Enters., Inc. Derivative Litig.*, 478 F. Supp. 2d 1369, 1376 (N.D. Ga. 2007) (same); *Sutherland v. Sutherland*, 958 A.2d 235, 241 (Del. Ch. 2008) (same).

**G.     A Majority of The Board is Disinterested as to Pre-2006 Conduct.**

Plaintiff occasionally refers in the Complaint to a "relevant period," but never defines that period. CC ¶¶ 5, 26, 29-31, 48, 62-65, 67-69, 112, 120-25, 127, 133, 138. Certain allegations in the Complaint, however, complain of matters that date back to 2004, including (a) alleged late deliveries identified in the OIG Report, and (b) DCAA Reports that also date back to 2004. *Id.* ¶¶ 66, 69. Although Plaintiff frequently treats "the Board" as though it were a continuous, monolithic entity, the composition of the Board changed significantly over the

relevant period. Therefore, any current directors who were not board members at the time of Plaintiff's allegations of wrongdoing face no likelihood of liability and are by definition disinterested. Indeed, *none* of the Director Defendants has a tenure on the Board that spans the entire duration of the time period covered by the Complaint.

Defendant Thompson joined the board on December 26, 2006, after the alleged late deliveries identified in the OIG Report had already occurred, and after at least some of the eight DCAA Reports were issued. *Id.* ¶ 30. The same is true of Defendants Moody and Davis, who joined the Board on September 18, 2006 and in March 2006, respectively. *Id.* ¶ 26, 29.

Defendant Day joined the Board on September 18, 2007. *Id.* ¶ 31. He therefore had no involvement in, and cannot be liable for, events that predate the start of his tenure, which include all of the alleged false statements issued in 2006 and the first three quarters of 2007 and alleged weaknesses in internal controls at that time. *Id.* ¶¶ 75-96 (complaining of false statements and deficient internal controls from December 2006 through August 2007). The same is true for Defendant Paxton, who did not join the Board until February 20, 2008. *Id.* ¶ 32. In fact, Plaintiff does not allege that any breaches of fiduciary duty occurred after February 20, 2008, making it impossible for Defendant Paxton to face any likelihood of liability.

## IV.    PLAINTIFF HAS FAILED TO ALLEGE THAT HE CONTINUOUSLY OWNED FORCE PROTECTION SHARES

Fed. R. Civ. P. 23.1 sets forth a simple, bright-line procedural rule that requires a derivative plaintiff to verify that he or she "was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law." "The requirements of Rule 23.1 are to be vigorously enforced, and failure to meet them requires dismissal of the suit." *Strickland v. Flue-Cured Tobacco Coop. Stabilization Corp.,* 643 F. Supp. 310, 316 (D.S.C. 1986). Here, Plaintiff alleges only that he "is, and at all

times relevant to this action, was a shareholder" of Force Protection. CC ¶ 22. That is not enough. Plaintiff must state specifically when he purchased shares, which he has failed to do. *See, e.g., In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1202 (N.D. Cal. 2007) (rejecting allegation of stock ownership "during the Relevant Period," and requiring plaintiffs to "unambiguously indicate in any amended complaint the dates they purchased [company] stock, and whether they have continuously owned [company] stock from the time of purchase up to the present"); *In re Computer Scis. Corp. Deriv. Litig.*, No. CV 06-05288 MRP (Ex), 2007 WL 1321715, at *15 (C.D. Cal. Mar. 26, 2007) (dismissing complaint because it "only generally allege[d] that each Plaintiff 'is, and was during the relevant period,' or 'is, and was at all times relevant to,' a shareholder"); *In re Maxim Integrated Prods., Inc.*, No. C06-0334JW, 2007 WL 2745805, at *3-4 (N.D. Cal. July 25, 2007) (dismissing claims because allegations of stock ownership "at all relevant times" is insufficient). Because Plaintiff has failed to satisfy the fundamental requirements of Rule 23.1, the Complaint must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Nominal Defendant Force Protection respectfully requests that this Court grant its motion to dismiss.

Respectfully submitted this 17th day of June, 2009.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: S/ELENI M. ROUMEL
Eleni M. Roumel
Fed. Bar. No. 9959
E-Mail: eleni.roumel@nelsonmullins.com
151 Meeting Street / Sixth Floor
Post Office Box 1806 (29402-1806)
Charleston, SC  29401-2239
(843) 853-5200

M. Robert Thornton *(admitted pro hac vice)*
Michael R. Smith *(admitted pro hac vice)*
Benjamin Lee *(admitted pro hac vice)*
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, Georgia  30309
404.572.4600 (Telephone)
404.572.5100 (Facsimile)
bthornton@kslaw.com
mrsmith@kslaw.com
blee@kslaw.com

*Attorneys for Frank Kavanaugh, Gordon R. McGilton, Michael Moody, Jack Davis, Roger G. Thompson, Jr., John S. Day, Raymond W. Pollard, R. Scott Ervin, John W. Paxton, Sr., Gale Aguilar, and Michael S. Durski*
*and Nominal Defendant Force Protection, Inc.*

Charleston, South Carolina
June 17, 2009