**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| IN RE FORCE PROTECTION, INC. DERIVATIVE LITIGATION | Master File No. 2:08-1907-CWH |
| | Consolidated with Case Nos. 2:08-1904-CWH; 2:08-1998-CWH; 2:08-2019-CWH |

**MEMORANDUM OF LAW IN OPPOSITION TO NOMINAL DEFENDANT FORCE PROTECTION, INC.'S MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED AMENDED VERIFIED DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 4

ANALYSIS.................................................................................................................. 13

I.   THE COMPLAINT ADEQUATELY ALLEGES PLAINTIFF'S
     CONTINUOUS AND CONTEMPORANEOUS OWNERSHIP OF FORCE
     PROTECTION SHARES ..................................................................................... 13

II.  THE COMPLAINT ADEQUATELY ALLEGES DEMAND FUTILITY ...................... 15

     A.   Legal Framework For Analyzing Demand Futility ................................... 17

          1.   Construction of Allegations and the "Reasonable Doubt" Standard ................ 19

          2.   There is a Reasonable Doubt that a Director is Not  Disinterested When
               the Director Faces a Substantial Likelihood of Liability for Failing to
               Perform His Duty of Oversight.......................................................... 20

          3.   Numerous Background Facts are Relevant to the Court's Analysis of
               Defendants' Substantial Likelihood of Liability for Failing to Oversee
               Force Protection ............................................................................. 23

     B.   The Complaint Creates More Than A Reasonable Doubt That The Director
          Defendants Are Interested .................................................................... 25

     C.   Other Demand Futility Allegations ......................................................... 34

CONCLUSION............................................................................................................ 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*In re Asyst Techs., Inc. Deriv. Litig.*,
    No. C-06-04669 EDL, 2008 WL 2169021 (N.D. Cal. May 23, 2008) ...................................36

*Bateson v. Magna Oil Corp.*,
    414 F.2d 128 (5th Cir. 1969) ................................................................................................15

*In re Biopure Corp. Deriv. Litig.*,
    424 F. Supp. 2d 305 (D. Mass. 2006) ..........................................................................7, 24, 33

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .........................................................................................19, 20, 35

*In re Bridgestone/Firestone, Inc.*,
    333 F.3d 763 (7th Cir. 2003) ................................................................................................17

*Britton v. Parker*,
    06-cv-017997-MSK-KLM, 2008 WL 4533727 (D. Colo. Sept. 5, 2008) .............................16

*Brown v. Kinross Gold U.S.A., Inc.*,
    531 F. Supp. 2d 1234 (D. Nev. 2008)....................................................................................18

*In re Caremark Int'l, Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996).....................................................................................22, 24, 26

*In re Cendant Corp. Deriv. Action Litig.*,
    189 F.R.D. 117 (D.N.J. 1999)........................................................................................19, 21

*In re Computer Sciences Corp. Deriv. Litig.*,
    244 F.R.D. 580 (C.D. Cal. 2007)..........................................................................................15

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................................24

*Desert Equities v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
    624 A.2d 1199 (Del. 1993) ....................................................................................................23

*Epstein v. Itron, Inc.*,
    993 F. Supp. 1314 (E.D. Wash. 1998) ..................................................................................33

*Fernandes v. Bianco*,
    No. C05-0964 RSM, 2006 U.S. Dist. LEXIS 42048 (W.D. Wash. June 22, 2006) ...............36

*Galdi v. Jones*,
    141 F.2d 984 (2d Cir. 1944) ....................................................................................14

*Grimes v. Donald*,
    673 A.2d 1207 (Del. 1996) ......................................................................................19

*Grobow v. Perot*,
    539 A.2d 180 (Del. 1988) ........................................................................................19

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003).......................................................................21, 22, 33

*Heineman v. Datapoint Corp.*,
    611 A.2d 950 (Del. 1992) ........................................................................................20

*Henik v. LaBranche & Co., Inc.*,
    433 F. Supp. 2d 372 (S.D.N.Y 2006).......................................................................17

*Estate of Jacquelin K. Stevenson v. Kavanaugh, et al.*,
    No. 2008-CP-10-1735 (S.C. Com. Pl. Feb. 10, 2009) ............................................16

*Jones v. Fife*,
    No. 2:06-CV-00030 PGC, 2007 WL 518428 (D. Utah Feb. 6, 2007) ....................36

*Kamen v. Kemper Financial Services*,
    500 U.S. 90 (1991)....................................................................................................3

*Kurlan v. Comm. Of Internal Revenue*,
    343 F.2d 625 (2d Cir. 1965).....................................................................................16

*In re Lernout & Hauspie Sec. Litig.*,
    286 B.R. 33 (D. Mass. 2002) ...................................................................................27

*Leslie v. Telephonics Office Techs., Inc.*,
    1993 WL 547188 (Del. Ch. Dec. 30, 1993)..............................................................21

*McCall v. Scott*,
    239 F.3d 808 (6th Cir. 2001) ...................................................................................19

*McCall v. Scott*,
    250 F.3d 997 (6th Cir. 2001) ...................................................................................23

*Mitzner v. Hastings*,
    No. C 04-3310 FMS, 2005 WL 88966 (N.D. Cal. Jan. 14, 2005) ..........................27

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    192 F.R.D. 111 (S.D.N.Y. 2000) ................................................................... passim

*Rales v. Blasband*,
 634 A.2d 927 (Del. 1993) ..................................................................18, 19, 21

*Saito v. McCall*,
 No. Civ. A. 17132-NC, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004) ...............................4, 22

*Sampson v. Robinson*,
 No. 07 Civ. 6890(PAC), 2008 WL 3884386 (S.D.N.Y. Aug. 20, 2008)..................................5

*In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*,
 495 F. Supp. 2d 477 (D.N.J. 2007) ..............................................................4, 24, 25, 31

*Shoen v. S.A.C. Holding Corp.*,
 137 P.3d 1171 (Nev. 2006)..............................................................18, 19, 20

*In re Silicon Graphics, Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999) ..................................................................33

*Stone v. Ritter*,
 911 A.2d 362 (Del. 2006) .................................................................. passim

*Strassburger v. Farley*,
 752 A.2d 526 (Del. Ch. 2000)..................................................................35

*In re TASER Int'l. S'holder Deriv. Litig.*,
 No. CV-05-123-PHX-SRB, 2006 WL 687033 (D. Ariz. March 17, 2006)...........................31

*In re The Walt Disney Co. Deriv. Litig.*,
 906 A.2d 27 (Del. 2006) ..................................................................23

*In re Tower Air, Inc.*,
 416 F.3d 229 (3d Cir. 2005)..................................................................21

*In re Veeco Instruments, Inc. Sec. Litig.*,
 434 F. Supp. 2d 267 (S.D.N.Y 2006).................................................................. passim

*Vitale v. McGilton, et al.*,
 No. A560860-B (Dist. Ct., Clark County, NV Feb. 10, 2009) .........................................16, 17

*Wencoast Restaurants, Inc. v. Chart Capital Partners, L.P.*,
 No. 2:05-1650-18, 2006 WL 490101 (D.S.C. Feb. 28, 2006) .................................17

## STATUTES & OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)..................................................................13

Fed. R. Civ. P. 15(a)(2)..................................................................36

Fed. R. Civ. P. 23.1 ..................................................................3, 14, 15, 17, 18

N.R.S. §78.138(7) ...........................................................................................................21, 34

7 Herbert B. Newberg, *Newberg on Class Actions* § 22:95 (4th ed.) ............................................14

13 Fletcher, Cyclopedia Corporations § 5982 (Rev. vol. 1970) ....................................................15

C. A. Wright, A. R. Miller & M. K. Kane, *Federal Practice and Procedure* § 1828 at 62
(2d ed. 1986) .........................................................................................................................14

Plaintiff Duaine Galbraith ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to Nominal Defendant Force Protection, Inc.'s ("Force Protection" or the "Company") Motion to Dismiss the Consolidated Amended Verified Derivative Complaint (the "Complaint") and Force Protection's accompanying Memorandum of Law ("F.P. Mem.").[1] Plaintiff respectfully requests that the pending Motion to Dismiss be denied in its entirety for the reasons detailed below.

## **INTRODUCTION**

This is a case where the Company, and the current officers and directors of the Company, have admitted that, during the relevant time period, the Company:

1. filed false and misleading financial statements;

2. had deficient internal financial and operational controls;

3. these deficient controls threatened the Company's ability to do business with the United States Department of Defense; and

4. the ability to do business with the United States Department of Defense was, and is, essential to the Company's survival.

Defendants' attempt to obfuscate these facts and their own admissions to deflect attention away from their own liability.

---

[1]      Defendants Frank Kavanaugh, Gordon R. McGilton, Michael Moody, Jack Davis, Roger G. Thompson, Jr., John S. Day, Raymond W. Pollard, R. Scott Ervin, John W. Paxton, Sr., Gale Aguilar, and Michael S. Durski (the "Individual Defendants") have filed a separate motion to dismiss the Complaint. The distinct arguments made in the Individual Defendants' Memorandum of Law ("Individual Defs.' Mem.") are addressed in a separate memorandum. However, the Individual Defendants have incorporated the arguments set forth in Force Protection's Memorandum of law, and Plaintiff's response to Force Protection's arguments applies equally to the Individual Defendants.

In fact, the Individual Defendants systematically ignored numerous and obvious red flags plainly indicating that the Company's internal controls were woefully inadequate. Specifically, the Individual Defendants failed to ensure that Force Protection maintained proper operational controls, resulting in the Company's repeated failure to meet contractual deadlines, significant potential contractual liabilities, and a severe reduction in the Company's competitive position. Furthermore, the Individual Defendants failed to ensure an adequate system of financial reporting controls, that ultimately led the Company to file restated financial results, and will, among other things, result in millions of dollars in potential liability under the federal securities laws. Apart from the foregoing, the Individual Defendants also permitted certain members of Force Protection's senior management team to enrich themselves at the expense of the Company. By participating in and consciously permitting such wrongdoing, Force Protection's directors failed to safeguard the Company they were entrusted to protect.

Defendants attempt to shift the blame for their failure of oversight to the Company's "rapid operational expansion" and the "back office struggle to keep up," and Defendants attempt to hide behind auditors issuing "clean audit opinions." However, the Individual Defendants consciously and intentionally disregarded their duty to the Company by ignoring, condoning, or covering up the improper actions of the Company and its senior management after actual notice of wrongdoing. The allegations set forth in the Complaint, and admitted in Force Protection's Annual Report on Form 10-K, filed September 15, 2008 (hereinafter, the "Restatement"))[2], are fundamentally at odds with the directors' obligation to act loyally and in good faith in the interest of the corporation and its shareholders. The shareholder derivative action filed by Plaintiff seeks redress for the harm caused to the Company by the Individual Defendants' breaches of fiduciary

---

[2]    *Available at*
http://www.sec.gov/Archives/edgar/data/1032863/000104746908010069/a2187693z10-k.htm.

2

duty, such breaches having caused (and threatening to continue to cause) significant damage to Force Protection.  *See*, *e.g.*, *Kamen v. Kemper Financial Services,* 500 U.S. 90, 95-96 (1991) ("[T]he purpose of the derivative action [is] to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers.") (internal quotation marks omitted).

Eschewing applicable legal standards and principles, and despite the fact that state courts in Nevada and South Carolina have already denied most aspects of similar motions to dismiss derivative actions on behalf of Force Protection and despite a seemingly endless list of actions the Individual Defendants have taken against the Company's best interests (with corresponding damage inflicted upon Force Protection), the Defendants seek to dismiss the Complaint under Fed. R. Civ. P. 23.1 on the grounds that Plaintiff's contemporaneous ownership of Force Protection stock is not adequately pled and that Plaintiff has not pled specific facts to show that pre-suit demand on the Company's Board of Directors (the "Board") was futile.  Both stated grounds for dismissal are without merit.  First, Plaintiff has, in fact, alleged his ownership of Company stock during times relevant to the Individual Defendants' wrongful course of conduct and that he remains a shareholder of the Company today.  (Compl. ¶22).  That is all that is required under Fed. R. Civ. P. 23.1 for a derivative plaintiff to maintain standing in a derivative action.  Second, Plaintiff has pleaded facts that, if true, would give a reasonable shareholder reason to doubt that a majority of the Company's Board had the ability to disinterestedly, independently, and dispassionately consider a pre-suit demand.  *See*, *e.g.*, *In re Oxford Health Plans, Inc. Sec. Litig.,* 192 F.R.D. 111, 117 (S.D.N.Y. 2000) ("In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of

3

significant magnitude and duration which went undiscovered by the directors."); *In re SFBC Int'l, Inc. Sec. & Deriv. Litig.,* 495 F. Supp. 2d 477, 485 (D.N.J. 2007) (holding that allegations of inaction in light of numerous red flags and endemic mismanagement suffice to demonstrate a "substantial likelihood of liability" to satisfy demand futility requirement).  As discussed herein, this case is a textbook example of why the courts have developed the demand futility doctrine – conscience and equity do not require a plaintiff to proceed with empty and futile ceremonies. Indeed, it strains the grounds of credulity to believe that the Force Protection Board, under these circumstances, could have properly, dispassionately, and disinterestedly considered a pre-suit demand.[3]  *See, e.g.*, *Saito v. McCall,* No. Civ. A. 17132-NC, 2004 WL 3029876, at *7 n.66 (Del. Ch. Dec. 20, 2004) (where a board had enough indicators and resources to discover the existence and extent of accounting problems, the "substantial likelihood of liability these directors faced for a breach of their duty of good faith disabled the entire … board from mustering an independent and disinterested majority").

Accordingly, Force Protection's Motion to Dismiss should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiff brings this action on behalf of Nominal Defendant Force Protection against the Individual Defendants for, *inter alia*, their breaches of fiduciary duties owed to the Company. (Compl. ¶ 1.)  The Complaint sets forth a compelling case that the Individual Defendants abdicated their obligations and acted in bad faith by, among other things, failing to ensure that Force Protection maintained adequate internal financial and operational controls.    With

---

[3]     Individual Defendants Moody, Davis, Thompson, Day, and Paxton comprised the five members of Force Protection's Board when this suit was filed.  Thus, the demand futility inquiry is relevant to these five defendants, hereinafter referred to as the "Director Defendants." Additionally, Individual Defendants Moody, Davis, Day, and Thompson served on the Force Protection Audit Committee during the relevant time period and are sometimes referred to herein as the "Audit Committee Defendants."

4

knowledge of what was at stake – the continued viability of the Company – the Individual Defendants failed to take meaningful steps to remedy obvious internal control failures notwithstanding the existence of clear and conspicuous red flags informing them of the severe risks facing the Company.  (*Id*. ¶ 16.)  These breaches of fiduciary duty have caused substantial monetary damages to Force Protection, damaged the Company's image and goodwill, and adversely affected its ability to compete in its primary business.  (*Id.* ¶ 1.)

Force Protection is a publicly traded company (NASDAQ Ticker "FRPT") headquartered in Ladson, South Carolina, in Charleston County.  (*Id*. ¶ 23.)  The Company is incorporated in the State of Nevada.  (*Id*.)  Force Protection designs, develops, and manufactures survivability equipment, namely ballistic and blast-protected vehicles deployed by the United States military.  (*Id*. ¶ 2)

Although Force Protection was one of the first firms to enter into this highly lucrative market, and as such initially enjoyed great success as one of the only providers of this specialized equipment to the United States military, the Company is now "subject to significant competition from companies . . . [with] considerably greater financial, marketing, and technological resources . . . ." Restatement at 9.[4]  As alleged in the Complaint, much of this increased competition is a result of Force Protection's own internal failures.  Those deficiencies have contributed to the reluctance of its primary customer, the United States military, to continue to deal exclusively with the Company.  (Compl. ¶ 3-8.)

---

[4]     As the Company noted in its Memorandum of Law, a court may take judicial notice of public filings, such as documents filed with the Securities and Exchange Commission ("SEC").  *See* F.P. Mem. 17 n.9; 23 n.11.  *See also Sampson v. Robinson*, No. 07 Civ. 6890(PAC), 2008 WL 3884386, *6 (S.D.N.Y. Aug. 20, 2008) ("On this motion to dismiss, the Court may take judicial notice of the SEC filings.").

Force Protection is a very small and centralized company, employing fewer than 1,400 people and housing both its corporate headquarters and manufacturing facilities in Ladson, South Carolina. Restatement at 19, 51. The Company's core business is producing Mine Resistant Ambush Protected ("MRAP") vehicles, virtually all of which are delivered to the United States Department of Defense ("DoD") for its MRAP vehicle program. (Compl. ¶¶ 2-3) Indeed, the Company is almost completely reliant upon the DoD for its continued existence. (*Id.* ¶ 3) For 2006 and 2007, "substantially all of [the Company's] net sales were derived from work performed directly or indirectly under U.S. government contracts." Restatement at 13. As a result of its almost complete reliance on the DoD, Force Protection is "subject to certain unique business risks" that could have an impact on its future viability. *Id.*

As a government contractor deriving substantially all of its revenue from contracts with the federal government, Force Protection's business involves a high degree of government regulation and scrutiny. (Compl. ¶ 99). As such, the Company is subject to special risks, including the fact that internal control failures can result in cancellation of vital government contracts, the imposition of fines, and the refusal of DoD to provide Force Protection with future business. Restatement at 15. Force Protection's agreements with the DoD include terms unlikely to be found outside of U.S. governmental defense contracts, and render even more important the quality of the Company's internal controls. *Id.* Specifically, these agreements are subject to unilateral cancellation or modification, and the Company must comply with numerous federal laws in order to continue to receive the government contracts upon which it relies for its very survival. *Id.* Simply put, inadequate internal controls threaten the Company's very existence, the knowledge of which can be imputed to the Company's Board. *See, e.g.*, *In re Biopure Corp. Deriv. Litig.*, 424 F. Supp. 2d 305, 308 (D. Mass. 2006) ("[I]n cases [such as here]

6

in which a company's primary product or service is in jeopardy, courts have been willing to impute that knowledge to the Company's officers and directors."). Stated otherwise, Force Protection must have adequate internal controls in order to continue to do business with the DoD. Restatement at 3. Yet, despite numerous red flags, many of which came directly from the federal government, the Individual Defendants failed throughout the relevant period to remedy significant and obvious problems. (Compl. ¶ 16).

The DoD ensures compliance with its procurement policies by conducting regular audits through the Defense Contract Audit Agency ("DCAA"). Restatement at 14. From May 2004 through October 2007, the DCAA issued at least eight audit reports on the Company's operations and contracts that were highly critical of Force Protection. (Compl. ¶ 66); Restatement at 33. Specifically, the DCAA expressed concerns regarding the Company's accounting and price estimating systems, the timeliness of the delivery of vehicles, and Force Protection's financial condition. *Id.* Because these audits may result in, among other things, price reductions, assessment of penalties, interest costs, or even potential debarment from participation in the federal procurement system, Restatement at 14, and because of the U.S. military's importance as the Company's primary customer, the entire Board had to be aware of these audits' findings. *Id.* at 13. Nonetheless, the Individual Defendants took no meaningful action to remedy these significant issues as demonstrated by two later DCAA reports. *Id.* at 33. A January 29, 2008, report found that the Company's estimating system was inadequate, and a March 21, 2008, report stated that the DCAA had received insufficient data from the Company to perform the required financial statement and ratio analysis. *Id.*

Notwithstanding that the Company is subject to significant government scrutiny, Force Protection has had extensive and systematic operational-control weaknesses. (Compl. ¶¶ 67-72);

*see also* Restatement at 33.  In June 2007, the DoD's Office of Inspector General ("OIG") issued a report criticizing Force Protection for repeatedly failing to deliver in a timely fashion vehicles and otherwise failing to act as a "responsible contractor."  (*Id.*)  *See also* U.S. Dept. of Defense Inspector Gen., Rep. No. D-2007-1007, at 21 (June 27, 2007) (the "OIG Report") *available at* http://www.dodig.osd.mil/Audit/reports/FY07/07-107.pdf.  The report revealed, for example, that with respect to one particular contract with the U.S. Marine Corps, Force Protection delivered 94% of its vehicles more than 30 days late.  (Compl. ¶ 69).  In another such contract, 86% of the Company's vehicles were delivered more than 30 days late.  (*Id.*)  It is telling that these operational miscues occurred notwithstanding that Force Protection had been granted numerous extensions of time and also received a $6.7 million government-subsidized upgrade to its manufacturing facilities.  (*Id.* ¶ 70).  The report also chronicled how the Company faced up to $6.6 million in liquidated damages because of its continued late deliveries.  (*Id.* ¶ 71).[5]

**Financial Controls**

Force Protection's problems are not limited to the foregoing operational problems. Indeed, the Company has been required to restate nearly every financial statement it has published since its inception as a public company.  As alleged in the Complaint, on December 15, 2006, the Company announced that it had discovered errors in prior financial filings, requiring restatements of the financial statements for the 2003 and 2004 fiscal years.  (Compl. ¶ 79).  On March 6, 2007, the Company announced that it had also discovered errors regarding its financial statement for the 2005 fiscal year and that another restatement was required.  (*Id.* ¶ 81).  On October 15, 2007, the Company acknowledged in amended Forms 10-K for the 2005

---

[5]     The U.S. Army Tank Automotive Armaments Command, the Directorate of Defense Trade Controls ("DDTC"), and the U.S. State Department have also commented unfavorably on the Company's internal, operational, and or export controls. Restatement at 31-33, 37-38.

and 2006 fiscal years that its internal controls over financial reporting were deficient and would continue to be inadequate into the future. (*Id.* ¶ 97). On February 29, 2008, the Company announced, yet again, that it would be required to restate previously reported financial statements, in this case for the three and nine month periods ended September 30, 2007, due to significant accounting errors. (*Id.* ¶ 104). On September 15, 2008, the Company finally filed its Form 10-K for the 2007 fiscal year, which included restatements of its financial results for the first, second, and third quarters of 2007. Restatement at 1.

These restatements have weakened investor confidence. Moreover, the obvious weaknesses in financial controls have adversely affected the Company's ability to conduct its business. As of November 14, 2007, the Company no longer qualified as a "small business" under applicable federal regulations and, therefore, was required to meet additional standards in order to obtain new contracts awarded by the U.S. government. Restatement at 31. At that time, the DCAA advised the Company that its accounting and estimating systems fail to comply with government requirements, and the Company has since admitted that extensive work remained to be completed before it could meet these standards. *Id.*

Force Protection's weaknesses in financial controls were and continue to be widespread. (Compl. at ¶¶ 79, 81, 97, 104); *see also* Restatement at 134-35. Since 2005 (and possibly earlier), the Company had lacked the basic ability to track its costs and inventory. Restatement at 134-35. Additionally, Force Protection had been unable even to effectively record revenues and sales orders. *Id.* Weakness in Force Protection's information technology controls further aggravated problems with financial controls. *Id.* In addition, Force Protection disclosed that it even lacked the ability to restrict or to independently monitor employee access to high-level electronically stored financial data. *Id.* In view of the foregoing, it hardly is surprising that, on

9

September 13, 2008, Force Protection's own auditor, Grant Thornton LLP, questioned the effectiveness of Company's financial controls: "we are unable to apply other procedures to satisfy ourselves as to the effectiveness of [Force Protection's] internal control over financial reporting . . . and do not express[] an opinion on the effectiveness of [its] internal control over financial reporting." *Id.* at 82-83.

### The Company's Audit Committee

That these glaring operational and financial control weaknesses permeated every aspect of the Company's business is a testament to the failure of Force Protection's Audit Committee. As noted earlier (*supra* at 4, n.3), the Audit Committee Defendants are Individual Defendants Moody, Davis, Day, and Thompson.   (Compl. ¶ 42).   Due to their position on the Audit Committee, these individuals had a special duty to know and understand Force Protection's financial statements and reports and ensure compliance with legal, ethical, and regulatory requirements.  (Compl. ¶¶ 42, 131).  Here, that committee failed on nearly every front.  The lack of adequate internal controls rendered Force Protection's financial reporting during the relevant period inherently unreliable and precluded the Company from preparing financial statements that complied with Generally Accepted Accounting Principles ("GAAP").  (Compl. ¶¶ 9, 113-121.) Nonetheless, through the relevant period, the Audit Committee Defendants approved and/or acquiesced in the dissemination of false and misleading information in the various public statements issued by the Company.  (*Id.* ¶ 131).

### Defendants' Insider Trading

While the Individual Defendants abdicated their oversight responsibilities and have put at risk the Company's ability to procure new government contracts, Defendants McGilton and Kavanaugh were successful in extracting a significant amount of money and equity from the

Company and an unsuspecting investing public. (Compl. ¶¶ 122-25.) During 2007, the Defendants McGilton and Kavanaugh sold over $47 million of Force Protection stock – exceeding Force Protection's entire net income of $7.65 million for fiscal 2007 by nearly $40 million. (*Id.*).

**<u>Other Self-Dealing</u>**

Ironically, it appears that the Company's serious operational problems may have been caused by and/or perpetuated by software purchased from a party related to Defendant McGilton. Defendant McGilton is a principal in APT Leadership ("APT"), a technology consulting firm. (Compl. ¶¶ 57-58); Restatement at 121-22. Beginning in 2005, Force Protection hired APT to provide the Company with various business consulting services, training seminars, and certain business software. *Id.* In 2005 and 2006, the Company paid APT $225,400 and $606,817, respectively, for such services, training, and software. *Id.* Additionally, in 2006, Force Protection entered into an agreement with APT for the non-exclusive right and license to use diagrams, methods, concepts, and business operation systems functionality contained in APT's "APT Tool" software.[6] The Company paid APT a one-time license fee of $60,000 and agreed to

---

[6]    These related party transactions between the Company and a consulting firm owned by McGilton were approved by the Individual Defendants and are described in the Company's 2006 Proxy as follows:

> Our Chief Executive Officer, Mr. McGilton, is a principle of APT Leadership, a consulting firm we hired to provide various business consulting services, training seminars and certain business software. Through the period ended June 30, 2006, APT Leadership has billed us a total of $563,120 for such services, training and software. In addition, we have entered into an agreement with APT Leadership pursuant to which APT has granted to the [sic] us a non-exclusive right and license to use the diagrams, methods, concepts and business operating system functionality contained in APT Leadership "APT Tool" software and presented in APT Leadership's training seminars, specifically including the use of system diagrams, process flow diagrams and actively linked inputs, outcomes and feedback loops to represent business "conversion processes" and to design and redesign "value added" versus "non-value added" process flow diagrams. Under

11

pay APT an annual license fee thereafter of $50,000. 2006 Proxy at 8-9. Interestingly, Thomas Thebes, the Company's former CFO, has questioned the propriety of Force Protection's deal with APT. Restatement at 43-44. As revealed in the Restatement, even in 2007, the Company continued to pay questionable fees to APT. Restatement at 121-22.

### **Continuation of Problems**

On February 29, 2008, the Company admitted to continued problems with its internal controls over financial reporting. (Compl. ¶ 9). At that time, Force Protection announced that it would restate its financial results for the three and nine months ending September 30, 2007 and delay the filing of its 2007 Annual Report. (*Id.*) The Company had not remedied these problems as of the filing of its 2008 Form 10-K on September 15, 2008. Restatement at 27. In the Restatement, Force Protection detailed numerous "material weaknesses in financial reporting." *Id.* In fact, Force Protection noted that it had "extensive work" remaining to remediate its controls. *Id.*[7] Furthermore, according to the Company's most Form 10-Q, filed May 11, 2009,

---

> the terms of such agreement we paid a one time license fee of $60,000 and agreed to pay an annual license fee thereafter of $50,000.

*See* Force Protection, Inc., Definitive Proxy Statement (Schedule 14A), at 8-9 (Aug. 24, 2006) ("2006 Proxy") *available at* http://www.sec.gov/Archives/edgar/data/1032863/000129707706000059/frpt_proxyaug222006.htm; *see also* Compl. ¶ 57-60 (alleging Defendant McGilton enriched himself to the detriment of the Company by approving related party transactions with a consulting firm where he is principal owner).

[7]    On August 28, 2008, Force Protection also conceded that material weaknesses in financial controls continued to plague the Company:

> [Force Protection] management does not believe that the material weaknesses identified as of December 31, 2007 will be remediated by September 30, 2008 and ***anticipates that material weaknesses will be identified in its Quarterly Report on Form 10-Q for the first, second and third quarters of 2008***. (emphasis added).

Force Protection, Inc., Current Report (Form 8-K), at Ex. 99.1 (Aug. 28, 2008) ("Form 8-K") *available at*: http://www.sec.gov/Archives/edgar/data/1032863/000110465908055801/a08-22591_18k.htm.

the Company's CEO and CFO have concluded that the Company's disclosure controls and procedures remain ineffective as of March 31, 2009. *See* Force Protection's Form 10-Q for the period ending March 31, 2009 at pg. 22.[8]

Such control failures have resulted in significant harm to the Company. Its reputation has been diminished and its continued viability in is great doubt. For these reasons, there was an 88% decline in the Company's stock price during the relevant time period. (Compl. ¶ 112). The Company and certain former and current management personnel also are named defendants in a federal securities fraud class action case arising from this intentional and reckless failure to make accurate statements about Force Protection's financial results and prospects, defending against which saps the Company's valuable resources. Restatement at 43.

## ANALYSIS

The Defendants have moved to dismiss the Complaint on the grounds that Plaintiff has purportedly failed to adequately plead standing as required by Fed. R. Civ. P. 23.1. The Individual Defendants also seek dismissal under Fed. R. Civ. P. 12(b)(6) on grounds that Plaintiff has purportedly failed to state a claim for which relief can be granted. Parts I and II below address the standing challenges. The issues raised by the Individual Defendants' Rule 12(b)(6) motion are addressed in a separate brief filed contemporaneously herewith.

### I.    THE COMPLAINT ADEQUATELY ALLEGES PLAINTIFF'S CONTINUOUS AND CONTEMPORANEOUS OWNERSHIP OF FORCE PROTECTION SHARES

Defendants argue that Plaintiff fails to allege that he continuously held shares of Force Protection stock during the relevant period. (F.P. Mem. at 34-35). Defendants are wrong. Fed. R. Civ. P. 23.1(b)(1) requires a complaint in a derivative action to "allege that the plaintiff was a

---

[8]    *Available at*
http://www.sec.gov/Archives/edgar/data/1032863/000110465909031242/a09-11533_210q.htm

shareholder or member at the time of the transaction complained of, or that the plaintiff's share

or membership later devolved on it by operation of law."  Here, the Complaint explicitly states

that Plaintiff is currently a Force Protection shareholder and was a shareholder at the time of the

transactions complained of in the Complaint. (Compl. ¶ 22).  This fully satisfies the pleading

requirements of Rule 23.1(b)(1), which does not require any additional allegations to be made in

the Complaint. *See Galdi v. Jones*, 141 F.2d 984, 992 (2d Cir. 1944) (finding that an allegation

of stock ownership that follows the precise language of the rule is sufficient to withstand a

motion to dismiss); *see also* 7C C. A. Wright, A. R. Miller & M. K. Kane, *Federal Practice and

Procedure* § 1828 at 62 (2d ed. 1986) (stating that "an allegation that merely employs the

language of the rule has been held sufficient to sustain the complaint against a motion to dismiss,

although the pleader may be required to furnish greater specificity at some ***later*** point in the

proceedings") (emphasis added); 7 Herbert B. Newberg, *Newberg on Class Actions* § 22:95 (4th

ed.) (same).[9]

Although Defendants complain that the Complaint does not specifically define "relevant

period," the "relevant period" of the allegations in the Complaint is the period covering

Defendants' wrongful acts complained of therein.  Pursuant to the continuing wrong doctrine,

where a plaintiff has alleged a course of conduct and continuing scheme of wrongdoing, a

shareholder is deemed to have standing if the alleged wrong commenced prior to the stock

acquisition but continued and was not executed and final until some period after which plaintiff

acquired their stock.  *See, e.g.*, *Bateson v. Magna Oil Corp.*, 414 F.2d 128, 130 (5th Cir. 1969)

("the requirement that a shareholder must have owned stock at the time of the wrong of which he

---

[9]        Although there is no requirement under the rules that a derivative plaintiff allege the
specific date on which he or she became a shareholder, Plaintiff respectfully notes that he has
continuously held shares of Force Protection stock shares since January 16, 2007.

complains may be satisfied if the wrong is a continuing one; that is, if it spans the plaintiff's ownership, or if new elements in a pattern of wrongful conduct occur after acquisition.") (internal citations omitted); 13 Fletcher, Cyclopedia Corporations (Rev. vol. 1970) § 5982, p. 426 ("continuing wrong" theory permits shareholder derivative suits to challenge wrongful acts that are "still in effect").

Here, Plaintiff adequately alleged that he is, and was, "a shareholder of FORCE PROTECTION, INC. at the times of the misconduct complained of in the [Complaint]." See Compl.; Verification of Duiane Galbraith. Moreover, as discussed in detail in Part II herein, Plaintiff alleges continuing, sustained, and systematic breaches of fiduciary duty on the part of the Individual Defendants. In view of these facts and the applicable law, Plaintiff has properly pled standing pursuant to the requirements of Rule 23.1(b)(1) and maintains standing to pursue claims based on actions occurring prior to his stock purchase that form a part of the a course of conduct and continuing scheme of wrongdoing complained of.[10]  Accordingly, the Motion to Dismiss directed to contemporaneous ownership should be denied.

## II.    THE COMPLAINT ADEQUATELY ALLEGES DEMAND FUTILITY

Defendants assert that Plaintiff has failed to adequately plead demand futility. However, Defendants acknowledge that state courts in Nevada and South Carolina, in "substantially

---

[10]    Should this court find that Plaintiff may only assert claims based on alleged wrongdoing occurring after the date he purchased his Force Protection shares, then the relevant period for purposes of Plaintiff's allegations should be deemed to begin on the date of such purchase, and the allegations of misconduct prior to the date should be considered as background to and supporting evidence of the later misconduct. See In re Computer Sciences Corp. Deriv. Litig., 244 F.R.D. 580, 586-87 (C.D. Cal. 2007) (where plaintiff alleged misconduct occurring both prior to and after his acquisition of stock, court found that plaintiff had standing to pursue claims arising after his acquisition of stock); Britton v. Parker, 06-cv-017997-MSK-KLM, 2008 WL 4533727, at *15 (D. Colo. Sept. 5, 2008) (denying derivative plaintiff's motion to amend a complaint **only** to the extent that it asserted claims for misconduct prior to plaintiff's acquisition of stock).

identical" derivative actions brought on behalf of Force Protection, have already concluded that the respective plaintiffs before them made sufficient allegations to demonstrate demand futility by raising a reasonable doubt that the same Force Protection board of directors could disinterestedly consider a demand.  (F.P. Mem. at 9).  In Nevada, Judge Denton, in *Vitale v. McGilton, et al.*, No. A560860-B (Dist. Ct., Clark County, NV Feb. 10, 2009), held that plaintiff adequately pleaded demand futility, noting that *Caremark* provides a well reasoned discussion of the view that liability can exist for a director's failure to ensure the adequacy of internal controls. (F.P. Mem., Ex. H, at 3).  In South Carolina, Judge Young, in *Estate of Jacquelin K. Stevenson v. Kavanaugh, et al.*, No. 2008-CP-10-1735 (S.C. Com. Pl. Feb. 10, 2009), found that plaintiffs had raised a reasonable doubt as to the Board's ability to disinterestedly consider a demand because, *inter alia*, "publicly traded companies … rely upon audit committee members to ensure that the corporation has proper internal controls in place," and plaintiffs alleged that a majority of the board served on the "audit committee when much of the alleged wrongdoing occurred, and when significant 'red flags' allegedly appeared and reappeared showing an urgent need for board action." (F.P. Mem., Ex. G, at 8).

Defendants urge this Court to sweep aside the *Vitale* and *Hughes* decisions denying their motions to dismiss in what they have termed "substantially identical" actions by broadly arguing that the Court is not bound by these decisions because they are not final judgments. (F.P. Mem. at 10). However, "general expressions that only final judgments can ever have collateral estoppel effect are considerably overstated." *Kurlan v. Comm. Of Internal Revenue*, 343 F.2d 625, 628 n. 1 (2d Cir. 1965); s*ee also In re Bridgestone/Firestone, Inc*., 333 F.3d 763, 767 (7th Cir. 2003) ("Although claim preclusion (res judicata) depends on a final judgment, issue preclusion (collateral estoppel) does not … for purposes of issue preclusion … 'final judgment' includes

any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."). At a minimum, the *Vitale* and *Hughes* decisions are highly persuasive authority that the Court should deny Defendants' motion to dismiss for failure to plead demand futility, especially considering that the demand futility inquiry bears no relation to any characteristics of the Plaintiff but only to those of the current Board and its members, which have not changed. *See Henik v. LaBranche & Co., Inc.*, 433 F. Supp. 2d 372, 381 (S.D.N.Y 2006) (in finding that a prior dismissal was suitable for issue preclusion, the court stated that "the facts submitted by an individual shareholder to demonstrate that she has standing to sue on behalf of a corporation are facts about the corporation and about members of the corporation's board of directors. Indeed, the demonstration of standing to sue derivatively does not require any showing of the characteristics specific to the individual shareholder who seeks standing…[g]iven this unique nature of the derivative standing inquiry … the standing analysis for one shareholder will not differ from the standing analysis for another shareholder.").

### A. Legal Framework For Analyzing Demand Futility

To determine whether Plaintiff has adequately alleged demand futility in his Complaint, the Court should analyze whether Plaintiff has "state[d] with particularity (federal procedural requirement under Rule 23.1) facts which would excuse a demand upon the directors as futile under corporate law (state substantive law)." *Wencoast Restaurants, Inc. v. Chart Capital Partners, L.P.*, No. 2:05-1650-18, 2:05-1651-18, 2006 WL 490101, at *2 (D.S.C. Feb. 28, 2006). The Court should look to the substantive corporate law of the state of incorporation, in this case Nevada, to judge whether the facts pleaded are sufficient to excuse demand. *See id.* This Court may also consider Delaware corporate decisions as persuasive authority because Nevada courts frequently look to Delaware law (and that of other states), particularly where there is no Nevada law directly on point. *See, e.g.*, F.P. Mem., Ex. H, at 3 (*Vitale* court applied the Delaware

*Caremark* decision in its analysis of certain Defendants' motion to dismiss a derivative complaint for failure to allege demand futility, stating that "[h]istorically, Nevada has looked to other jurisdictions for development of its own common law").[11]

It is well settled that pre-suit demand need not be made if the facts pleaded show that such a demand would have been futile. *See, e.g.*, *Shoen v. S.A.C. Holding Corp.*, 137 P.3d 1171, 1175 (Nev. 2006). In *Shoen*, the Nevada Supreme Court expressly adopted Delaware's standard for establishing demand futility. *Shoen*, 137 P.3d at 1184.

Under Nevada and Delaware law, demand futility is shown where a plaintiff alleges facts creating a ***reasonable doubt*** that, as of the time the complaint is filed, a majority of the board of directors could have properly exercised independent and disinterested business judgment in responding to a demand. *See id.*; *see also Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993) (same). "Reasonable doubt," in this regard, is a flexible, workable, and objective test, "akin to the concept that the stockholder has a 'reasonable belief'" that the board lacks impartiality. *Grimes v. Donald*, 673 A.2d 1207, 1217 n.17 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).[12]

_____

[11]    *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008) ("Because the Nevada Supreme Court frequently looks to the Delaware Supreme Court and the Delaware Courts of Chancery as persuasive authorities on questions of corporation law, this Court often looks to those sources to predict how the Nevada Supreme Court would decide the question.").

[12]    This reasonable doubt standard promotes a strong public policy, since ***"'the derivative suit . . . [is a] potent tool[] to redress the conduct of a torpid and unfaithful management.'"*** *Rales,* 634 A.2d at 933 (emphasis added) (citation omitted). It also is a particularly appropriate standard to utilize in derivative suits, where plaintiffs often have not had the opportunity to conduct extensive discovery. *Id.* at 934 (rejecting defendant's proposal that the court adopt a requirement that a plaintiff demonstrate because it would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").

1.      **Construction of Allegations and the "Reasonable Doubt" Standard**

In determining whether Plaintiff has met his burden for pleading demand futility, the Court "must accept as true each of the complaint's particularized factual allegations and draw every fair factual inference flowing from those particularly alleged facts in favor of [the plaintiff]." *Shoen*, 137 P.3d at 1180; *Rales*, 634 A.2d at 931 (explaining that in determining a motion to dismiss pursuant to Rule 23.1 for failure to make a demand, "[t]he well-pleaded factual allegations of the derivative complaint are accepted as true"). This Court must construe all of Plaintiff's allegations as a whole and each part must be given the meaning it derives from the context of the whole. *See McCall v. Scott*, 239 F.3d 808, 817 (6th Cir. 2001) (stating that the court must consider "the accumulation of all the facts taken together," and holding that the district court "erred by viewing the factual allegations separately and by refusing to draw reasonable inferences in plaintiff's favor"); *In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999) ("In its determination, the trial court must not rely on any one factor but examine the totality of the circumstances and consider all of the relevant factors."). Moreover, reasonable doubt in this context "must be decided by the trial court on a case-by-case basis employing an objective analysis." *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). As noted in *Grobow*, "it would be neither practicable nor wise to attempt to formulate a criterion of general application for determining reasonable doubt" given the "highly factual nature" of the demand futility inquiry. 539 A.2d at 186.

Importantly, Plaintiff is ***not*** required to plead evidence at this stage of the proceedings. *Shoen*, 137 P.3d at 1180; *see also McCall*, 239 F.3d at 816 (stating that plaintiff is not required to plead facts sufficient to support a judicial finding of demand futility or a reasonable probability

19

of success on the merits).  Furthermore, proving demand futility does ***not*** require showing that

there is ***no*** possibility the board will agree to the requested action.  *Heineman v. Datapoint*

*Corp.*, 611 A.2d 950, 952 (Del. 1992), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d

244 (Del. 2000).  Nor does Plaintiff need to demonstrate a reasonable probability of success on

the merits.  *Rales*, 634 A.2d at 934.  Rather, the relevant question is whether "the particularized

factual allegations of a derivative stockholder complaint create a ***reasonable doubt*** that, as of the

time the complaint [was] filed, the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand."  *Id.* (emphasis

added); *see also Shoen*, 137 P.3d at 1183.  If the derivative plaintiff satisfies this burden, demand

will be excused as futile.  *Rales*, 634 A.2d at 934.

> **2.      There is a Reasonable Doubt that a Director is Not
> Disinterested When the Director Faces a Substantial
> Likelihood of Liability for Failing to Perform His Duty of
> Oversight**

The demand futility inquiry here consists of whether the facts and circumstances raise a

reasonable doubt that the majority of the Board – three of five – could be disinterested in

considering a demand to bring this lawsuit.   A director is not disinterested in a corporate

decision, including responding to a shareholder demand, when the "decision will have a

materially detrimental impact on [the] director, but not on the corporation and the stockholders,

… [such that the] director cannot be expected to exercise his or her independent business

judgment without being influenced by the adverse personal consequences resulting from the

decision." *Rales*, 634 A.2d at 936.

Plaintiff alleges that the Board was not disinterested because its members faced a "substantial likelihood" of liability for the alleged wrongful conduct.[13]  *See Rales*, 634 A.2d at 936; *see also Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) ("[I]f the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under *Rales*, excusing demand.").  Among other situations, a director may face a substantial likelihood of liability where the director fails to act in good faith[14] by "intentionally

---

[13]     Apart from raising a reasonable doubt that Defendant Moody is disinterested because of his potential liability as a Director, Plaintiff also alleges particularized facts creating a reasonable doubt that Defendant Moody is independent because of his employment as Force Protection's CEO, President, and Chairman of the Board. (Compl. ¶ 131).  Demand is excused where the complaint alleges that members of the board lack independence due to employment relationships.  *See, e.g.*, *Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices.").  Futhermore, Defendant Moody is also in interested because, as a named defendant in the related securities fraud class action suit (Compl. ¶ 17), he is subject to significant potential liability in other related litigation.  *See In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 ("There is no question then that [the defendant] 'is interested because he is a defendant in [a] pending class action suit[ ] arising out of the [same] accounting irregularities and faces significant personal liability for the wrongdoing alleged in the complaint.'") (quoting *Cendant*, 189 F.R.D. at 129 (applying Delaware law)).

[14]     Defendants assert that, to the extent Count I for breach of fiduciary duty is based on alleged breaches of the duty of care, Count I poses no threat of liability to Directors Defendants because Nevada's exculpation statute, N.R.S. §78.138(7); and that the Company's articles of incorporation exculpate Director Defendants from monetary liability to the Company for any breach of the Director Defendants' duty of care. (F.P. Mem. at 22-24).  Accordingly, Defendants argue that such claims do not provide grounds on which to excuse demand. (F.P. Mem. at 23).  However, Defendants' argument based upon the exculpatory statute and the articles of incorporation is in the nature of an affirmative defense, which should not be considered at the pleading stage.  *See In re Tower Air, Inc.*, 416 F.3d 229, 238, 242 (3d Cir. 2005) ("the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense…" and "affirmative defenses generally will not form the basis for dismissal").  In addition, Defendants' reliance on the exculpation statute and articles of incorporation to assert that Plaintiff's allegations of breaches of Defendants' duty of care pose no threat to Defendants is further misplaced given that the Plaintiff seeks equitable remedies in addition to damages.  (Compl. pg. 71); *see also Leslie v. Telephonics Office Techs., Inc.*, 1993 WL 547188, at *9 (Del. Ch. Dec. 30, 1993) (finding that "to the extent plaintiffs seek equitable relief for any alleged breaches of the duty of care . . . [the articles of incorporation's exculpatory] provision would not bar them").

fail[ing] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Stone*, 911 A.2d at 369.

A director acts in bad faith (and, thus, breaches his fiduciary duty of loyalty) by failing to properly oversee the corporation. *See Guttman*, 823 A.2d at 506 (interpreting *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996)). The Supreme Court of Delaware recently approved the *Caremark* standard for director oversight liability, stating that its predicate conditions are: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system of controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[15] *Stone*, 911 A.2d at 370 (emphasis in original).[16] A conscious failure of oversight by the directors can be established if the directors failed to heed known risks,

---

[15]      The Company posits that the *Caremark* theory of liability is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." (F.P. Mem. at 3 (internal quotation marks and citation omitted).) However, *Caremark* was an opinion approving a settlement after discovery, and not a motion to dismiss case. In *Saito,* the court acknowledged that "a *Caremark* claim is difficult to advance," it stated that it "must find that plaintiff would not be entitled to relief under *any set of facts that could be proven* to support the claim." *Saito,* 2004 WL 3029876, at *6 n.66 (internal quotations omitted) (emphasis in original). The court in Saito denied a motion to dismiss, stating that "[a]lthough the facts later adduced may prove otherwise, the procedural posture of the case requires me to focus on the plaintiffs' complaint ***and read it generously***." *Id.* at *7 (emphasis added). In view of *Saito*, dismissal is ***not*** warranted at this stage in the proceedings.

[16]      Recently, the Delaware Supreme Court approved the standard for so-called "oversight" liability articulated in *Caremark*. *See Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006). Although the Defendants argue that *Stone* requires dismissal here (*see* F.P. Mem. at 12-13), no such result logically follows. The Delaware Court of Chancery dismissed the plaintiff's complaint in *Stone* in large part because, as the Supreme Court stated, the plaintiffs did not plead the existence of facts showing that the board was ever aware of the inadequacy of AmSouth's internal controls, that these inadequacies resulted in improper activity, and that the board chose to do nothing about problems it allegedly knew existed. *Stone*. To wit, the plaintiffs did not plead the existence of "red flags" that would have put the AmSouth board on notice that deficiencies in the company's reporting systems existed. Plaintiff here alleges the exact opposite.

including "red flags," causing the company and/or shareholders to suffer damages. *McCall v. Scott*, 250 F.3d 997, 1001 (6th Cir. 2001).

Accordingly, it is well-settled that a substantial likelihood of liability "can be established by showing a sustained or systematic failure to exercise oversight." *See Oxford Health*, 192 F.R.D. at 117 (noting that "[i]n numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found"); *see also In re The Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) ("A failure to act in good faith may be shown … where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."). Thus, Plaintiff can demonstrate demand futility by alleging facts – and fair factual inferences flowing therefrom – indicating that Force Protection's directors had "actual knowledge of accounting irregularities, or knowledge of facts indicating potential accounting irregularities, and took no action until confronted." *Ash*, 2000 WL 1370341, at \*16. Importantly, a "fairly pleaded claim of . . . bad faith raises essentially a question of fact that cannot be resolved on the pleadings without first granting an adequate opportunity for discovery." *Desert Equities v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993).

### 3. Numerous Background Facts are Relevant to the Court's Analysis of Defendants' Substantial Likelihood of Liability for Failing to Oversee Force Protection

There are a number of factors that can be relevant to a finding that Defendants face a substantial likelihood of liability (and, thus demand is excused) for failing to properly oversee Force Protection. Principal among these factors is the presence of "red flags" that would invariably provide warnings of serious problems that went unheeded by the directors. *See, e.g.*, *McCall*, 250 F.3d at 1001; *Stone*, 911 A.2d at 373. Other such relevant factors are: (1) the size

of the company;[17] (2) the company's organizational structure;[18] (3) whether the allegations

concern a core business or product;[19] (4) the significance of internal controls;[20] (5) director audit

---

[17]    *See, e.g.*, *SFBC*, 495 F. Supp. 2d at 480 (demand futile and knowledge imputed where primary testing facility was located in the same building as corporate offices); *Veeco*, 434 F. Supp. 2d at 276-77 (demand futile where wrongdoing occurred at division signifying core of the company's business); *Caremark*, 698 A.2d at 962 (noting that company employed over 7,000 employees in 90 branch operations in determining that the record did not support a finding that director defendants failed to exercise their oversight function); *Stone*, 911 A.2d at 365 (noting that company employed over 11,600 people in finding that demand was not futile).

[18]    *See, e.g.*, *SFBC*, 495 F. Supp. 2d at 486 (location of principal testing facility and primary revenue generating activity were in the same building as corporate headquarters, important to the finding that "this was not merely decentralized activity by employees of a far-flung enterprise of the company, as was the case in *Caremark*"); *Caremark*, 698 A.2d at 962 (company's "decentralized management structure" was relevant to finding determining that the record did not support a finding that director defendants failed to exercise their oversight function); *Stone*, 911 A.2d at 365 (company's broad presence, 11,600 employees spread across six states, was relevant to finding that demand was not futile).

[19]    *See, e.g.*, *Biopure*, 424 F. Supp. 2d at 308 (knowledge of problems with a company's core product can be imputed to officers and directors); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1063 (C.D. Cal. 2008) (since loan originations were company's core business, knowledge of red flags concerning core business imputed to defendants); *Veeco*, 434 F. Supp. 2d at 278 (where wrongdoing threatened 70% of revenues, and therefore viability of entire company, demand was futile); *SFBC*, 495 F. Supp. 2d at 481, 485 (noting that where wrongdoing concerned drug trials comprising 30% of profits, demand was futile).

[20]    *See, e.g.*, *Veeco*, 434 F. Supp. 2d at 275-278 (lack of internal controls, which resulted in violations of federal export law and potentially led to loss of company's primary revenue source was relevant to finding demand futile, and further, that lack of internal controls "ha[d] substantially impaired the Company's market capitalization, []eroded the Company's goodwill and trust in the marketplace, and []threatened the Company's overseas sales").

24

committee responsibilities and membership;[21] and (6) the magnitude of potential liability or harm to the corporation.[22]

### B.    The Complaint Creates More Than A Reasonable Doubt That The Director Defendants Are Interested

Plaintiff's Complaint provides abundant particularized facts establishing that the Director Defendants had knowledge of the endemic internal control failures – both financial and operational – at Force Protection.  Indeed, Plaintiff has shown a substantial likelihood of liability based on the Individual Defendants' failure to act despite a known duty to do so.

As noted earlier, an inquiry into a board's ability to consider a demand is context-dependent and fact-specific.  *See supra*, at 19.  Here, the following facts and circumstances lend significant support to Plaintiff's position that the directors consciously disregarded their obligations:

### Size of the Company/Number of Employees

Compared to the size of the companies at issue in the *Caremark* and *Stone* cases relied upon by Defendants – 7,000 employees and 11,600 employees respectively – Force Protection is relatively small with approximately 1,400 employees.  Restatement at 19.  In fact, up until November 14, 2007, Force Protection qualified as a small business under the applicable federal regulations for U.S. government contracting.  *Id.* at 31.

---

[21]    *See, e.g.*, *Countrywide*, 554 F. Supp. 2d at 1063 (pre-suit demand was futile since audit committee with oversight responsibilities for company's primary business and overall risk position imputed with knowledge of red flags concerning those responsibilities); *Veeco*, 434 F. Supp. 2d at 276-77 (audit committee members faced a substantial likelihood of liability for failure to oversee, monitor, and manage internal accounting controls and compliance with federal export law and admission in Form 10-K of deficiency in internal controls over financial reporting relevant to demand futility analysis).

[22]    *See, e.g.*, *Oxford Health*, 192 F.R.D. at 117 (issuance of false statements concerning the company's operations and finances, and comparison of actual facts with those public statements, allowed inference of knowledge to directors); *SFBC*, 495 F. Supp. 2d at 486 (egregious safety risks created by wrongdoing contribute to finding of demand futility).

### Centralized Organizational Structure

Force Protection's operations are centrally located, as compared to the companies at issue in *Caremark* and *Stone* cited by Defendants. The Company maintains its principal executive offices and substantially all of its manufacturing facilities, in and around Ladson, South Carolina. *Id.* at 21, 51. The Company also maintains a comparatively small Board, consisting of only five directors. *Id.* at 20-23. By contrast, in *Caremark*, the company has fourteen directors and its 7,000 employees were located in 90 different branch offices, and in *Stone*, the company had at least eight directors and its 11,600 employees were spread across six states. *Caremark*, 698 A.2d at 961-62; *Stone*, 911 A.2d at 366-67.

### Core Business/Primary Product

Force Protection is a DoD contractor with its core operations related to the manufacture of MRAP vehicles. (Compl. ¶ 2.) Additionally, to date, substantially all of Force Protection's net sales were derived from work performed directly or indirectly under U.S. government contracts and the Company expected to depend on contracts with governmental agencies for a substantial portion of its revenue for the foreseeable future. (Compl. ¶ 45.) In 2007, substantially all of the Company's revenues came from contracts with the U.S. government. Restatement at 8, 13.

### Significance of Internal Controls

Force Protection's reliance on the DoD subjects it to the unique requirements of contracting with the United States military. The government contracting process differs in many ways from commercial contracting, and involves a high degree of federal government regulation and oversight. Restatement at 13. Compliance is generally reviewed by the DCAA, an arm of the DoD. (Compl. ¶¶ 46-47.) Contractors who do not meet applicable standards generally are

26

not eligible to win certain new contracts from the DoD.  *Id.*; *see also* Restatement at 30-32.

Therefore, Force Protection is subject to certain unique business risks associated with DoD

program funding, appropriations, and government contracts.  Restatement at 13.  Because the

Company derives substantially all of its revenue from contracts with the DoD, Force Protection's

reputation with government regulators is critical to the Company's continued success or lack

thereof.  (Compl. ¶ 45.)

### Audit Committee Responsibilities and Membership

In this case, three of the five Director Defendants (Davis, Thompson, Day, and Moody)

were members of the Company's Audit Committee when much of the wrongdoing occurred.  *See*

*supra*, at 4 n.3.  Publicly-traded companies rely upon audit committee members to ensure that the

corporation has proper financial controls in place.  *See, e.g.*, *In re Lernout & Hauspie Sec. Litig.*,

286 B.R. 33, 37-40 (D. Mass. 2002) (audit committee plays "critical role" in the corporation);

*Mitzner v. Hastings*, No. C 04-3310 FMS, 2005 WL 88966, at *6 (N.D. Cal. Jan. 14, 2005)

(audit committee directors have a "special relationship" with the corporation).  The Company's

SEC filings in April 2007 indicate this was true at Force Protection as well.  *See* Force

Protection, Inc., Definitive Proxy Statement (Schedule 14A), at 7 (Apr. 30, 2007) ("2007

Proxy")[23].  The general purpose of Force Protection's Audit Committee is to provide "oversight

with respect to [Force Protection's] financial statements and reports and other disclosures

provided to stockholders, the system of internal controls, the audit process, and legal and ethical

compliance."  *Id.*  Notwithstanding this stated purpose, the oversight provided by the Company's

Audit Committee members, since January 2007 (and likely earlier), has proven, and continues to

be, woefully inadequate.  During the Relevant Period, there were, among other things, financial

---

[23]     *Available at*
http://www.sec.gov/Archives/edgar/data/1032863/000110465907033462/a07-2765_1def14a.htm

restatements for the first three quarters of 2007; a six month delay in reporting results for the fourth quarter of 2007; and significant problems in the Company's ability to track inventory, costs, and shipments.  Restatement at 133-36.  Failures of oversight continue to this day. *See* Form 10-Q for the period ending March 31, 2009 stating that disclosure controls and procedures remain ineffective as of March 31, 2009.

### Nature and Magnitude of Potential Liability

Because of various inadequacies in operational and financial controls since January 2007, Force Protection has incurred significant harm to its reputation, its balance sheet, and ultimately its viability as a company.  Among the results of the inadequacies were: an 88% decline in the Company's stock price (Compl. ¶ 112), a threatened delisting from the NASDAQ, (Compl. ¶ 12), a multitude of regulatory admonitions with the potential to result in fines and loss of export privileges, (Restatement at 37, 44-45), and a securities class action concerning the false and misleading statements the Company disseminated to the investing public. *Id.* at 43.

### Red Flags Abound and Compel the Conclusion that Demand Was Futile

These facts and circumstances provide important background to the issue of whether a majority of the current Board face a substantial likelihood of liability for their conscious failure to act.  When coupled with the following glaring red flags alerting the Director Defendants to inadequate financial and operational controls, there exists only one reasonable conclusion – the Director Defendants, a majority of the Board, breached their duties of loyalty and good faith and could not possibly have impartially considered a pre-suit demand:

- From May 2004 through October 2007, the DCAA issued at least eight audit reports on the Company's operations and contracts that were generally highly critical of the areas covered by the audits, including job cost accounting and price estimating systems, the timeliness of the delivery of vehicles, and the Company's financial condition.  (Compl. ¶¶ 66, 69); Restatement at 33.  These audits may result in, among other

things, price reductions, assessment of penalties, interest costs, or even potential debarment from participation in the federal procurement system. Restatement at 14.[24]

- In early 2006, the U.S. Army Tank-Automotive and Armaments Command audited the Company's quality systems of control and, like the DCAA, was exceedingly critical. Restatement at 33. These audits carry potential negative consequences as well. Restatement at 14.

- On December 15, 2006, the Company announced that it discovered errors in prior financial filings requiring restatement of its fiscal 2003 and 2004 financial statements. (Compl. ¶ 79.)

- On March 6, 2007, the Company announced that it discovered errors requiring the financial statement for the 2005 fiscal year to be restated. (*Id.* ¶ 81.)

- In January 2007, Defendant CEO and Director McGilton sold almost $20 million of Force Protection stock. (Compl. ¶ 125.)

- In June 2007, the Inspector General of the DoD issued a report questioning the award of sole source contracts to Force Protection, which report was harshly critical of Force Protection's performance under such contracts and questioned the Company's financial stability. (F.P. Mem., Ex. I, at i-ii).

- In April and May 2007, Chairman Kavanaugh sold over $27 million of Force Protection stock. (Compl. ¶ 124.)

- On October 15, 2007, Force Protection acknowledged in amended Forms 10-K for the 2005 and 2006 fiscal years that its internal controls over

---

[24]     Defendants assert that a majority of the Board is disinterested in pre-2006 Board conduct because the longest tenured Board member, Defendant Davis, joined the Board in March 2006. (F.P. Mem. at 33-34). However, Plaintiff has alleged, *inter alia*, a continuing failure by Defendants to properly oversee the Company and ensure that adequate controls were in place. Thus, for a Board member to consider a demand based on pre-2006 conduct, he would be forced to pass judgment on his own similar, later-occurring conduct. In effect, if a Board member were to determine that an earlier composition of the Board breached its fiduciary duty by failing to oversee the Company, such a Board member would expose himself to liability for the continued failure of oversight. *See In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 118 (S.D.N.Y. 2000) (where directors are charged with similar misconduct, "[i]t is frivolous to argue that [directors] are not disabled from evaluating similar or identical claims against their colleagues"). Therefore, by definition, such a Board member cannot be disinterested when considering a demand to bring an action based on conduct occurring prior to his joining the Board.

financial reporting were inadequate and would continue to be inadequate.
(Compl. ¶ 97.)

- As of November 13, 2007, the Company no longer qualified as a small
  business under the applicable federal regulations and, as such, was
  required to meet additional accounting and estimating standards to the
  extent implicated in any new contracts awarded by the U.S. government.
  (Compl. ¶ 99.). The DCAA advised the Company that its accounting and
  estimating systems did not meet such requirements, and the Company has
  admitted that extensive work remained in order to meet the standards. *Id.*
  Ten months later, the Company still had not met these qualifications.
  Restatement at 31.

- The DCAA issued two reports, one on January 29, 2008 stating that Force
  Protection's estimating system was inadequate and another on March 21,
  2008 stating that there was insufficient data, due to a lack of 2007
  financial reports, to perform a financial statement and ratio analysis. *Id.* at
  33. As a result, the DCAA might disallow the Company's proposed costs
  under some of its government contracts. This could adversely affect Force
  Protection's profits. *Id.*

- On February 29, 2008, Force Protection admitted to continued problems
  with its internal controls over financial reporting and announced that it
  would restate its financial results for the three and nine months ending
  September 30, 2007, and also delay the filing of its 2007 Annual Report.
  (Compl. ¶ 9.)

It is inconceivable that the Director Defendants, particularly the Audit Committee
Defendants, did not know about the foregoing red flags. This is particularly true because of
Force Protection's relatively small size, its centralized management structure and concentrated
production capacity, its highly specialized primary product related to a single core business
model, its utter dependence on a single customer insistent on the Company's maintaining
adequate internal controls, the Company's delegation of Board oversight of those internal
controls to its Audit Committee, and the nature and magnitude of potential liability for failure to
exercise that oversight.

Not surprisingly, courts have not hesitated to find that demand was futile in strikingly
similar circumstances. *See, e.g.*, *Oxford Health*, 192 F.R.D. at 117 ("In numerous cases where

liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors"); *see also In re TASER Int'l. S'holder Deriv. Litig.*, No. CV-05-123-PHX-SRB, 2006 WL 687033, at *17 (D. Ariz. March 17, 2006) (shareholder adequately alleges claim for breach of the duty of good faith by establishing a "reasonable inference[]" that the Board was aware of an important problem which it did not adequately address). In *SFBC*, for example, the court found that demand was futile where, as here, the wrongdoing concerned the Company's "primary business" and the red flags were "not rare or isolated occurrences." *SFBC*, 495 F. Supp. 2d at 485-86. Further, the *SFBC* court noted that the alleged wrongdoing "was not merely decentralized activity by employees of a far-flung enterprise" of the company. *Id.* Force Protection's centralized business operations clearly distinguish it from the nominal corporate defendants at issue in *Caremark* and *Stone*.

The *Veeco* court's analysis is particularly instructive here. In that case, the court held that pre-suit demand was futile where the plaintiffs alleged that the directors recklessly ignored red flags signaling an inadequate system of internal controls in connection with the most significant division of the company (accounting for 70% of the firm's revenues). *Veeco*, 434 F. Supp. 2d at 277. Important to the court's analysis was the fact the firm's audit committee abdicated its responsibility to monitor legal compliance by failing to investigate claims relating to the Company's flagrant and systematic violations of export control laws. *Id.* at 278. Indeed, the audit committee allowed seven months to elapse between the time when alleged violations of export laws were first discovered and brought to the Company's attention and when a second report surfaced concerning the same violations. *Id.* The court held that "in light of the second

report, the [a]udit [c]ommittee permitted additional violations to occur, either by completely disregarding the first report, or by establishing procedures that were wholly inadequate and ineffective and that failed to protect the Company from potentially enormous liability." *Id.* Under these circumstances and since a majority of the company's board also were audit committee members, the *Veeco* court did not hesitate to find that demand was futile. *Id.*[25]

In the instant case, Force Protection's Audit Committee failed to heed repeated red flags related to the Company's compliance with the rules and regulations dictated by the DoD, Force Protection's primary customer. The violation of these rules and regulations was likely to lead to the loss of all government business and completely erase Force Protection's viability as an ongoing concern. Additionally, Force Protection's *repeated* failure to file accurate financial statements coupled with the repeated admission of deficient financial controls at the Company served as glaring and repeated red flags, making the directors, particularly the Audit Committee Defendants, acutely and undeniably aware of the Company's systemic problems. Under these circumstances, the Individual Defendants clearly face a "substantial likelihood of liability" for their dereliction of duty.

Further, as in *Veeco*, a majority of the company's board served at one time or another on the Audit Committee. *Id.* at 276. Indeed, four of the five Director Defendants (a majority of the Board) are also Audit Committee Defendants and, therefore, face a substantial likelihood of

---

[25]     This case is also like *Veeco* because, just as in *Veeco*, the Company has admitted that its controls were deficient during the relevant period and such deficiencies could harm the Company's core business. *See Veeco*, 434 F. Supp. 2d at 276-77.

liability for their conscious disregard of duty.  As a result, Plaintiff's allegations concerning the Audit Committee, standing alone, suffice to render demand futile.[26]

Incredibly, Defendants argue that they had no direct knowledge of the problems at Force Protection (F.P. Mem. at 14), while at the same time they assert the conflicting argument that, during the relevant period, they took action (albeit, minor action) to address the problems at Force Protection (F.P. Mem. at 12-13).  Then they go on to argue that for both reasons Director Defendants are shielded from liability and able to disinterestedly consider a demand.  However, neither theory absolves Director Defendants for their substantial likelihood of liability for Plaintiff's claims.  *See Guttman*, 823 A.2d at 507 n. 36 (demand may be excused where facts "support an **inference**" that the directors had knowledge of improprieties and did not address them) (emphasis added);[27] *Veeco*, 434 F. Supp. 2d at 278 (noting plaintiffs' assertion that defendants failed to establish procedures **or "establish[ed] procedures that were wholly inadequate and ineffective"**) (emphasis added); *Stone*, 911 A.2d at 370 (stating that directors may be liable for a failure of oversight where "having implemented … controls, [directors] consciously fail[] to monitor or oversee [their] operations").  Here, Plaintiff has alleged that

---

[26]     Although Defendants do not address Plaintiff's claim for gross mismanagement in the Company's motion to dismiss for failure to make a demand, a demand on the Board concerning Plaintiff's gross mismanagement claim would be futile because the Director Defendants face a substantial likelihood of liability for gross mismanagement for the same reasons that they face liability for failing to perform their oversight function. *See* Plaintiff's Memorandum of Law in Opposition to Individual Defendants' Motion to Dismiss, pg. 9 n. 8.

[27]     *See also In re Biopure Corp. Deriv. Litig.*, 424 F. Supp. 2d 305, 308 (D. Mass. 2006) (board would be presumed to be knowledgeable about a principal product); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998), *abrogated on other grounds by In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) ("[F]acts critical to a business' core operations or an important transaction are generally so apparent that their knowledge may be attributed to the company and its key officers.").  The facts asserted in the Complaint and described above concerning red flags affecting the Company's core business, the Company's size and centralization, and certain Director Defendant's positions on the Audit committee more than support an inference that Director Defendants had knowledge of improprieties.

Individual Defendants' actions, if any, were clearly inadequate and ineffective as the problems at Force Protection persisted and worsened throughout the relevant period. *See, e.g.,* Compl. ¶7 (Force Protection continued to miss deadlines); *id.* at ¶¶79, 81, 97, 98, 104 (Force Protection pronouncements of multiple restatements and control deficiencies).

### C.    Other Demand Futility Allegations

In addition to, and related to, the Director Defendants substantial likelihood of liability for their failure to perform their oversight function, Director Defendants are also face a substantial likelihood of liability for their misconduct in connection with the knowing or reckless issuance of materially false statements concerning Force Protection's financial results, operations, internal controls.   As noted above, Director Defendants were aware of, and breached their fiduciary duties by not responding to, numerous "red flags" that alerted them to the fact that Force Protection's financial results were unreliable and that there existed severe deficiencies in the Company's internal controls. "To the extent that a Defendant violated his or her fiduciary duty by allowing others to make materially false or misleading statements about [a corporation's] financial matters . . . demand is excused." *See Oxford Health*, 192 F.R.D. at 117.  Defendants' assertion that Director Defendants are exculpated from liability by N.R.S. § 78.138(7) and Force Protection's articles of incorporation for Plaintiff's claims based on the dissemination of false and misleading financial statements (F.P. Mem. at 24) is unsupportable. *See Oxford Health*, 192 F.R.D. at 117 ("dissemination of false and misleading financial statements cannot be deemed to be the product of a valid exercise of business judgment").

Defendants also argue that Director Defendants do not face a substantial likelihood of liability as a result of the wrongful insider stock sales by Defendants Kavanaugh and McGilton. By failing to monitor appropriately insider selling, the Director Defendants subordinated the interests of the Company's public stockholders to Force Protection insiders.   That is a clear

34

breach of the duty of loyalty, which cannot be exculpated under the Company's Articles.  *See Strassburger v. Farley,* 752 A.2d, 557, 581 (Del. Ch. 2000) (a loyalty claim is stated where a director acquiesces in approving a wrongful transaction or fails to protect the interests of the corporation and the minority shareholders (i.e., that he or she showed an indifference to duty)); *see also Oxford Health*, 192 F.R.D. at 118 ("knowledge of or participation in the [insider trading] of a friend and colleague … bear[s] adversely on the independence or disinterestedness of [a director].").[28]

Finally, demand is excused as to Plaintiff's claim for waste of corporate assets.  As discussed in Plaintiff's response to the Individual Defendants' Motion to Dismiss, the Individual Defendants, including Director Defendants, face a substantial likelihood of liability for waste or corporate assets.  *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) (demand is excused where facts have been alleged that, if proven, would show that defendants committed waste).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Force Protection's Motion to Dismiss should be denied in its entirety.  In the alternative, Plaintiff seeks leave to

---

[28]    As discussed in Plaintiff's Memorandum of Law in Opposition to the Individual Defendants' Motion to Dismiss, Plaintiff has properly stated a claim for unjust enrichment which should not be dismissed. *See See* Plaintiff's Memorandum of Law in Opposition to Individual Defendants' Motion to Dismiss, pg. 9-10.  Director Defendants cannot disinterestedly consider a demand concerning Plaintiff's claim for unjust enrichment because, in order to disinterestedly consider such a demand, Director Defendants would have to pass judgment on many of the same facts that form the basis of Director Defendants' substantial likelihood of liability for failure to properly oversee the Company.  For example, in determining whether Defendants Kavanaugh and McGilton were unjustly enriched through their insider stock sales, Director Defendants would need to consider whether Defendants Kavanaugh and McGilton were aware of the disastrous state of Force Protection's internal and operational controls and the harm that it could cause the Company.  These are the same conditions that Plaintiff alleges that Director Defendants ignored, which constitutes a breach of their own fiduciary duties.

amend in accordance with Fed. R. Civ. P. 15(a)(2), which provides that "the court should freely give leave when justice so requires."[29]

Dated: August 3, 2009                          Respectfully submitted,

                                  By:_____/s/ Theodore Huge_____
                                        Theodore Huge, Esq. (Fed. Bar # 9508)
                                        **THEODORE HUGE LAW FIRM LLC**
                                        171 Church Street, Suite 160
                                        Charleston, SC 29401
                                        Tel: (843) 793-4702
                                        Fax: (843) 577-0460

                                        Sherrie R. Savett, Esq.
                                        Russell D. Paul, Esq.
                                        Jeffrey L. Osterwise, Esq.
                                        **BERGER & MONTAGUE, P.C.**
                                        1622 Locust Street
                                        Philadelphia, PA 19103
                                        Tel: (215) 875-3000
                                        Fax: (215) 875-4604 (Fax)

                                        ***Attorneys for Plaintiff***

Malta48431

---

[29]    Numerous courts have applied the principle that leave to amend should be freely given in the shareholder derivative context. *See, e.g.*, *Fernandes v. Bianco,* No. C05-0964 RSM, 2006 U.S. Dist. LEXIS 42048, at *19 (W.D. Wash. June 22, 2006) (Washington district court grants leave to amend shareholder derivative complaint where motion to dismiss was based on sufficiency of demand futility allegations); *In re Asyst Techs., Inc. Deriv. Litig*., No. C-06-04669 EDL, 2008 WL 2169021, at *5 (N.D. Cal. May 23, 2008) ("Asyst's Motion to Dismiss is granted with leave to amend to allege . . . demand futility."); *Jones v. Fife,* No. 2:06-CV-00030 PGC, 2007 WL 518428, at *6 (D. Utah Feb. 6, 2007) ("Nonetheless, the court has granted Mr. Jones and Mr. Hansen ***leave to amend their Amended Complaint*** to plead facts showing that demand on MGO was futile.") (emphasis added).