UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE FORCE PROTECTION, INC. )<br>DERIVATIVE LITIGATION )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master File No. 2:08-1907-CWH<br><br>Consolidated with Case Nos.<br>2:08-1904-CWH; 2:08-1998-CWH<br>2:08-2019-CWH |

**NOMINAL DEFENDANT FORCE PROTECTION, INC.'S
REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION TO DISMISS**

Eleni M. Roumel
Federal Bar No. 9959
NELSON MULLINS RILEY &
SCARBOROUGH LLP
151 Meeting Street
Charleston, SC  29401
843.534.4112 (Telephone)
843.534.4223 (Facsimile)
eleni.roumel@nelsonmullins.com

M. Robert Thornton
Michael R. Smith
Benjamin Lee
KING & SPALDING LLP
1180 Peachtree Street N.E.
Atlanta, Georgia  30309
404.572.4600 (Telephone)
404.572.5100 (Facsimile)
bthornton@kslaw.com
mrsmith@kslaw.com
blee@kslaw.com

*Attorneys for Defendants*

**INTRODUCTION**

Plaintiff's consolidated Amended Verified Derivative Complaint (the "Complaint") must be dismissed for the following reasons:

*First*, Plaintiff has now admitted that he has not continuously owned shares of Nominal Defendant Force Protection, Inc. ("Force Protection" or the "Company"). Plaintiff complains of transactions that stretch back to 2005. *See* CC ¶¶ 50, 56-58. Yet, as Plaintiff has belatedly acknowledged in his brief, it appears that *he did not purchase Force Protection shares until January 16, 2007.* Pl. Br. p. 14, n. 9.

*Second*, the Complaint does not meet Rule 23.1's stringent requirements for pleading demand futility. In fact, much of Plaintiffs' brief does not address the Complaint at all, because it is a carbon copy of an entirely different brief: the *Hughes* derivative action pending before Judge Young in South Carolina state court.[1] Plaintiff's brief thus ignores several issues raised in the Company's Motion to Dismiss, including: (a) the alleged "confidential witness," CC ¶¶ 53-55, (b) the alleged inventory discrepancy, CC ¶ 53, and (c) alleged accounting software problems. CC ¶ 56. Plaintiff's brief also addressees a supposed claim for failure to investigate insider trading that was not alleged in the Complaint.

*Third*, even where Plaintiff's plagiarized brief actually addresses his own Complaint, it fails to establish that a majority of the Company's Board of Directors could not have impartially considered a demand. Plaintiff has alleged no facts showing the sort of "substantial and systematic failure of the board to exercise oversight" necessary for liability. *In re Caremark Int'l*

---

[1] A copy of the Hughes brief is attached hereto as Exhibit A, and Exhibit B hereto is a copy of Plaintiff's brief, with text copied from the *Hughes* brief highlighted in yellow. Although the adequacy of Plaintiff's counsel is not part of the Company's motion to dismiss, Plaintiff's counsel's demonstrated unwillingness to fulfill a core function of their responsibilities -- writing their own brief -- raises serious questions about their adequacy to represent the Company's interests in this litigation. Those concerns are underscored by the fact that, as described below, Plaintiff himself has already submitted an admittedly false verification to the Court. *See* Rule 23.1 ("The derivative action many not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members who are similarly situated in enforcing the rights of the corporation or association.").

1

*Inc. Deriv. Litig.*, 698 A.2d 959 (Del Ch. 1996). The Court should therefore dismiss the Complaint.

## ARGUMENT

## I. PLAINTIFF HAS FAILED TO ALLEGE THAT HE CONTINUOUSLY OWNED FORCE PROTECTION SHARES

Rule 23.1 provides that "the Complaint must be verified" and that it "must . . .allege that the plaintiff was a shareholder or member at the time of the transaction complained of . . . ." As this Court has held, "the requirements of Rule 23.1 are to be vigorously enforced, and failure to meet them requires dismissal of the suit." *Strickland v. Flue-Cured Tobacco Coop. Stab. Corp.*, 643 F. Supp. 310, 316 (D.S.C. 1986)

Plaintiff alleged that he was a Force Protection shareholder "at all times relevant to this action," but did not specify when he first purchased Force Protection shares. CC ¶ 22. Rule 23.1 does not permit such an intentionally vague allegation of continuous ownership. Pl. Br. p. 14. Plaintiff must specify when he purchased shares. *See, e.g., Strickland.,* 643 F. Supp. at 316; *In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1202 (N.D. Cal. 2007) (requiring plaintiffs to "unambiguously indicate in any amended complaint the dates they purchased stock, and whether they have continuously owned stock from the time of purchase up to the present.").[2] Plaintiff does not even discuss, much less distinguish, *Strickland* on this point. Plaintiff's failure to specify the date on which he acquired Force Protection shares, standing alone, warrants dismissal.[3]

---

[2] *See also In re Computer Scis. Corp. Deriv. Litig.*, No. CV 06-05288 MRP (Ex), 2007 WL 1321715, at *15 (C.D. Cal. Mar. 26, 2007) (dismissing complaint because it "only generally allege[d] that each Plaintiff 'is, and was during the relevant period,' or 'is, and was at all times relevant to,' a shareholder."); *In re Maxim Integrated Prods., Inc.*, No. C06-0334JW, 2007 WL 2745805, at **3-4 (N.D. Cal. July 25, 2007) (dismissing claims because allegations of stock ownership "at all relevant times" are insufficient).

[3] Despite its title, Plaintiff's complaint is *not* verified, and therefore fails to comply with Rule 23.1 for that reason, as well. A verification must be made under oath (as administered and evidenced by the signature of a notary), or

It appears that Plaintiff has attempted to remedy this defect by disclosing in a footnote that he purchased Force Protection shares on January 16, 2007. Pl. Br., p. 14 n. 9. But, even if true, this belated disclosure only proves that Plaintiff has not continuously owned Force Protection shares. Plaintiff complains of transactions that took place in 2005 and 2006. CC ¶¶ 50, 56-58, 75-80, 123. If Plaintiff's purported January 16, 2007 purchase is to be believed, he clearly was not a Force Protection shareholder when any of those events occurred, and lacks standing to pursue claims relating to them.[4]

Reconizing this, Plaintiff asks the Court to permit him to pursue claims based on events that occurred after January 16, 2007. Pl. Br., p. 15, n. 10. But Rule 23.1 does not give the Court that option; rather, it requires that deficient complaints be dismissed. *See, e.g., Strickland.,* 643 F. Supp. at 316. Moreover, Plaintiff cannot be granted standing to pursue any claims that post-date January 16, 2007 unless and until he supplies the Court with a *verified* allegation that he purchased shares on that date and has held them continuously since then. Rule 23.1. Plaintiff's supposed January 16, 2007 purchase of Force Protection shares has been disclosed only in a footnote to a brief, and is not verified.

As a last-ditch effort, Plaintiff asks the Court to invoke the continuing wrong doctrine to overlook his admitted lack of continuous stock ownership. Pl. Br., p. 14. The continuing wrong

---

expressly made under penalty of perjury of the laws of the United States, as set forth in 28 U.S.C. § 1746. Plaintiff's so-called verification meets neither standard. Plaintiff merely states that he declares "under oath" -- without any evidence that any oath was actually administered -- that his Complaint is "true and correct." That does not suffice. *Marron ex rel. Stewart & Stevenson Services, Inc. v. Ream*, 2006 WL 2734267, at *3 (S.D. Tex. May 5, 2006); *Luster v. Macomb County Sheriff's Jail*, 2006 WL 3086907, at *2 (E.D. Mich. Oct. 30, 2006).

[4] There is substantial reason to doubt Plaintiff's assertion. Footnote 9 of Plaintiff's brief -- where Plaintiff purports to disclose his January 16, 2007 purchase of Force Protection shares -- is nearly identical to Footnote 9 of the Hughes brief. *Compare* Exs. 1 and 2. The similarities are not merely stylistic; both footnotes purport to disclose that the plaintiffs purchased Force Protection shares on the very same day, January 16, 2007. *Id.* Thus, one of two things is true: *one*, by fantastic coincidence, Plaintiff Duane Galbraith just happened to purchase shares on the very same day as Barabra Hughes, or *two*, Mr. Galbrlaith did not actully buy shares on January 16, 2007, and Footnote 9 of Plaintiff's brief is merely a function of his counsel's indiscriminate plagrism of the *Hughes* brief.

doctrine "is a narrow [doctrine] that typically is applied only in unusual situations, such as where a plaintiff acquires his stock after a particular transaction has begun but before it is completed." *Desimone*, 924 A.2d at 925. The Complaint made no mention of the continuing wrong doctrine, and Plaintiff's brief does not identify a particular transaction that allegedly began before he purchased shares and continued thereafter. Instead, the complaint identifies a series of unrelated transactions, ranging from MRAP production delays, government audits, accounting errors, and the alleged making of false statements in routine public SEC filings. Even if some of those transactions were tangentially related, that alone would not justify application of the continuing wrong doctrine. *Desimone*, 924 A.2d at 925 ("the continuing wrong doctrine does not bestow standing upon a stockholder to challenge transactions occurring before he bought his stock simply because they are similar or related to transactions or other conduct that occurred later.").

## II.     PLAINTIFF HAS NOT ALLEGED FACTS ESTABLISHING THAT DEMAND WAS EXCUSED

Plaintiff argues that his allegations establish a "reasonable doubt" that a majority of the Directors can impartially consider a demand. Pl. Br. p. 18. But Plaintiff ignores the well-settled requirement that a "reasonable doubt" can be raised only through particularized factual allegations, as opposed to the unsupported conclusions and generalities that comprise Plaintiff's Complaint. *Shoen*, 137 P.3d at 1179-80.[5]

### A.     The Complaint Does Not State A Viable *Caremark* Claim.

The crux of Plaintiff's Complaint is that the Directors face a substantial likelihood of personal liability because the Company eventually acknowledged material weaknesses in its

---

[5] Plaintiff appears to admit that the orders denying the Company's motions to dismiss in the state court proceedings in Nevada and South Carolina are merely "persuasive authority" (Pl. Br. at 17), and not binding on the Court. Despite the admitted similarities of those earlier complaints, the issue immediately before the Court is whether this Plaintiff's particular allegations are legally sufficient, and not whether prior complaints satisfied Rule 23.1.

internal controls. But a valid *Caremark* claim requires far more than the mere existence of such weaknesses. *Stone,* 911 A.2d at 370. Only "a substantial and systematic failure of the board to exercise oversight -- such as an utter failure to attempt to assure that reasonable information and reporting exists -- will establish the lack of good faith that is a necessary condition to liability." *In re Caremark Int'l,* 698 A.2d at 971.

Plaintiff argues that he has pled such an "utter failure" because there were "red flags" signaling weaknesses in the Company's internal controls and it is "inconceivable" that the Director Defendants did not know of them. Pl. Br., pp. 28-30. Plaintiff's "red flags" are not actually "red flags" at all, but merely hindsight allegations that impermissibly seek to equate a bad outcome with bad faith. *Stone,* 911 A,2d at 373. Moreover, even if the supposed red flags existed, there is no specific allegation showing that the Director Defendants ignored them.

***The DCAA reports.*** Plaintiff alleges only that the DCAA issued eight reports over a span of three years and that the Reports were "generally" critical of the Company's "finances and financial accounting systems," thereby "harm[ing] Force Protection's contracting business." CC ¶¶ 66. The Complaint does not explain precisely how or why the DCAA criticized the Company's finances and accounting systems. For example, Plaintiff argues that the DCAA "expressed concerns regarding the Company's accounting and price estimating systems, the timeliness of the delivery of vehicles, and Force Protection's financial condition," followed by the speculation that "the entire Board *had to be aware* of these audits' findings." Pl. Br., p. 7 (emphasis added). But Plaintiff does not define the DCAA's concerns, or indicate whether they were ever remedied. Plaintiff merely speculates that the Board "took no meaningful action" because in early 2008 the DCAA supposedly found the Company's "estimating system" to be "inadequate," and claimed that it lacked sufficient data to "perform the required financial

5

statement and ratio analysis." Pl. Br. p. 7. Nothing in Plaintiff's Complaint, however, suggests that these two discrete issues were related to prior DCAA Audit Reports. The supposed inadequacies in the Company's "estimating system" are not specified. Nor does the Complaint say what type of "financial statement and ratio analysis" the DCAA was to perform, or specify why the data supplied by the Company was "insufficient" for the DCAA's purposes.

Even if one assumes that the DCAA Reports were red flags, there is no specific allegation that the Director Defendants ignored them. Plaintiffs' allegations acknowledge the Company's efforts to improve its internal controls during 2007. CC ¶ 98. Plaintiff attempts to brush these efforts aside with the conclusory allegation that the efforts were "clearly inadequate and ineffective." Pl. Br. p. 34. But those assertions are irrelevant to a *Caremark* claim, which requires a showing that directors ***utterly ignored*** their duty of oversight, not, as Plaintiff argues here, that directors acted but could have done more.[6] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009).

***The OIG Report.*** Plaintiff alleges that the OIG Report was a "red flag" because it identified "missed delivery deadlines" and "questioned the Company's financial stability." CC ¶ 90; Pl. Br. p. 29. But neither the OIG Report, nor anything in Plaintiff's pleadings, suggests that inadequate internal controls *actually caused* the delivery delays, as opposed to other possible reasons (i.e., supplier disruptions, materials shortages, etc.). Plaintiff's rank speculation that delivery delays stemmed from the Board's systemic inattention falls well short of Rule 23.1's heightened pleading standards, and, indeed, even the more liberal "notice pleading" standards of Rule 8. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("To survive a motion to dismiss, a

---

[6] Plaintiff's reliance on the DCAA reports is further misplaced because at least some of the reports, and possibly most of them, were issued before Plaintiff became a Force Protection shareholder. Plaintiff alleges that the DCAA issued "eight audit reports" from "May of 2004 through October of 2007" (CC ¶ 66), but Plaintiff now admits that he did not own Force Protection stock until January 16, 2007. Plaintiff has thus failed to establish that he has legal standing to complain about any of the alleged deficiencies cited by the DCAA reports.

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.")

Plaintiff's speculation is also contradicted by the OIG Report, which indicates that on-time delivery rates actually *improved* dramatically over time. Particularly in light of the unique pressures the Company faces when delivering MRAPs to American troops,[7] Plaintiff has alleged no facts to suggest that any delivery delays did not result from the time pressure and/or supply chain difficulties largely beyond the Company's control. Plaintiff has therefore failed to allege specific facts showing "a substantial and systematic failure of the board to exercise oversight," and his allegations are therefore insufficient.

***Increased Competition in the MRAP market.*** Plaintiff continues his utterly conclusory assertion that increased competition in the MRAP market "is a result of Force Protection's own internal failures." Pl. Br. p. 5; *see* CC ¶¶ 70-72. But the OIG Report on which Plaintiff relies shows that Force Protection's sole provider status initially was a result of the "unusual and compelling requirement" for MRAPs, and that the emergence of other MRAP manufacturers necessitated a more competitive bidding process. Force Protection Br. p. 16-17; Ex. I, p. 26 of Motion to Dismiss. Indeed, the Marines had started competitive bidding for MRAPs *before* the OIG Report was issued. *Id*. And even after the OIG Report and most of the DCAA Reports had been released, the Company continued to receive a steady stream of orders for MRAPs throughout 2007. *See* Force Protection Br. p. 17.

***The Company's restatements and disclosures about its internal controls.*** Plaintiff contends that the Company's earnings restatements in December 2006 and March 2007 were

---

[7] The Company has disclosed that it relies "on subcontractors and other companies to provide raw materials, major components and subsystems for our products," and "some of our product components are manufactured in and supplied from other foreign countries." Ex. S to Motion to Dismiss, p. 11. In addition to this complicated supply chain, the Company has also dealt with rushed delivery schedules and other time pressures associated with providing MRAPs to troops in the field.

"red flags" ignored by the Directors. Pl. Br. p. 29. Plaintiff further contends that the Company's disclosures of inadequate financial controls in October 2007 and February 2008 are representative of additional "red flags" involving the Company's financial reporting. Pl. Br. p. 29-30. Each of these arguments is wrong.[8]

Accounting errors and internal controls weaknesses that were in fact *discovered and reported* by Force Protection could not have also been *ignored*. Force Protection indisputably disclosed its accounting errors and internal controls weaknesses on multiple occasions from December 2006 to February 2008. Pl. Br. pp. 29-30. Such public disclosures directly contradict Plaintiff's conclusory assertion that the Company did nothing in the face of its accounting miscues. Plaintiff also acknowledges that the Company took a number of actions to remedy its weaknesses once problems were discovered. CC ¶ 98. As discussed in the Company's opening brief, a federal court applying Delaware law dismissed similar allegations in *Kenney* v. *Koenig,* 426 F. Supp. 2d 1175, 1183 (D. Colo. 2006). Plaintiff makes no effort to distinguish *Kenney*.

*Kenney* is a straightforward application of settled Delaware law. In *Stone*, for example, the Delaware Supreme Court held that even when internal controls have failed completely, *Caremark* precludes the imposition of liability where a complaint uses hindsight "to equate a bad outcome with bad faith." *Stone,* 911 A.2d at 370. *Stone* affirmed the dismissal of a derivative complaint even where "[w]ith the benefit of hindsight, it is beyond question that AmSouth's internal controls . . . were inadequate," and the fine levied against the company was "alleged to

---

[8] Plaintiff did not own stock when much of this alleged wrongdoing occurred. Plaintiff's Brief makes clear that Plaintiff seeks to sue on the Company's behalf for accounting errors that occurred from 2003 through 2006. Pl. Br. p. 14 (noting that the "'relevant period' of the allegations in the Complaint is the period covering Defendants' wrongful acts complained of therein"). Plaintiff apparently did not become a shareholder until January 16, 2007, long after those alleged accounting errors occurred.

be the largest ever of its kind."[9] 911 A.2d at 371; *see also Wood* v. *Baum,* 953 A.2d 136, 141 (Del. 2007) (collecting cases and stating that "[t]his case is but another replay of other similar cases where the plaintiff failed to allege with particularity any facts from which it could be inferred that particular directors knew or should have been on notice of alleged accounting improprieties, and any facts suggesting that the board knowingly allowed or participated in a violation of law."). Even the cases relied upon by Plaintiff illustrate that *Caremark* claims typically end in dismissal. *See Sampson* v. *Robinson,* No. 07 Civ. 6890 (PAC), 2008 WL 3884386 (S.D.N.Y. Aug. 20, 2008) (cited on page 5 of Plaintiff's Brief); *Ash v. McCall,* No. Civ.A. 17132, 2000 WL 1370341 at *115 (Del. Ch. Sept. 15, 2000) (cited at page 23 of Plaintiff's Brief).[10]

***The Audit Committee.*** Plaintiff also argues that demand is excused because three of the Director Defendants served at various times on the Company's Audit Committee. Pl. Br. p. 27. Audit Committee membership, standing alone, does not excuse demand. *Kenney,* 426 F. Supp. 2d at 1183; *Rattner* v. *Bizdos,* No. Civ.A. 19700, 2003 WL 22284323, at *12 (Del. Ch. Sept. 30, 2003). Plaintiff fails to allege the frequency of the Audit Committee's meetings, the matters discussed by the Committee, the Committee's notice of any irregularities, or the amount of time

---

[9] Plaintiff attempts to distinguish *Stone* by arguing that the plaintiffs in that case failed to plead that inadequacies in the company's internal controls "resulted in improper activity." Pl. Br. p. 22, n. 16. That is simply false; the court affirmed dismissal despite allegations that the defendant company paid $40 million in fines and $10 million in civil penalties to resolve investigations brought by government agencies. *Stone.* 911 A.2d at 370 (stating that "the lack of internal controls resulted in a huge fine -- $50 million, alleged to be the largest ever of its kind.")

[10] The Delaware Chancery Court eventually sustained *Caremark* claims after the plaintiffs amended their complaint. *See Saito v. McCall*, 2004 WL 3029876 at *7 (Del. Ch. 2004). But even those *Caremark* claims "barely" sufficed, despite the fact that the plaintiffs had conducted an extensive pre-filing investigation and had alleged highly specific facts including the dates of specific audit committee meetings, that accounting problems were discussed at the meetings, and that the audit committee "allegedly knew that [accounting] adjustments would not account sufficiently for the problems identified by" the company's outside auditor. No such allegations appear in Plaintiff Galbraith's Complaint. The Delaware Court of Chancery has distinguished *Saito* precisely because, unlike the Complaint at issue here, the plaintiffs in *Saito* "pled specific facts that the company's Audit Committee knew of certain accounting risks and that the risks were specifically discussed with some board members." *Desimone,* 924 A.2d at 943.

that the Committee devoted to its work. CC ¶ 42; Pl. Br. p. 27-28. The absence of such allegations requires dismissal. *Kenney,* 426 F. Supp. 2d at 1183; *Rattner,* 2003 WL 22284323, at *12.

Plaintiff relies on *In re Veeco Instruments, Inc. Sec. Litig.,* 434 F. Supp. 2d 267 (S.D.N.Y. 2006), but the allegations at issue there differ markedly from Plaintiff's Complaint.[11] In *Veeco,* the plaintiff's detailed allegations demonstrated that members of the audit committee neglected "dramatic cutbacks" within the accounting department despite meeting 27 times during the relevant period. *Id.* at 277. The complaint in *Veeco* also alleged that the audit committee was made directly aware of illegal activity within the company and that it refused to stop the activity for months after the initial report. *Id.* at 278. Plaintiff's Complaint lacks any similarly detailed allegations.

In *McCall v. Scott,* 239 F.3d 808 (6th Cir. 2001), cited on page 19 of Plaintiff's Brief, the plaintiff specifically alleged that the defendant directors did nothing in response to an investigation conducted by federal regulators and the *New York Times* and an unsealed *qui tam* complaint. In particular, the board waited nearly *two years* after the *qui tam* complaint had been unsealed and derivative litigation had been initiated before it took any steps to address the matter. *Id.* at 820, 822. Those allegations stand in stark contrast to the claims at issue here.

*In re Oxford Health Plans, Inc. Sec. Litig.,* 192 F.R.D. III (S.D.N.Y. 2000), cited on pages 29-31 and 34-35 of Plaintiff's Brief is also inapposite. The plaintiffs in *Oxford Health* alleged that the directors "were aware" of legal non-compliance within the company but failed to

---

[11] Plaintiff also relies on *In re TASER Int'l S'holder Litig.*, 2006 WL 687033 (D. Ariz. Mar. 17, 2006), but that case is irrelevant to the issues currently before the Court. Indeed, the plaintiffs in TASER did not assert a claim based on *Caremark,* as Plaintiff seeks to do here. *Id.* (noting that "Plaintiffs here say they are not asserting a claim based on the 'failure to monitor' theory of liability discussed in *Caremark.*") Plaintiff's reliance on *Buckley v. O'Hanlon,* No. 04-955 (GMS), 2007 WL 956947 (D. Del. Mar. 28, 2007) is misplaced for the similar reason that *Buckley* was not a derivative action, and therefore was not decided under the heightened pleading standards that Plaintiff must satisfy here.

10

ensure "that fundamental measures were undertaken and controls put in place."[12] *Id*. at 115. By contrast, Plaintiff merely speculates that "it is inconceivable" for the Directors not to have known about internal controls weaknesses. *See* Pl. Br. p. 30. These allegations are insufficient.[13] *Desimone,* 924 A.2d at 940 (rejecting allegations that directors "must have known" of an internal memo warning of stock options backdating).

      **B.    The Individual Defendants Are Exculpated From Liability For Alleged Breaches Of The Duty of Due Care.**

Plaintiff argues the exculpatory provision in the Company's Articles of Incorporation is an affirmative defense not to be considered at the pleading stage. Pl. Br. p. 21, n. 14. Plaintiff is wrong. *Wood v. Bourn,* 953 A.2d 136, 141 (Del. 2007) (quoting *Guttman v. Huang,* 823 A.2d 492.501 (Del. Ch. 2003)); *see also In re Lear Corp. S'holder Litig.,* Cons.C.A. No. 2728-VCS, 2008 WL 4053221, at *1 (Del. Ch. 2008).

Plaintiff also argues that his Complaint seeks equitable relief and is therefore not subject to the exculpatory provision. But Count One of the Complaint, a claim for breach of the duties of loyalty and due care expressly seeks "damages and other relief." CC ¶ 141. Plaintiff's prayer

---

[12] *In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*, 495 F. Supp. 2d 477, 485 (D.N.J. 2007), cited on pages 4, 24-25, and 31 of Plaintiff's Brief, is a decision which rests on a truly unique and egregious set of circumstances. There, the plaintiffs alleged specific facts showing that the company's standard "operating procedure" which "enabled the company to secure and perform contracts for large drug trials" involved "'drug trials involving human beings as test subjects" that "were routinely conducted in an egregiously unethical manner," including "preying on groups particularly vulnerable to PDG's financial inducements to participate in drug trials without protest regarding the conditions of treatment." *In re SFBC*, 495 F. Supp. 2d at 485.

[13] Plaintiff relies on *In re Biopure Deriv. Litig.* 424 F. Supp. 2d 305 (D. Mass. 2006) for the proposition that knowledge of problems with a company's primary product may be imputed to directors. But *Biopure* did not involve mere delays in the delivery of products under some, but not all, of a company's contracts. Rather, *Biopure* involved a pharmaceutical company whose primary product was kept off the market altogether by a FDA clinical hold. In any case, *Biopure's* imputation standard is out of step with Delaware precedents concerning oversight claims. *See Connolly v. Gasmire.* 257 S.W3d 831 (2008) (applying Delaware law and criticizing *Biopure* as inconsistent with Delaware law, which requires allegations actual, as opposed to imputed, knowledge to sustain a *Caremark* claim). *In re Countrywide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d 1044 (C.D. Cal. 2008), cited at pages 24 and 25 of Plaintiff's Brief, is distinguishable because the complaint contained allegations based on first-person confidential witness accounts of "a widespread Company culture that encouraged employees to push mortgages through without regard to underwriting standards." Plaintiff's Complaint, by contrast, offers no such evidentiary support for its vague allegations.

for relief further requests "damages in favor of Plaintiff," an award of "punitive and exemplary damages as appropriate, plus prejudgment interest," and attorneys' fees. There can be no serious dispute that those claims and prayers seek monetary relief based in part on alleged breaches of the duty of care. As such, those claims fall within the ambit of the Company's exculpatory provision.

So, too, do Plaintiff's claims premised on alleged false statements in the Company's SEC filings. As discussed in the Company's opening brief, the Director Defendants are exculpated from liability for such claims unless Plaintiff pleads specific facts showing "the Board lacked good faith in approving the disclosure." *In re Tyson Foods, Inc. S'holders Litig.*, 919 A.2d 563, 597 (Del. C. 2007). Plaintiff has made no such allegation, and fails to address the issue in his brief. Instead, Plaintiff relies solely on *Oxford Health*, which does not address the impact of an exculpatory charter provision on a false statements claim at all.

### C. A Majority Of The Board Is Disinterested As To Pre-2006 Conduct.

Plaintiff devotes a single footnote in his Brief to the argument that Directors who were not even Board members at the time of Plaintiff's allegations are nonetheless interested and face a substantial likelihood of liability. *See* Pl. Br. p. 29, n.24. Plaintiff again relies on *Oxford Health*, but that case expressly refused to hold that current Board members can face liability for the actions of prior Directors. *See* 192 F.R.D. at 118. Instead, *Oxford Health* stands for the unremarkable proposition that Board members may be disabled from evaluating claims against other *current* members of the Board. *See Id.*

### D. The Individual Defendants Did Not Breach Their Duty Of Loyalty By Allegedly Failing To Monitor Insider Trading

Plaintiff argues that the Directors' failure "to monitor appropriately insider selling" breached the Board's duty of loyalty and exposed the Directors to liability for non-exculpated

12

claims. Pl. Br. p. 34. The Court can ignore this argument because Plaintiff asserted no such claim in his Complaint. In any case, any decision not to investigate or monitor alleged wrongdoing is still entitled to the protection of the business judgment rule. *Rattner v. Bidzos*, No. Civ. A. 19700, 2003 WL 22284323, at *7 (Del. Ch. Oct. 7, 2003).[14]

### E. The Business Judgment Rule Precludes Plaintiff's Claims Based On The Alleged Approval Of "Related Party Transactions"

Plaintiff openly speculates that "*it appears* the Company's serious operational problems *may have* been caused by and/or perpetuated by" a supposed "related party transaction" between APT Leadership ("APT") and the Company and unspecified "other self-dealing" by Defendant McGilton. Pl. Br. pp. 11-12, n. 6; CC ¶¶ 57-60. McGilton did have a relationship with APT, but that alone does not render the transaction improper. *See* NEV. REV. STAT. § 78.140(2)(a) (stating that related party transactions are not void or voidable if the Board knows of the conflict and in good faith approves the transaction). There is no allegation that McGilton's interest in APT was not disclosed to the Board. To the contrary, as Plaintiff admits, the transactions (and McGilton's interest in APT) were publicly disclosed in a Company proxy statement. Pl. Br. p. 11, n. 6.

### F. No Director Faces A Substantial Likelihood Of Liability In Connection With Plaintiff's Claims For "Unjust Enrichment" Or "Waste Of Corporate Assets"

Plaintiff's claim for "Waste of Corporate Assets" is so perfunctory that it is impossible to identify the facts on which Plaintiff relies. CC ¶ 147. Such threadbare pleadings do not satisfy Rule 23.1. *See Kanter v. Barella*, 489 F.3d 170, 180 (3rd Cir. 2007); *Stepak v. Addison*, 20 F.3d 398, 403 (11th Cir. 1994) (same). Plaintiff attempts to expand his waste claim in his brief in

---

[14] As a matter of Nevada law, the business judgment rule is a statutory presumption that "[d]irectors and officers, in deciding upon matters of business, are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation." N.R.S. § 78.138(3).

13

opposition to the Individual Defendants' Motion to Dismiss, but, as stated in the Individual Defendants' Reply, those attempts fall flat, as well.

Plaintiff devotes even less attention to his deficient claim for unjust enrichment. In essence, Plaintiff argues that Force Protection's internal control weaknesses and accounting errors -- by their mere existence -- necessarily prevent the Directors from disinterestedly considering a demand. Such conclusory and circular logic is plainly insufficient under Rule 23.1's heightened pleading standards, and Plaintiff cites no legal authority in support of his argument.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint without granting Plaintiff leave to re-plead.

Respectfully submitted this 3rd day of September, 2009.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:  /s/ Eleni M. Roumel
    Eleni M. Roumel
    Fed. Bar. No. 75763
    E-Mail: eleni.roumel@nelsonmullins.com
    151 Meeting Street / Sixth Floor
    Post Office Box 1806 (29402-1806)
    Charleston, SC  29401-2239
    (843) 853-5200

    M. Robert Thornton *(admitted pro hac vice)*
    Michael R. Smith *(admitted pro hac vice)*
    Benjamin Lee *(admitted pro hac vice)*
    KING & SPALDING LLP
    1180 Peachtree Street N.E.
    Atlanta, Georgia  30309
    404.572.4600 (Telephone)
    404.572.5100 (Facsimile)
    bthornton@kslaw.com
    mrsmith@kslaw.com

<div style="margin-left: 3in;">

blee@kslaw.com

*Attorneys for Frank Kavanaugh, Gordon R. McGilton, Michael Moody, Jack Davis, Roger G. Thompson, Jr., John S. Day, Raymond W. Pollard, R. Scott Ervin, John W. Paxton, Sr., Gale Aguilar, and Michael S. Durski*
*and Nominal Defendant Force Protection, Inc.*

</div>

Charleston, South Carolina
September 3, 2009